IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
_____

Civil Action No. 06-00520-GMS, 06-00521-GMS
_____

In re: NELLSON NUTRACEUTICAL, INC., et al.

*Debtors.*

Bankruptcy Case No. 06-10072(CSS)

**UNITED STATES TRUSTEE AND
OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

*Appellants,*

**v.**

**NELLSON NUTRACEUTICAL, INC., et al.**

*Appellees.*
_____

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
(Christopher S. Sontchi, Judge)
_____

**APPELLANT UNITED STATES TRUSTEE'S APPENDIX RELATED TO BRIEF IN
OPPOSITION TO APPELLEES' MOTION TO DISMISS APPEAL ON MOOTNESS
GROUNDS**

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
William K. Harrington (Bar No. 4051)
Joseph J. McMahon, Jr. (Bar No. 4819)
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE  19801
Telephone:    (302) 573-6491
Facsimile:    (302) 573-6497

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR UNITED STATES TRUSTEES
Office of the General Counsel
Roberta A. DeAngelis
John P. Sheahan (Bar No. 3999)
20 Massachusetts Avenue, NW
Washington, DC  20530

Counsel for Appellant United States Trustee

DATED:  July 30, 2007

## TABLE OF CONTENTS

|  | **TAB NO.** | **PAGE NO.** |
|---|---|---|
| Precautionary Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees | 1 | 1 |
| Objection to Debtors' Precautionary Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees | 2 | 34 |
| Order Approving in Part and Reserving in Part Decision Upon Debtors' Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees | 3 | 49 |
| Opinion -- Second Order Approving Debtors' Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees | 4 | 53 |
| Second Order Granting Debtors' Precautionary Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees | 5 | 94 |
| Motion for the Debtors for an Order: (I) Approving Sale of Substantially All of the Debtors' Operating Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interest Pursuant to Sections 363 (b), (f) and (m) of the Bankruptcy Code; (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief | 6 | 98 |
| General Docket - US Court of Appeals for the Third Circuit - United States Trustee v. Official Comm.of Equity Sec. Holders (In re Zenith Elecs. Corp.), Court of Appeals Docket No. 02-2078. | 7 | 203 |

B-1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) | Case No. 06-10072 (CSS) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

Objection Deadline: **April 18, 2007, at 4:00 p.m. prevailing Eastern time**
Hearing Date: **April 23, 2007, at 10:00 a.m. prevailing Eastern time**

## NOTICE OF DEBTORS' PRECAUTIONARY MOTION FOR ORDER APPROVING MODIFICATION TO ORDINARY COURSE BONUS COMPENSATION PROGRAM FOR EMPLOYEES

To:   (a) the Office of the United States Trustee, (b) counsel to the Official Committee of Unsecured Creditors, (c) counsel to UBS AG, (d) counsel to Fremont Investors VII, LLC, (e) counsel to the Ad Hoc Committee of First Lien Lenders, and (f) the persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure

The above-captioned debtors and debtors in possession (the "Debtors") have filed

with the United States Bankruptcy Court for the District of Delaware, 824 Market Street,

Wilmington, Delaware 19801 (the "Bankruptcy Court") the annexed *Debtors' Precautionary*

*Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program*

*for Employees* (the "Motion").

You are required to file in writing any objection or response to the entry of the

order on the Motion with the United States Bankruptcy Court for the District of Delaware,

---

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc., a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

Marine Midland Plaza, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 no later than

**4:00 p.m. prevailing Eastern time on April 18, 2007.**

You must also serve a copy of the objection or response so as to be received on or

before April 18, 2007, upon: Pachulski Stang Ziehl Young Jones & Weintraub LLP, 919 North

Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801),

Attn: Michael R. Seidl, Esquire.

IF AN OBJECTION OR RESPONSE IS FILED AND SERVED, A HEARING

ON THE MOTION WILL BE HELD ON APRIL 23, 2007, AT 10:00 A.M. PREVAILING

EASTERN TIME BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, UNITED

STATES BANKRUPTCY JUDGE, 824 MARKET STREET, 5TH FLOOR, COURTROOM 6,

WILMINGTON, DELAWARE 19801.

DOCS_DE:126253.1

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE

COURT MAY GRANT THE RELIEF DEMANDED BY THE MOTION WITHOUT

FURTHER NOTICE OR HEARING.

Dated: March 30, 2007          PACHULSKI STANG ZIEHL YOUNG
                          JONES & WEINTRAUB LLP

                          Laura Davis Jones (Bar No. 2436)
                          Richard M. Pachulski (CA Bar No. 90073)
                          Brad R. Godshall (CA Bar No. 105438)
                          Alan J. Kornfeld (CA Bar No. 130063)
                          Michael R. Seidl (Bar No. 3889)
                          Maxim B. Litvak (CA Bar No. 215852)
                          919 North Market Street, 17th Floor
                          P.O. Box 8705
                          Wilmington, DE  19899-8705 (Courier 19801)
                          Telephone:  (302) 652-4100
                          Facsimile:  (302) 652-4400
                          Email: ljones@pszyjw.com
                                    rpachulski@pszyjw.com
                                    bgodshall@pszyjw.com
                                    akornfeld@pszyjw.com
                                    mseidl@pszyjw.com
                                    mlitvak@pszyjw.com

                          Counsel for Debtors and Debtors in Possession

3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) Case No. 06-10072 (CSS) |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) |

**Objection Deadline: April 18, 2007, at 4:00 p.m. prevailing Eastern time**
**Hearing Date: April 23, 2007, at 10:00 a.m. prevailing Eastern time**

## DEBTORS' PRECAUTIONARY MOTION FOR ORDER APPROVING MODIFICATION TO ORDINARY COURSE BONUS COMPENSATION PROGRAM FOR EMPLOYEES

The above-captioned debtors and debtors in possession (the "Debtors") hereby

move this Court (the "Motion") for a precautionary order approving a modification to the

Debtors' ordinary course employee bonus compensation program for calendar year 2006 (the

"2006 OCP"). In support of this Motion, the Debtors respectfully state as follows:

### Preliminary Statement

1.      The 2006 OCP is the Debtors' ordinary course bonus compensation

program for both management and non-management employees, covering approximately 133

employees or 30% of the Debtors' workforce. The 2006 OCP is similar to the Debtors' pre-

bankruptcy bonus compensation programs, which were generally tied to achieving certain

---

[1]   The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows:
(a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware
corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id.
#0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical
Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc.,
a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

objective performance targets (the "Milestones"). The 2006 OCP was implemented by the

Debtors in the ordinary course of business (without approval of this Court).

      2.     The 2006 OCP must be distinguished from the Debtors' management

incentive plan (the "MIP"), which only covered executive officers. The MIP was prepared as a

result of the Debtors' bankruptcy filing and was specifically designed to provide additional

incentives to the Debtors' management in the context of these bankruptcy cases. The MIP was

the subject of a motion by the Debtors and a contested hearing in mid-2006. The MIP was

ultimately approved by the Court and the Debtors have since achieved certain of the performance

benchmarks under the MIP.[2]

      3.     As a result of various factors, however, the Debtors did not reach the

Milestones required for full payment under the 2006 OCP (although certainly not by much).

Taking into account the Debtors' operational performance in the face of unique and extreme

challenges encountered by virtue of these bankruptcy cases, the Debtors' board of directors, in

the exercise of its sound business judgment and consistent with its practice in prior years,

decided to modify the 2006 OCP to permit payment of reduced bonuses to the Debtors'

management and non-management employees (the "Board-Approved Modified 2006 OCP").[3]

      4.     Before bringing this Motion, the Debtors presented their proposed Board-

Approved Modified 2006 OCP to their principal creditor constituencies and the Office of the

United States Trustee (the "UST"). With one revision incorporated below (namely, a further

reduction in the bonuses payable to senior officers), the Debtors believe that they have now

---

[2] A total of $665,000 has been paid to the Debtors' management employees under the MIP (out of the $1.395 million approved by the Court). No additional amounts will be paid under the MIP.

[3] As to certain lower level employees, there are no reductions from target bonuses.

2

obtained full creditor support for the modified 2006 OCP (the "Lender-Approved Modified 2006 OCP").

5.      The Debtors (and their creditors) submit that the Lender-Approved Modified 2006 OCP is critically important to fairly compensating the Debtors' employees and maintaining employee morale.  The Debtors have a long prepetition history of flexibility in their bonus compensation program that is reflective of the efforts and dedication of their employees and commensurate with the overall performance of the company.  The proposed Lender-Approved Modified 2006 OCP is completely consistent with the Debtors' past practices and vital to rewarding the Debtors' employees for their hard work and commitment under extremely difficult circumstances.

6.      Notwithstanding the foregoing and despite the Debtors' position that the 2006 OCP and any modifications thereto are transactions in the ordinary course, the UST has required that the Debtors bring a motion seeking approval of the modified 2006 OCP.

7.      Hence, by this Motion, the Debtors seek confirmation and approval of the Lender-Approved Modified 2006 OCP as a transaction in the ordinary course of business under section 363(c)(1) of the Bankruptcy Code.  Alternatively, to the extent the Court determines that the proposed modification to the 2006 OCP is outside the ordinary course, the Debtors seek approval of the Lender-Approved Modified 2006 OCP as a reasonable exercise of the Debtors' business judgment under section 363(b)(1) of the Bankruptcy Code.

## Proposed Modification to the 2006 OCP

8.      The 2006 OCP is a broad-based compensation program covering approximately 133 employees or 30% of the Debtors' workforce, ranging from the Debtors'

3

executive officers to line managers and office staff. The chart below outlines the scope of the 2006 OCP and the proposed modification thereto:

| | ORIGINAL TARGET BONUS ('000)[4] | BOARD-APPROVED MODIFIED BONUS ('000) | % OF TARGET BONUS | LENDER-APPROVED MODIFIED BONUS ('000) | % OF TARGET BONUS |
|---|---|---|---|---|---|
| LEVEL I[5] | $1,037.0 | $778.2 | 75% | $487.7[6] | 47% |
| LEVEL II[7] | $490.0 | $355.7 | 75% | $355.7 | 75% |
| LEVEL III[8] | $469.0 | $350.6 | 75% | $350.6 | 75% |
| SALES DIRECTORS[9] | $27.0 | $26.4 | 98% | $26.4 | 98% |
| SALES MANAGERS[10] | $16.0 | $16.0 | 100% | $16.0 | 100% |
| LINE MANAGERS/ OFFICE STAFF[11] | $87.6 | $87.6 | 100% | $87.6 | 100% |
| TOTAL | $2,126.6 | $1,614.6 | | $1,324.0 | |

[4] The original target bonus was generally contingent upon the company achieving certain Milestones.

[5] The Debtors' Level I employees consist of eight (8) management-level officers, including the Chief Executive Officer (Mr. Dias), Chief Financial Officer (Ted A. Schouten), and various vice presidents of the company.

[6] Nothing herein is intended to limit the right of Level I employees to seek approval of an administrative expense claim for the difference between the amount sought as part of the Lender-Approved Modified 2006 OCP proposed herein (i.e., 47% of the target bonus) and the amount approved in the context of the Board-Approved Modified 2006 OCP (i.e., 75% of the target bonus).

[7] The Debtors' Level II employees consist of approximately fourteen (14) operational directors of the company, including the Director of Purchasing, Director of Manufacturing, and Director of Finance.

[8] The Debtors' Level III employees consist of approximately thirty-two (32) managers of the company, including R&D Managers, Materials Managers, and Maintenance Managers.

[9] The Debtors have three (3) sales directors.

[10] The Debtors have five (5) sales managers.

[11] The Debtors have approximately seventy-one (71) line managers and office staff.

### Relevant Factual Background

9.      As noted above, the Debtors believe that the proposed modification to the

2006 OCP (i.e., the Lender-Approved Modified 2006 OCP) is a transaction in the ordinary

course of business. The Debtors implemented the 2006 OCP without Court approval, and they

should now be able to make reduced payments thereunder without Court approval, especially

given overwhelming creditor support for the modified plan.[12]

10.      The UST, however, has taken the position that Court approval of the

Lender-Approved Modified 2006 OCP is necessary. The UST may also argue that the

contemplated modification to the 2006 OCP should not be approved (at least as to management

level employees) given the Court's findings concerning business planning on the part of Debtors'

management in the context of the valuation litigation.

11.      The Debtors obviously disagree with the UST's position. Based on the

following compelling facts (which the Debtors believe cannot be controverted), the Debtors'

proposed modification to the 2006 OCP is entirely justified in the ordinary course of business (or

alternatively, as a reasonable exercise of the Debtors' business judgment) and supported by the

estates' principal creditor constituencies:

- The 2006 OCP was originally approved by the Debtors' board in March 2006 and implemented during the second quarter of 2006 in the ordinary course of business and without obtaining Court approval thereof.

- Most of the benefits payable under the 2006 OCP were tied to the company attaining certain budgeted earnings targets (i.e., the Milestones).

- The Milestones set for the Debtors' employees in the 2006 budget were challenging. For instance, Debtors' management intentionally did not take into account the possible negative future effects of the Debtors'

---

[12]   Assuming that the Debtors' secured lenders consent, the Debtors also will have authority to use cash collateral to fund the payments under the proposed modified 2006 OCP.

bankruptcy filing. There were three principal reasons for this decision: (1) the Debtors filed for bankruptcy in 2006 and no one could predict what effect (if any) the case would have on the company's business; (2) at the time that the 2006 OCP was implemented (approximately 4 months into the case), the Debtors' operational performance was actually improving; and (3) the Debtors wanted to motivate employees to strive for a "zero-impact" plan that would result in even better results than had been achieved outside of bankruptcy.

- The Debtors' budgeted EBITDA[13] target for 2006 was $43.2 million. Actual EBITDA totaled $37.0 million. Hence, despite the pendency of a hotly-contested and highly-publicized bankruptcy case, the Debtors missed targeted EBITDA last year by only 12%.

- Approximately $2 million (or nearly 40%) of the difference between targeted and actual EBITDA can be directly attributed to currency fluctuations in connection with the company's Canadian operations, which are wholly outside of management control.

- The Debtors estimate that EBITDA was also negatively impacted to the tune of $4.5 million by a shortfall in nutritional bar sales to five specific customers. These customers either decreased or eliminated new orders as a direct result of the Debtors' pending bankruptcy cases (this was a policy decision by these customers, not a performance issue).

- Without currency exchange and bankruptcy-related losses, the Debtors' EBITDA for 2006 would have been $43.5 million ($37.0 million + $6.5 million) or approximately $3.5 million higher than actual EBITDA for 2005 (which totaled $40 million).

- Despite the adverse effects of bankruptcy and the resulting demands placed on the company, the Debtors' overall operational performance actually improved during 2006 on many levels. Some of the Debtors' accomplishments include: (1) holding EBITDA (i.e., profit) margins steady throughout 2006; (2) delivering millions in cost savings as part of a world-class capital planning program; (3) maintaining existing customers and even growing the company's customer base; (4) preserving all critical supply relationships; (5) substantially increasing sales at the company's powder division; (6) implementing a standard cost accounting system, superior reporting mechanisms, and an inventory management program that, among other things, allowed the company to streamline its purchasing and pricing functions; (7) introducing new products that have had a positive effect on the bottom line; and (8) addressing customer service gaps -- the company now has a fill rate for customer orders approaching 100%.

- In approving the 2006 OCP, the Debtors' board always reserved the right (as it had in prior years) to apply its own subjective override to the specific criteria in the plan to the extent justified by actual circumstances.

---

[13] Earnings before interest, taxes, depreciation and amortization.

- Just last year as part of the company's ordinary course bonus program, the Debtors' board approved a payout of 66% of target bonus compensation based on the company's performance for calendar year 2005. Similarly for calendar year 2004, bonuses were approved for junior-level managers despite the company's overall disappointing operational results.

- Based on the ability of the Debtors' employees to deliver substantial operational improvements in 2006 in the context of the overwhelming pressures placed on them by these bankruptcy cases, the board determined that a modification of the 2006 OCP to allow reduced bonus payments to employees was entirely appropriate and even necessary.

- The Debtors' principal creditors agree that the Debtors' employees deserve additional bonus compensation. UBS AG ("UBS") insisted, however, that senior officers should be paid at an even lower level than approved by the board. Hence, as described above, the Debtors propose to pay Level I employees at the rate of 47% of target bonus, rather than the modified rate of 75% approved by the board.[14]

12. To the extent that the UST raises the Court's valuation opinion as a

possible impediment to the payment of bonuses under the modified 2006 OCP (at least as to the

Debtors' management employees), the Debtors urge the Court to consider the following salient

facts:

- The 2006 OCP has nothing to do with the Debtors' long-range planning efforts, which were the subject of the Court's valuation opinion. The 2006 OCP is tied to the company's budget for 2006, not to its five-year business plan for years 2007 through 2011 (the "May 2006 LRP").

- Even if the issues raised in the valuation litigation could be construed as somehow relevant to the instant Motion, the Debtors vehemently dispute any impropriety in their long-term planning (as reflected in the Debtors' pending motion for reconsideration of certain aspects of the valuation order).

- The Court's findings to the effect that management did not "believe" in the May 2006 LRP appear to be largely based on e-mails written by management going back to January 2006 expressing serious concern with the company's business trends. The undeniable reality, however, is that the Debtors' operational performance materially improved in the months leading up to the release of the May 2006 LRP. Specifically, the

---

[14]  The rate of 47% of target bonus is calculated by reference to the Debtors' improved EBITDA performance for 2006 (which totaled *$1.5 million*, excluding bankruptcy-related adjustments in the amount of $4.5 million, but including currency fluctuations) as compared to targeted EBITDA growth for the year (which was budgeted at *$3.2 million*). Although by this Motion, the Debtors only seek approval of bonus payments to executives at the 47% rate, nothing herein is intended to limit the right of the Debtors' Level I employees to seek an administrative expense claim for the remainder of their reduced bonus compensation approved by the board.

company's 12-month EBITDA improved from approximately $35 million in November 2005 to approximately $43 million as of May 2006 (an increase in earnings of nearly 23%). *See* Chart at **Exhibit A**.[15] Management took these results into account in fashioning its May LRP. Unfortunately, these trends began to reverse themselves by August 2006, and the negative effects of bankruptcy eventually offset such positive performance.

- Certain creditor constituencies elected to attack the credibility of the Debtors' management. The reality of the valuation trial, however, was that the Debtors' business began trending downward in the third quarter of 2006 for reasons unrelated to the aggressiveness of the Debtors' 2006 budget. The Debtors therefore did not dwell on the "integrity issue" (or put on a rebuttal case on that issue) during the valuation trial because it would not have changed the realities of an ongoing negative trend in the business. The Debtors nonetheless believe that management's integrity is beyond reproach.

## Request for Relief

13.     Based on the foregoing factual circumstances, the Debtors seek

confirmation and approval of the Lender-Approved Modified 2006 OCP as a transaction in the

ordinary course of business under section 363(c)(1) of the Bankruptcy Code. Alternatively, to

the extent the Court determines that the proposed modification to the 2006 OCP is outside the

ordinary course, the Debtors seek approval of the Lender-Approved Modified 2006 OCP as a

reasonable exercise of the Debtors' business judgment under section 363(b)(1) of the Bankruptcy

Code.

## Basis for Relief

14.     The 2006 OCP is a critical component of the Debtors' employee

compensation structure. It covers approximately 30% of the Debtors' employees. The Debtors

believe that their employees deserve to be fairly and reasonably compensated for their

---

[15]   The chart shows that after the Debtors' LTM (last twelve month) EBITDA performance hit rock bottom at approximately $35 million in the third quarter of 2005, the Debtors responded with month-by-month increases in EBITDA and EBITDA margins over the following six to seven months reaching an EBITDA high of $43 million right around the time that the May 2006 LRP was released.

unwavering dedication to the company and ability to improve the company's bottom line under very challenging circumstances. The Debtors' proposed Lender-Approved Modified 2006 OCP achieves this purpose and will also serve the vital function of improving employee morale while the company remains embroiled in these chapter 11 cases.

15.    For these reasons, the Debtors believe that the Lender-Approved Modified 2006 OCP is in the best interests of creditors, has the support of the Debtors' principal creditor constituencies, and should be approved. Only the UST has insisted that the Debtors seek Court approval of the contemplated modifications to the 2006 OCP. Although the Debtors have agreed to bring this Motion in response to the UST's demand, the Debtors submit that the 2006 OCP and any modification thereto reflects an exercise of business judgment in the ordinary course of the Debtors' business.

## A.    The Proposed Modification of the 2006 OCP is a Transaction in the Ordinary Course That Does Not Require Court Approval

16.    Section 363(c)(1) of the Bankruptcy Code provides as follows:

> If the business of the debtor is authorized to be operated under . . . this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

17.    As stated by the Third Circuit, "[t]he framework of section 363 is designed to allow a trustee (or debtor-in-possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." Teamsters Local

Union No. 1 v. Health & Welfare Fund (In re Roth Amer., Inc.), 975 F.2d 949, 952 (3d Cir.

1992).

        18.     The Bankruptcy Code does not specify what is "ordinary course of

business." The Third Circuit (like most other courts) has adopted a two-step inquiry for

determining whether a transaction is ordinary course, consisting of a horizontal and a vertical

dimension. Id.; see also In re Vision Materials, Inc., 325 B.R. 138, 143-145 (Bankr. D. Del.

2005) (citing Roth), reconsidered on other grounds, 327 B.R. 719 (Bankr. D. Del. 2005).

        19.     The horizontal test is "whether, from an industry-wide perspective, the

transaction is of the sort commonly undertaken by companies in that industry." Roth, 975 F.2d

at 953.

        20.     The vertical inquiry "(more appropriately characterized as the creditors'

expectation test) analyzes the transactions from the vantage point of a hypothetical creditor and

[considers] whether the transaction subjects a creditor to economic risk of a nature different from

those accepted when he decided to extend credit." Id. (quotations omitted). The "touchstone" of

ordinariness is "the interested parties' reasonable expectations of what transactions the debtor in

possession is likely to enter in the ordinary course of its business." Id. Thus, the "primary focus

is on the debtor's pre-petition business practices and conduct, although a court must also

consider the changing circumstances inherent in the hypothetical creditor's expectations." Id.

        21.     A recent decision by Judge Lifland in In re Dana Corp., ___ B.R. ___,

2006 WL 3479406, at *8-10 (Bankr. S.D.N.Y. Nov. 30, 2006), applies the foregoing two-step

analysis to an annual incentive plan for key employees. In that case, the debtors sought court

approval of a long-term incentive plan, but took the position that no such approval was necessary

with respect to the company's separate short-term annual bonus program for 2006. Id. at *8.

The short-term program for 2006 was "a refinement of the 2005 short-term incentive program,

reflecting current business conditions and a reduction in the number of participants." Id. It was

similar to Dana's previous short-term incentive programs. Id. The court agreed that the debtors'

short-term incentive plan was within the ordinary course of business because it "has been a

common component of compensation plans at Dana for the past fifty years and does not differ

significantly from Dana's prepetition practice." Id. at *10; see also In re Global Home Prods.,

LLC, ___ B.R. ___, 2007 WL 689747 at *7-8 (Bankr. D. Del. Mar. 6, 2007) (J. Gross) (citing

Dana with approval and finding that incentive plans that were nearly identical to those previously

used and approved by the debtors "are clearly in the ordinary course of the Debtors'

businesses.").

      22.     Newly-enacted section 503(c) of the Bankruptcy Code also limits certain

retention and severance payments to insiders. The court in Dana concluded, however, that

section 503(c) only "restricts transfers or payments by debtors to the extent that such payments

are outside the ordinary course." Id. at *5. Payments that are tied to legitimate performance

targets are also outside the scope of the statute. See id. at *2, 10-11.

      23.     Based on the foregoing standard, it is clear that the Debtors' decision to

adopt the 2006 OCP was well within the ordinary course of business. Just like the "short-term"

incentive plan in Dana, the 2006 OCP is completely consistent with the company's prepetition

practices and commonly undertaken by companies in the industry. Creditors also should have

expected (and indeed, should have known based on the hearing in connection with the MIP) that

11

the Debtors would continue to provide bonus compensation to employees in the ordinary course during the bankruptcy cases.

24.    Applying the two-step test adopted in <u>Roth</u>, the question is, first, whether the contemplated modification of the 2006 OCP is the sort of thing commonly undertaken by companies in the Debtors' industry, and second, whether creditors should expect such modification to occur. As to both points, the answer is undeniably "yes."

25.    Paying bonuses as an aspect of total employee compensation is extremely common. Indeed, virtually every company has a bonus compensation program. The Debtors' proposed bonuses therefore satisfy the "horizontal test."

26.    Modifying an ordinary course bonus plan is also no different from promulgating the plan in the first place. If the Debtors could have initially adopted a bonus plan in the ordinary course of business (as countless companies do) that contemplated reduced bonus payments to management if lower performance targets were achieved, there is no reason why the Debtors should not be permitted to modify the 2006 OCP (in the form of the Lender-Approved Modified 2006 OCP) at a later date to arrive at the same result.

27.    It should also come as no surprise to creditors that the Debtors are seeking to modify the 2006 OCP in this instance. They have done so before with prior ordinary course bonus programs (including just last year). Indeed, the Debtors' employees have come to expect it. The Debtors are admittedly pragmatic in their approach to bonus compensation, but that is not because the Debtors are frivolous with company funds or willing to enrich employees at the expense of creditors. Rather, the Debtors believe that bonus compensation should reflect the realities of the company's performance during any given year (much of which cannot be

12

predicted in advance) and responsive to the efforts and commitment of the company's employees

(also which only can be analyzed in hindsight).

28.     Hence, the Debtors submit that the reasonable modification to the 2006

OCP (in the form of the Lender-Approved Modified 2006 OCP) outlined herein is undoubtedly

within the ordinary course of business.

**B.    Alternatively, Implementation of the Modified 2006 OCP
        is a Valid Exercise of the Debtors' Business Judgment
        Under Section 363(b) of the Bankruptcy Code**

29.     Even if the Court were to find that the Debtors' proposed modification to

the 2006 OCP falls outside the ordinary course of business, the Court may nonetheless authorize

it under section 363(b)(1) of the Bankruptcy Code.[16]

30.     Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing,

may use, sell, or lease, other than in the ordinary course of business, property of the estate." The

use, sale, or lease of property of the estate, other than in the ordinary course of business, is

authorized when a "sound business purpose" justifies such action.  See, e.g., In re Montgomery

Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of

key employee retention program, stated that "in determining whether to authorize the use, sale,

or lease of property of the estate under [section 363(b)], courts require the debtors to show that a

---

[16]   It bears mention that section 503(c)(1) of the Bankruptcy Code is not implicated by the 2006 OCP regardless of
whether it is treated as a transaction in the ordinary course. The limitations in section 503(c)(1) only apply to
payments that are meant to induce insiders to "remain with the [debtors'] business" by requiring, among other
things, that a debtor demonstrates that the insider (a) has a bona fide job offer from another business and (b) is
"essential to the survival of the business."  11 U.S.C. §503(c)(1)(A) and (B). The 2006 OCP is not intended to
"induce" anyone to "remain with the Debtors' business," in any manner different than any other component of
employee compensation. (Obviously, all compensation is in some respect intended to induce employees to remain
with their employer.) Instead, the 2006 OCP (as modified) is intended to fairly compensate the Debtors' employees
in the ordinary course for their efforts last year and to improve overall employee morale. At its heart, the 2006 OCP
is an incentive plan that falls outside the scope of section 503(c)(1). The 2006 OCP also covers many more
employees than just insiders -- management makes up only eight (8) out of the approximately 133 employees under
the plan.

13

sound business purpose justifies such actions"); <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 395

(3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment

concerning use of property under §363(b) when there us a legitimate business justification); <u>In re</u>

<u>Delaware & Hudson R.R. Co.</u>, 124 B.R. 169, 176 (D. Del. 1991) (explaining that the Third

Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to

section 363(b)).

31.     Courts have found that a debtors' use of reasonable retention bonuses and

other incentives to retain employees is a valid exercise of a debtors' business judgment. <u>See,</u>

<u>e.g.</u>, <u>Global Home Prods.</u>, 2007 WL 689747 at * 5 ("The reasonable use of incentives and

performance bonuses are considered the proper exercise of a debtor's business judgment."); <u>In re</u>

<u>America West Airlines, Inc.</u>, 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (it is the proper use of a

debtors' business judgment to propose bonuses for employees who helped propel the debtor

successfully through the bankruptcy process); <u>In re Interco Inc.</u>, 128 B.R. 229, 234 (Bankr. E.D.

Mo. 1991) ("debtors' business judgment" was controlling in the approval of a

"performance/retention program").

32.     This Court reached the same conclusion in approving the Debtors' MIP in

July 2006. <u>See</u> *Order Authorizing and Approving Payments Under Management Incentive Plan*

(Docket No. 482), entered July 18, 2006.

33.     Now, with respect to the Lender-Approved Modified 2006 OCP, the

Debtors submit that authorizing bonus compensation to a broad swath of the Debtors' workforce

is not only a reasonable exercise of the Debtors' business judgment, but is simply necessary to

maintain the focus and commitment of the Debtors' employees.  It is only through the dedication

and commitment of the Debtors' employees that the company has achieved numerous

operational improvements (and missed budgeted EBITDA for the year by a mere 12%) in the

face of extremely contentious and highly-publicized bankruptcy proceedings. Setting aside

currency fluctuations, the "miss" in terms of actual versus budgeted EBITDA for 2006 is even

more miniscule. The Debtors' employees also should not be penalized for the company's

adoption of aggressive bonus criteria in the 2006 OCP that intentionally did not take into account

the possible adverse effects of a bankruptcy filing (2006 was the first year of the Debtors'

bankruptcy case and no one could predict what effect, if any, the bankruptcy would have).

34.    Ultimately, the 2006 OCP served its purpose of motivating the Debtors'

employees. They remained on task with respect to their job responsibilities and professional

goals, and should be fairly compensated for their efforts. Moreover, the costs associated with the

modified 2006 OCP are frankly miniscule in relation to the potential risks to the Debtors'

business if employee morale were to suffer from a failure to pay bonus compensation. (This

would be particularly aggravating to employees given the millions of dollars that have been paid

to various professionals during the course these cases.)

35.    The UST may argue that compensating the Debtors' executive employees

is inappropriate in light of the Court's valuation decision. However, as addressed above, the

company has performed extremely well under the circumstances. Whether or not the Debtors'

long-range planning efforts were somehow tarnished (an issue very much in dispute given the

Debtors' improving EBITDA performance in the months leading up to the release of the May

2006 LRP, *see* **Exhibit A**), the Debtors still came close to achieving budgeted EBITDA goals in

2006. In fact, by ignoring the direct negative impacts of bankruptcy, the Debtors' EBITDA

15

improved in 2006 against the prior year by $1.5 million, which represents 47% of the targeted

EBITDA improvement for the year. This is the same rate (against targeted bonus) at which the

Debtors (and their creditors) now propose to compensate management. It is an eminently

reasonable arrangement and has the full support of the Debtors' creditor constituencies.

36.     For these reasons, the Debtors submit that the Lender-Approved Modified

2006 OCP represents a sound exercise of the Debtors' business judgment and should be

approved.

### Notice

37.     Notice of this Motion has been given to: (a) the Office of the United

States Trustee, (b) counsel to the Official Committee of Unsecured Creditors, (c) counsel to UBS

AG, (d) counsel to Fremont Investors VII, LLC, (e) counsel to the Ad Hoc Committee of First

Lien Lenders; and (f) the persons who have requested notice pursuant to Rule 2002 of the

Federal Rules of Bankruptcy Procedure. The Debtors submit that, in light of the nature of the

relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that this Court (a) approve the

proposed Lender-Approved Modified 2006 OCP, (b) enter the attached proposed form of order,

and (c) grant such other and further relief as this Court deems just and proper.

Dated: March 30, 2007

PACHULSKI STANG ZIEHL YOUNG
JONES & WEINTRAUB LLP

_/s/ Laura Davis Jones_

Laura Davis Jones (Bar No. 2436)
Richard M. Pachulski (CA Bar No. 90073)
Brad R. Godshall (CA Bar No. 105438)
Alan J. Kornfeld (CA Bar No. 130063)
Michael R. Seidl (Bar No. 3889)
Maxim B. Litvak (CA Bar No. 215852)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszyjw.com
        rpachulski@pszyjw.com
        bgodshall@pszyjw.com
        akornfeld@pszyjw.com
        mseidl@pszyjw.com
        mlitvak@pszyjw.com

Counsel for Debtors and Debtors in Possession

17

# EXHIBIT A



*STRICTLY CONFIDENTIAL*

LTP - EBITDA and EBITDA % P12, 2004 to P12, 2006

*Prepared by XRoads from Company information*

23

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re ) Chapter 11
)
NELLSON NUTRACEUTICAL, INC.,[1] ) Case No. 06-10072 (CSS)
) (Jointly Administered)
)
Debtors. ) **Related to Docket No.**

## ORDER APPROVING MODIFICATION TO ORDINARY
## COURSE BONUS COMPENSATION PROGRAM FOR EMPLOYEES

Upon consideration of the *Debtors' Precautionary Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees* (the "Motion"),[2] filed by the above-captioned debtors and debtors-in-possession (the "Debtors"); and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their creditors and other parties in interest, and may be authorized pursuant to section 363 of the Bankruptcy Code; and notice of the Motion having been provided to the (a) the Office of the United States Trustee, (b) counsel to the Official Committee of Unsecured Creditors, (c) counsel to UBS AG, (d) counsel to Fremont Investors VII, LLC, (e) counsel to the Ad Hoc Committee of First Lien Lenders, and (f) the persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; and it appearing that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefore, it is hereby

---

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc., a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion.

ORDERED that the Motion is GRANTED; and it is further

ORDERED that, to the extent such approval is necessary, the modification described in the Motion and approved by creditors to the Debtors' ordinary course employee bonus compensation program for calendar year 2006 (the "Lender-Approved Modified 2006 OCP") is approved; and it is further

ORDERED that the Debtors are authorized, to the extent such authority is necessary, to take all appropriate steps to implement and effectuate the Lender-Approved Modified 2006 OCP; and it is further

ORDERED that nothing herein is intended to limit the right of the Debtors' Level I employees to seek an administrative expense claim for the remainder of their reduced bonus compensation approved by the board; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2007          _____
                                            Honorable Christopher S. Sontchi
                                            United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) | Case No. 06-10072 (CSS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

## AFFIDAVIT OF SERVICE

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) ss.: |
| COUNTY OF NEW CASTLE | ) |

Karina Yee, being duly sworn according to law, deposes and says that she is

employed by the law firm of Pachulski Stang Ziehl Young Jones & Weintraub LLP, counsel for

the debtors and debtors in possession, in the above-captioned action, and that on the 30th day of

March, 2007, she caused a copy of the following document(s) to be served upon the attached

service list(s) in the manner indicated:

**Notice of Debtors' Precautionary Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees**

**Debtors' Precautionary Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees**

---

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc., a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

[Proposed] Order Approving Modification to Ordinary Course Bonus
Compensation Program for Employees

_Karina Yee_

Karina Yee

Sworn to and subscribed before
me this 20th day of March, 2007

Notary Public
My Commission Expires: 03-21-08

VANESSA A. PRESTON
Notary Public - State of Delaware
My Comm. Expires March 21, 2008

Nellson Nutraceutical, Inc. 2002 Service
List
Case No. 06-10072 (CSS)
Document No. 114109
15 – Hand Delivery
02 – Interoffice Delivery
35 – First Class Mail

**(Counsel to the Debtors)**
Laura Davis Jones, Esquire
Rachel Lowy Werkheiser, Esquire
Pachulski Stang Ziehl Young Jones &
Weintraub LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

**Interoffice Mail**
(Counsel to the Debtors)
Debra Grassgreen, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl Young Jones &
Weintraub LLP
150 California Street, 15th Floor
San Francisco, CA 94111

**Interoffice Mail**
(Counsel to the Debtors)
Richard M. Pachulski, Esquire
Brad R. Godshall, Esquire
Pachulski Stang Ziehl Young Jones &
Weintraub LLP
10100 Santa Monica Boulevard, Suite 1100
Los Angeles, CA 90067

**Hand Delivery**
(Copy Service)
Parcels, Inc.
Vito I. DiMaio
4 East Seventh Street
Wilmington, DE 19801

**Hand Delivery**
(United States Trustee)
William Harrington, Esquire
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Fremont Investors VII, LLC)
Mark D. Collins, Esquire
Richards Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Wells Fargo Bank, N.A. and
Wells Fargo Brokerage Services, LLC)
Richard Cobb, Esquire
Jamie L. Edmonson, Esquire
Landis, Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Pride Transport, Inc., Erie
Foods, Inc., Malnove, Inc.)
Jackson Shrum, Esquire
Ron L. Woodman, Esquire
Harvey Pennington Ltd.
913 North Market Street, Suite 702
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Westaff (USA))
James E. Huggett, Esquire
Margolis Edelstein
1506 Gilpin Avenue
Wilmington, DE 19806

**Hand Delivery**
(Counsel to UBS)
Richard W. Riley, Esquire
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801

**Hand Delivery**
(Counsel to the Official Committee of
Unsecured Creditors)
Kurt F. Gwynne, Esquire
Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Orafti, American Honey and
Kerry, Inc.)
Mark E. Felger, Esquire
Cozen O'Connor
Chase Manhattan Centre
1201 North Market Street Suite 1400
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Dell Marketing, L.P.)
Patricia P. McGonigle, Esquire
Seitz, Vanogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
PO Box 68
Wilmington, DE 19899

**Hand Delivery**
(Counsel to Informal Committee of First
Lien Lenders)
Robert S. Brady, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Utah Paperbox Company)
Neil B. Glassman, Esquire
Daniel K. Astin, Esquire
Ashley B. Stitzer, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

**Hand Delivery**
(Counsel to The Solae Company)
Jennifer A.L. Kelleher, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801

**Hand Delivery**
(Counsel to The Bloomer Chocolate
Company)
Norman M. Monhait, Esquire
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Barry Callebaut USA, Inc.)
Jeffrey C. Wisler, Esquire
Marc J. Phillips, Esquire
Connolly Bove Lodge & Hutz LLP
the Nemours Building
1007 North Orange Street
Wilmington, DE 19801

**First Class Mail**
(Counsel to UBS)
James J. Holman , Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA

**First Class Mail**
(Counsel to UBS)
Gregory A. Bray, Esquire
Thomas R. Kreller, Esquire
Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017

**First Class Mail**
(Counsel to Fremont Investors VII, LLC)
Suzanne Uhland, Esquire
O'Melveny & Myers LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305

**First Class Mail**
(Counsel to Wells Fargo Bank, N.A. and
Well Fargo Brokerage Services, LLC)
Maria K. Pum, Esquire
White & Case LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071

**First Class Mail**
(Counsel to the Ad Hoc Committee of First
Lien Lenders)
Fred Hodara, Esquire
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue, 19th Floor
New York, NY 10022-2524

**First Class Mail**
(Counsel to Wells Fargo Bank, N.A. and
Well Fargo Brokerage Services, LLC)
Daniel P. Ginsberg, Esquire
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036-2787

**First Class Mail**
(Wells Fargo Bank, N.A. and Well Fargo
Brokerage Services, LLC)
Ms. Ellen Trach
Wells Fargo Bank, N.A.
MAC N9305-198
90 South 7th Street
Minneapolis, MN 55479

**First Class Mail**
(Counsel to Erie Foods International, Inc.)
Dale G. Haake, Esquire
Katz, Huntoon & Fieweger, P.C.
1000 36th Avenue
Moline, IL 61265

**First Class Mail**
(Counsel to Experimental and Applied
Sciences, Inc. a/k/a EAS, Inc.)
Samuel C. Wisotzkey, Esquire
Kohner, Mann & Kailas, S.C.
Washington Building
Barnabas Business Center
4650 North Port Washington Road
Milwaukee, WI 53212-1059

**First Class Mail**
(Counsel to the Official Committee of
Unsecured Creditors)
Claudia Springer, Esquire
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

**First Class Mail**
(Counsel to Ryco Packaging Corporation)
Steven J. Woolley, Esquire
Marks Clare & Richards, LLC
11605 Miracle Hills Drive., Suite 300
Omaha, NE 542005

**First Class Mail**
)
Stacey Harris
Andrew Herenstein
Quadrangle Group LLC
375 Park Avenue, 14th Floor
New York, NY 10152

**First Class Mail**
(Counsel to Farbest-Tallman Foods Corp.)
Stephen V. Falanga, Esquire
Connell Foley LLP
85 Livingston Avenue
Roseland, NJ 07068-9500

**First Class Mail**
(Counsel to Clasen Quality Coatings, Inc.)
Thomas J. O'Brien, Esquire
Peter C. Blain, Esquire
Reinhart Boerner Van Deuren S.C.
1000 North Water Street, Suite 2100
Milwaukee, WI 53202-3186

**First Class Mail**
(Counsel to Dell Marketing, L.P.)
Sabrina L. Streusand, Esquire
G. James Landon, Esquire
Hughes & Luce, LLP
111 Congress Avenue, Suite 900
Austin, TX 78701

**First Class Mail**
(Counsel to CGU Capital Group, LLC)
Andrew A. Goodman, Esquire
Greenberg & Bass LLP
16000 Ventura Blvd., Suite 1000
Encino, CA 91436

**First Class Mail**
(CGU Capital Group, LLC)
B. Dale Ulman
CGU Capital Group, LLC
PO Box 2573
Palos Verde Peninsula, CA 90274

**First Class Mail**
(Counsel to Informal Committee of First
Lien Lenders)
Scott L. Alberino, Esquire
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036

**First Class Mail**
(Informal Committee of First Lien Lenders)
Steve Landzberg
Paul Lukaszewski
Roderick Bryce
Barclays Bank PLC
200 Park Avenue
New York, NY 10166

**First Class Mail**
(Informal Committee of First Lien Lenders)
Michelle Patterson
Cypresstree Investment Management
Company, Inc.
1 Boston Place, 16th Floor
Boston, MA 02108

**First Class Mail**
(Informal Committee of First Lien Lenders)
Kamilah Boyd
General Electric Capital Corporation
Bank Loan Group
201 Merritt 7
PO Box 5201
Norwalk, CT 06856

**First Class Mail**
(Counsel to McCormick & Company)
Daniel J. Carrigan, Esquire
DLA Piper Rudnick US LLP
1200 19th Street, N.W.
Washington, DC 20036

**First Class Mail**
(McCormick & Company)
Mr. Austin Nooney
McCormick & Company, Inc.
211 Schilling Circle
Hunt Valley, MD 21031

**First Class Mail**
(Fee Auditor)
Warren H. Smith, Esquire
**Warren H. Smith & Associates, P.C.**
Republic Center
325 North St. Paul, Suite 1275
Dallas, TX 75201

**First Class Mail**
(Counsel to Barry Callebaut USA Inc)
Paula K. Tucker, Esquire
Gardere Wynne Sewell LLP
3000 Thanksgiving Tower
1601 Elm Street
Dallas, TX 75201

**First Class Mail**
(Counsel to The Bloomer Chocolate
Company)
David W. Wirt, Esquire
Courtney Engelbrecht Barr, Esquire
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601

**First Class Mail**
(Counsel to Conopco, Inc.)
Andrew C. Gold, Esquire
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016

**First Class Mail**
(Counsel to NBTY Successor in Interest to
Vitamin World, Inc. and Rexall Sundown,
Inc.)
Lisa M. Golden, Esquire
Craig M. Johnson, Esquire
Jaspan Schlesinger Hoffman, LLP
300 Garden City Plaza
Garden City, NY 11530

**First Class Mail**
(Counsel to The Solae Company)
Vincent J. Marriott, III, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

**First Class Mail**
(St. Paul Travelers)
Beth Dibiaso-Francis
Account Resolution
St. Paul Travelers
National Accounts
1 Tower Square – 5MN
Hartford, CT 06183-4044

**First Class Mail**
(Counsel to All Packaging Company, Inc.)
Lawrence Bass, Esquire
Holme Roberts & Owen LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203

**First Class Mail**
(Con-way Transportation Services, Inc.)
Susan de la Cruz
CWY Credit
Bankruptcy Department
Con-Way Transportation Services, Inc.
5555 Ruff Snow Dr., Suite 5515
North Richland Hills, TX 76180

**First Class Mail**
(State of Michigan, Dept. of Treasury)
Michael A. Cox, Attorney General
Julius O. Curling, Assistant Attorney
General
Cadillac Place
3030 W. Grand Blvd., Suite 10-200
Detroit, MI 48202

**First Class Mail**
(Examiner)
Michael Luskin, Esquire
Luskin, Stern & Eisler LLP
330 Madison Avenue, 34th Floor
New York, NY 10017

**First Class Mail**
(Riverside Claims LLC)
Neil Herskowitz
Riverside Claims LLC
PO Box 626
Planetarium Station
New York, NY 10024

B-2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Nellson Nutraceutical, Inc., et al, | : | Bankr. Case No. 06-10072 (CSS) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| | : | **Hearing Date: April 23, 2007 at 1:30 p.m.** |
| | : | **Objection Deadline: April 18, 2007 at 4:00 p.m.** |

**OBJECTION TO DEBTORS' PRECAUTIONARY MOTION FOR ORDER
APPROVING MODIFICATION TO ORDINARY COURSE BONUS COMPENSATION
PROGRAM FOR EMPLOYEES**

In support of her objection to the Debtors' Precautionary Motion (the "Amended Bonus
Motion") for Order Approving Modification to Ordinary Course Bonus Compensation Program for
Employees (the "Objection"), Kelly Beaudin Stapleton, the United States Trustee for Region 3
("UST"), by and through her undersigned counsel, states as follows:

    1.    This Court has jurisdiction to hear the above-referenced Objection.

    2.    Pursuant to 28 U.S.C. § 586, the UST is charged with the administrative oversight
of cases commenced pursuant to title 11 of the United States Bankruptcy Code.  This duty is part
of the UST's overarching responsibility to enforce the bankruptcy laws as written by Congress and
interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas
Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that UST has "public interest standing" under
11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In
re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the UST as a "watchdog").

    3.    Pursuant to 11 U.S.C. § 307, the UST has standing to be heard with regard to the
above-referenced Objection.

## SUMMARY

4.     The UST objects to the Debtors' Amended Bonus Motion because the modified 2006 OCP[1] violates sections 363(b) & 503(c) of the Bankruptcy Code.  The Debtors argue in the Amended Bonus Motion that the adoption and modification the 2006 OCP  is an ordinary course transaction which is not subject to Court approval and does not implicate Section 503(c).  However, as the Amended 2006 OCP includes payments to "officers and managers," the Debtors must abide by the limitations set forth in Section 503(c).  Moreover, the modification of the company's annual bonus program was not the type of transaction that was routinely engaged in by the Debtors prepetition and thus, it does not qualify as an ordinary course transaction pursuant to Section 363(c)(1).

5.     On the day before the Valuation Opinion was issued by this Court, the Debtors advised certain parties in interest that Nellson's Board of Directors (the "Board") had approved certain bonus payments to members of their senior management and others under the 2006 OCP, despite the fact that the Debtors failed to meet their projected targets.  This conduct is particularly troubling in light of Debtors' counsel's representations to the Court during the MIP Trial (as defined below) regarding modifications to the 2006 OCP.  At that time, Debtors' counsel noted any decision to revise the 2006 OCP without Court approval  would be ill-advised due to the criticism leveled at the Board during the MIP Trial.  Specifically, Debtors' counsel stated the following on the record:

> The Court: I find it hard to believe that this Board would not grant
> bonuses under the April program if they hit 92 percent.

---

[1]     All capitalized terms not defined herein shall have the meaning ascribed to them in the Amended Bonus Motion.

2

> Mr. Pachulski: Your Honor, there's no guarantee of that. And I don't think this Board, based on the criticism that's been levied on it, would do - - and knowing that the Committee may object or the - - that there will be a breach of fiduciary duty lawsuit - - I will tell you I would not recommend they pay it. I'll tell you straight out. Based on the criticism that's been levied to them today, for them to basically make a payment at 92 percent under the old plan, without coming before Your Honor or having the consent of the parties, would – I would be walking into a Trustee motion. So, the answer is – the direct answer to your question is if it hits 92 percent, they will have to deal with the problem, and I do not believe this Board, who is very conservative, I've been on many calls with them, I don't think they would pay it. Transcript of July 10, 2006 hearing before the Honorable Christopher S. Sontchi at page 202.

6.    Despite such representation of counsel, the Debtors declare in the Amended Bonus Motion that they are only seeking Court approval of the Amended 2006 OCP because the UST "required that the Debtors bring a motion seeking approval" of the Amended 2006 OCP.

7.    Additionally, the Board approved modifications to the 2006 OCP despite the Debtors' failure to achieve its performance goals and despite the continuing deterioration of the Debtors' enterprise value.

8.    Such conduct is even more troubling when one considers that the Board is controlled by Fremont Capital Partners, LLP ("Fremont"), the Debtors' controlling shareholder, whom the Court found in the Valuation Opinion cooperated with the Debtors' management "to manipulate both the business planning and valuation processes to come up with an artificially inflated enterprise value in order to claim some residual value for their existing equity position" and to whom the Debtors had agreed to provide a blanket release pursuant to a settlement agreement entered into between the Debtors, Fremont and UBS (the "Fremont Settlement"). See the Valuation Opinion at paragraph 119. This settlement agreement which was approved by the Board at the same Board

3

meeting at which the Amended 2006 OCP was approved. The Debtors' motion to approve the

Fremont Settlement was subsequently denied by this Court on or about March 12, 2007.

## BACKGROUND

9.       On January 28, 2006 (the "Petition Date"), the Debtors each filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses

as debtors-in-possession. 11 U.S.C. §§ 1107, 1108.

10.      On or about February 9, 2006, the UST appointed an Official Committee of Unsecured

Creditors (the "Committee"). The UST appointed five members to the Committee: Solae, LLC

("Solae"), Kerry, Inc. ("Kerry"), Pride Transport, Inc. ("Pride"), The Blommer Chocolate Company

("Blommer") and Printpak, Inc. ("Printpak;" collectively, the "Committee Members").[2]

11.      On or about October 10, 2006, the UST filed a Motion for Entry of an Order to Appoint

a Chapter 11 Trustee (the "Trustee Motion"). The Trustee Motion was resolved by the entry of an

order on November 29, 2006, wherein this Court directed the UST to appoint an Examiner to

investigate the Debtors' discussions with the Committee Members during the course of the Valuation

Litigation. On or about January 23, 2007, this Court entered an order approving the selection by the

UST of Michael Luskin as the Examiner.

12.      The Debtors are suppliers to the "functional bar market" as well as manufacturers of

nutritional powders and diet supplements. The Debtors manufacture food bars and powders for

weight loss, sports training and wellness and medical categories. The Debtors operate three

manufacturing facilities located in Irwindale, California; Salt Lake City, Utah; and Montreal,

Canada. The Debtors' headquarters and primary production facility is located in Irwindale.

---

[2]       Printpak resigned from the Committee, as its claim was paid in full by the Debtors.

4

13.     The Debtors do not manufacture products under their own brand but rather produce products that are sold by food marketers.

14.     Fremont Investors VII, LLC ("Fremont") is the Debtors' principal equity holder. Fremont owns approximately a 95% interest in Nellson Holdings, Inc., a Debtor and the ultimate parent of the other Debtor-entities.

15.     As of the Petition Date, the Debtors' outstanding principal obligation to its prepetition lenders (collectively, the "Lenders") under a First Lien Credit Agreement and a Second Lien Credit Agreement was approximately $330 million. UBS AG, Stamford Branch, acts as the agent for the Lenders.

Debtors' Management

16.     In early 2005, the Debtors retained new management in an effort to reverse the decline in the business suffered by the Debtors in 2004. Jeffrey Dias was retained as President and CEO on an interim basis in January 2005 and, eventually, on a permanent basis in April 2005. Ted Schouten was hired as CFO in May 2005. In January 2005, Tom Jagiela was hired as Vice President of Manufacturing and Operations. Scott Sturgill, who was hired as a manager in 1998, was promoted to Vice President of Research and Development. Jim Cudahy was hired in April 2005 as Vice President and General Manager of Nellson's Powder Division in Salt Lake City.

17.     The Board consists of six individuals: Robert Jaunich, who is the chairman and one of the founding partners of Fremont; William Lenihan, an employee of Fremont; Jeffrey Dias; Ben Muhlenkamp, the Debtors' former president; Tom Dembrowski; and Doyle Waggle.

18.     Dembrowski and Waggle were recruited to serve on the Board by Jaunich, when Fremont acquired a majority stake in the business in 2004. In its Valuation Opinion, the Court found

5

39

that Waggle was the only independent director on the Board.

Bonus Payments

19.     In May 2006, the Debtors filed a Motion for Approval of a Management Incentive Plan (the "MIP"), which was ultimately approved by the Court over the objection of both the Committee and the UST (the "MIP Trial"). During the course of the MIP Trail, the Committee and the UST discovered that the Debtors had an undisclosed employee bonus program, the 2006 OCP.[3] Although the 2006 OCP was eventually disclosed to the Court at trial, the existence of the same was never disclosed to parties in interest who did not attend the MIP Trial. Moreover, as the record for the MIP trial was sealed by this Court at the Debtors' request, the Debtors' assertion in the amended Bonus Motion that all creditors must be aware of the 2006 OCP because of the disclosure of the 2006 OCP during the MIP Trial is mistaken.

20.     Under the 2006 OCP, senior management employees, which included all the employees covered under the MIP, are entitled to earn up to 70% of their base pay as a bonus if the Debtors meet certain performance targets based on Debtors' Budgeted EBITDA. The performance targets for other employees covered under the plan varies depending on the employee's title. Under the 2006 OCP, the minimum bonus payable under the program was triggered for Level I managers only if the company achieved 93% of its Budgeted EBITDA (the "Minimum EBITDA Target").

21.     If the Debtors had achieved their Minimum EBITDA Target under the 2006 OCP, the Debtors' Level I managers would have been entitled to bonuses of between 10 to 25% of their

---

[3]     In March or April 2006, the Board approved an employee bonus program. The 2006 OCP Program was fairly comprehensive. In the Amended Bonus Motion, the Debtors indicate that the 2006 OCP was approved in March. However, the copy of the same provided to the UST was dated April 2006. It covered senior management, management, office staff and various others involved in manufacturing. The 2006 OCP was similar to programs approved by the Board in prior years.

base salaries.[4] If the Debtors had exceeded their projected targets by 10% or more, such individuals could have been entitled to bonuses of up to 70% of their base salaries.

22.     Consistent with prior bonus programs,[5] Debtors' management was not entitled to a bonus if the Debtors failed to meet the Minimum EBITDA Target.

23.     Despite failing to meet the Minimum EBITDA Target as of December 31, 2006, the Board approved various bonuses for Debtors' management and others (the "Amended 2006 OCP").

24.     As noted above, on or about January 17, 2007, Debtors' counsel advised the UST and other parties in interest of their intent to make payments under the Amended 2006 OCP.

25.     The Debtors generated only $37 million in EBITDA for the calendar year ending December 31, 2006. The Debtors' Consolidated Budgeted EBITDA for 2006 was $43.2 million (the "EBITDA Target"). Accordingly, the Debtors achieved only 86% of their EBITDA Target.

26.     Furthermore, despite the fact that the Debtors generated only 86% of their EBITDA Target and failed to meet the Minimum EBITDA Target set forth in the 2006 OCP, the Debtors' Board approved payments to Debtors' senior management of between 35% - 45% of their base salaries. The payment is at the rate of 75% of the target rate which would have been paid had the company achieved 100% of their performance targets.

27.     While reserving their rights to seek the entire 75% amount as an administrative expense claim, the Debtors, at the request of certain of the Lenders, are only seeking 47% of the target bonuses for Level I managers. Comparatively, if the Debtors had actually achieved the

---

[4]     Under the 2006 OCP, bonuses were to be paid to Debtors' management to reward management for achieving certain EBITDA targets and were payable based on the achievement by management of such EBITDA targets. Bonuses for other employees including, but not limited to, sales directors, office staff, supervisors are predicated on different criteria.

[5]     Upon information and belief, the Board rarely deviated from their practice of not paying bonuses when the Debtors' management failed to achieve its performance targets.

7

Minimum EBITDA Target under the 2006 OCP, these individuals would have only been entitled to bonuses of between 10 - 25% of their base salaries. Thus, not only has the Debtors' Board lowered the bar regarding the Debtors' performance goals, but it has raised the floor with respect to the payout authorized.[6]

Valuation Litigation

28.     The Debtors' plan from the outset of this case has been to use the bankruptcy process to recharacterize their balance sheet. The Debtors have repeatedly stated that, unlike a typical chapter 11 case, this company does not have any significant operational problems. After orchestrating the valuation litigation to recharacterize their balance sheet, the Debtors now want to blame the valuation trial for their failure to meet their performance objectives. It is also important to note that the actual cost of the trial does not effect the Debtors' EBITDA calculations, as "restructuring costs" are excluded from the EBITDA calculation. Accordingly, the millions of dollars charged to the Debtors' estates for the valuation litigation has no direct effect on the Debtors' EBITDA calculation. This case involves a dispute between Debtors' secured lenders and Fremont as to the value of the company.

29.     The Court issued its valuation opinion on January 18, 2007 (the "Valuation Opinion"). In addition to determining the Debtors' enterprise value, the Court made certain findings[7] in the Valuation Opinion that call into question the honesty and integrity of the Debtors' current management, the board of directors and the controlling shareholders; and the accuracy of

---

[6]     These payments include significant payments to the CEO and the CFO. As outlined below, the Court found that these two individuals cooperated with Fremont to manipulate the Debtors' long range business plan (the "May LRP") for the sole purpose of inflating the enterprise value in order to claim some residual value for existing equity.

[7]     The Debtor has filed a Motion for Reconsideration as to the findings listed above.

8

the May LRP including, without limitation, the following:

(i)    "The evidence at trial, however, overwhelmingly established that the May 2006 LRP was not managements best and most honest thinking about the Debtor's financial future but rather was manipulated at the direction of and in cooperation with the Debtor's controlling shareholder . . ." Valuation Op. at paragraph 2.

(ii)    "The primary source of error is not the experts themselves but the deliberately inaccurate information provided by the Debtors upon which the experts justly relied . . . . Any other approach would serve to reward the very persons who have created the conundrum (management and the controlling shareholders) at the expense of the creditors." Valuation Op. at paragraph 5.

(iii)    "Both Mr. Schouten and Mr. Dias acknowledged that the lender version of the November 2005 LRP was their most realistic plan for Nellson."( Mr. Dias is the Debtors' CEO and Mr. Schouten is the Debtors' CFO.) "There is no evidence to suggest that any similar diligence was pursued in arriving at the May 2006 LRP." ". . . the May 2006 LRP was hurriedly prepared without the same level of customer or operational analysis as occurred for earlier plans." Valuation Op. at paragraphs 52, and 61

(iv)    "During early 2006, Mr. Dias wrote internal e-mails and memoranda to Mr. Lenihan and the Board stating that market pressures that continued during 2006 necessitated further downward revisions to the LRP (from December 2005) In response to one of these communications, a senior executive at Xroads (Nellson's Financial Advisors), counseled Mr. Dias, advising him to keep his views such as those expressed in his January 3 letter to himself in order that the interests of equity holders could be protected by the professionals. Xroads discouraged Mr. Dias from expressing his views that may have significance from a valuation perspective or from ascribing ultimate probabilities of success to any plan. As a result, Mr. Dias took the position that he would not abandon Fremont's alternative plan parameters but neither would he endorse it." Valuation Op. at paragraph 74.

(v)    "**In sum, Fremont utilized its control over Nellson to manipulate both the business planning and valuation processes to come up with an artificially inflated enterprise value in order to claim some residual value for their existing equity position. There is no other credible interpretation of the evidence before the Court.**" Valuation Op. at paragraph 119.

9

## GROUNDS/BASIS FOR THE RELIEF REQUESTED

30.     In light of the above, the UST objects to the Amended Bonus Motion because the Amended 2006 OCP violates sections 363(c) & 503(c) of the Bankruptcy Code.

Violation of Section 503(c) of the Bankruptcy Code

31.     Although the UST does not have complete information regarding the full extent of the payments approved by the Board under the Amended 2006 OCP,[8] the UST believes that certain of the contemplated payments under the Amended 2006 OCP run afoul of the limitations provided for in Section 503(c)(1)&(3) of the Bankruptcy Code.

32.     As the Debtors have argued that the Amended 2006 OCP does not implicate Section 503(c), no facts necessary to demonstrate compliance with Section 503(c) have been provided by the Debtors in the Amended Bonus Motion.

33.     The UST does not dispute that the payment of "wages, salaries, and commissions for services rendered after the commencement of the case" to Debtors' employees are valid administrative expenses claims for "the actual, necessary costs and expenses of preserving the estate." See 11 U.S.C. § 503(b). However, newly enacted Section 503(c) imposes certain limitations on such payments as Section 503(c) provides that "[n]otwithstanding subsection (b), there shall neither be allowed, nor paid . . ." certain transfers to insiders and members of Debtors' management unless certain conditions are met. Accordingly, prior to making such payments, the Debtor must "based on evidence in the record" demonstrate the required elements set forth in Section 503(c)(1)&(3).

---

[8]     In response to the UST's informal discovery request, the Debtors provided the UST with numerous documents upon which it intends to rely at trial. The UST is still in the process of reviewing these documents and reserves the right to use any of these documents at trial.

10

34.    Section 503(c)(1) provides, in pertinent part, as follows:

(1) a transfer made to, or an obligation incurred for the benefit of , an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that:

> (A) The transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
>
> (B) The services provided by the individual are essential to the survival of the business; and
>
> (C) either (I) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to non-management employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation incurred;, then the amount of such transfer is not greater that an amount equal to twenty-five percent of the amount of any similar transfers made during the calendar year. (emphasis added).

35.    Section 503(c)(3) provides, in pertinent part, as follows:

(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

36.    Section 101(31) of the Bankruptcy Code defines an "insider" of a corporation as an "officer," a "director", or a "person in control." Based on the limited list of individuals provided to the Debtors eligible to receive payments under the Amended 2006 OCP, certain of these individuals, if not all, are insiders, officers or mangers of the Debtors.

11

45

37.    As the Debtors believe such payments do not implicate Section 503(c), the Debtors have offered no analysis as to whether such payments are appropriate under Section 503(c). As certain payments under the Amended 2006 OCP are being made to insiders and officers and managers of the Debtors, it is clear that Section 503(c) must be complied with if the Debtors intend to make such payments.

Violation of Section 363 of the Bankruptcy Code

38.    The Debtors argue that Court approval of the Amended 2006 OCP is unnecessary as compensation matters are ordinary course transactions within the discretion of the Board. However, as noted above, while the Debtors' Board has historically approved (early in the year) a performance based bonus program. However, upon information and belief, it is not the Debtors' normal practice to thereafter modify such bonus program if the Debtors fail to meet their performance objectives. Indeed, the only time UST is aware of that the Debtors made such a drastic modification to the bonus program occurred just days before the filing of the Bankruptcy Case. The UST believes that approval of the Amended 2006 OCP is outside of the ordinary course of business and so the notice and hearing provisions of Section 363(b)(1) apply.

39.    *In re Clinton Centrifuge, Inc.*, 85 B.R. 980 (E.D. Pa 1988), the Court noted that the most complete articulation of the standard, ordinary course of business, is found in *In re Johns-Manville Corp.*, 60 B.R. 612 (Bankr.S.D.N.Y. 1986). A two-part analysis is offered: A transaction is in the ordinary course of business if: (a) the transaction is consistent with the day-to-day operations of the debtor and is consistent with the creditors' reasonable expectations of what transactions the debtor is likely to enter into while operating its business (vertical dimension test); and (2) the transaction is of a type engaged in by businesses similar to the

12

46

debtors' business (horizontal dimension test).

40.    In the Amended Bonus Motion, the Debtors argue that the modification to the 2006 OCP was routine and should have been anticipated by the Debtors creditors because on one occasion in the past  - - just days before the filing of this case - - the Debtors modified the 2005 bonus program to allow bonus payments to Debtors' senior management and, on one other occasion, the Debtors modified their 2004 bonus program to allow some bonus payments to be made to lower level employees of the Debtors.  However, the Debtors are unable to identify one other instance where the entire bonus program was modified to allow the Debtors to make bonus payments when the Debtors failed to achieve their performance targets.

**[Remainder of Page Intentionally Left Blank]**

13

WHEREFORE the UST respectfully request that this Court enter an Order denying the

Amended Bonus Motion.

                                    Respectfully submitted,

                                    **KELLY BEAUDIN STAPLETON**
                                    **UNITED STATES TRUSTEE**

                                    By:  /s/ William Harrington
                                       William K. Harrington, Esquire
                                       Trial Attorney
                                       J. Caleb Boggs Federal Building
                                       844 King Street, Suite 2207, Lockbox 35
                                       Wilmington, DE 19801
                                       (302) 573-6491
                                       (302) 573-6497 (Fax)

Dated: April 18, 2007

B-3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) Case No. 06-10072 (CSS) |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) **Related to Docket No. 1222** |

### ORDER APPROVING IN PART AND RESERVING IN PART DECISION UPON DEBTORS' MOTION FOR ORDER APPROVING MODIFICATION TO ORDINARY COURSE BONUS COMPENSATION PROGRAM FOR EMPLOYEES

Upon consideration of the *Debtors' Precautionary Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees* (the "Motion"),[2] filed by the above-captioned debtors and debtors-in-possession (the "Debtors"); and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their creditors and other parties in interest, and may be authorized pursuant to section 363 of the Bankruptcy Code; and notice of the Motion having been provided to the (a) the Office of the United States Trustee, (b) counsel to the Official Committee of Unsecured Creditors, (c) counsel to UBS AG, (d) counsel to Fremont Investors VII, LLC, (e) counsel to the Ad Hoc Committee of First Lien Lenders, and (f) the persons who have requested notice pursuant to Rule 2002 of the Federal

---

[1]  The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows:  (a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc., a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

[2]  Capitalized terms not defined herein shall have the meanings set forth in the Motion.

Rules of Bankruptcy Procedure; and it appearing that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefore; and upon the hearing conducted on April 23, 2007, the testimony taken at that hearing, and the arguments of counsel;

THE COURT EXPRESSLY FINDS AND DETERMINES that with respect to the Debtors' modified ordinary course employee bonus compensation program for calendar year 2006 solely as it pertains to Sales Directors, Sales Managers, and Line Managers/Office Staff and as described as the Lender-Approved Modified Bonus in the Motion, the Debtors have satisfied the business judgment test, and any determination as to whether the program is within the ordinary course of business is therefore irrelevant; it is therefore

ORDERED that the Motion is GRANTED in part, and the ordinary course employee bonus compensation program for calendar year 2006 as modified and described as the Lender-Approved Modified Bonus (the "Modified OCP Bonus Program") is approved solely as it pertains to Sales Directors, Sales Managers, and Line Managers/Office Staff; and it is further

ORDERED that the Court takes under submission and reserves for further decision and order the Modified OCP Bonus Program as it pertains to Level I, Level II, and Level III participants; and it is further

ORDERED that this Order and the granting of the relief as described herein is without prejudice to any decision upon the Modified OCP Bonus Program as it pertains to Level I, Level II, and Level III participants; and it is further

ORDERED that the Debtors are authorized to pay the Modified OCP Bonus Program as it pertains to Sales Directors, Sales Managers, and Line Managers/Office Staff; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _Apr.1 24_____, 2007

Honorable Christopher S. Sontchi
United States Bankruptcy Judge

B-4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | Case No. 06-10072(CSS) |
| NELLSON NUTRACEUTICAL, INC., | ) | |
| et al., | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Related Docket No. 1222 |

## OPINION[1]

Laura Davis Jones
Curtis A. Hehn
Michael Seidl
Pachulski Stang Ziehl
Young Jones & Weintraub
919 N. Market Street
16th Floor
Wilmington, DE  19801

Brad R. Godshall
Alan J. Kornfeld
Pachulski Stang Ziehl
Young Jones & Weintraub
10100 Santa Monica Blvd.
Suite 1100
Los Angeles, CA  90067

Counsel for Debtors and
Debtors in Possession

Robert S. Brady
M. Blake Cleary
Margaret B. Whiteman
Young Conaway Stargatt
& Taylor, LLP
P.O. Box 391
Wilmington, DE  19899-0391

Kurt F. Gwynne
Thomas J. Francella, Jr.
Reed Smith, LLP
201 Market Street
15th Floor
Wilmington, DE  19801

Claudia Springer
Reed Smith, LLP
2500 One Liberty Place
650 Market Street
Philadelphia, PA  19103

Counsel for the Official
Committee of Unsecured
Creditors

Richard W. Riley
Duane Morris, LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801

James J. Holman
Duane Morris, LLP
30 South 17th Street
Philadelphia, PA  19103

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

Fred S. Hodara
Abid Qureshi
Akin, Gump, Strauss, Hauer
& Feld
590 Madison Avenue
New York, NY 10022

Scott L. Alberino
Akin, Gump, Strauss, Hauer
& Feld
1333 New Hampshire Ave., N.W.
Washington, D.C. 20036

Counsel for the Informal
Committee of First Lien Lenders

Linda Dakin-Grim
Gregory A. Bray
Thomas R. Kreller
Jason B. Baim
Milbank, Tweed, Hadley
& McCoy
601 S. Figueroa St.
30th Floor
Los Angeles, CA  90017

Counsel for UBS AG,
Stamford Branch

William K. Harrington
Trial Attorney
Office of the United
States Trustee
Lockbox 35
Wilmington, DE  19801

Counsel for Kelly
Beaudin Stapleton, the
United States Trustee
for Region 3

Date: May 24, 2007

SONTCHI, J.

## Introduction

Before the Court is the Debtors' Precautionary Motion For Order Approving Modification To Ordinary Course Bonus Compensation Program For Employees [Docket No. 1222]. Through the motion, the Debtors seek the Court's approval to modify the Debtors' "ordinary course employee bonus compensation program" for the calendar year 2006 (the "2006 OCP").[2]   The Debtors' motion raises a number of issues

---

[2] The Debtors did not seek Court approval when they established the 2006 OCP in April, 2006.

2

relating to the interplay between section 363(c)(1) of the
Bankruptcy Code, which provides that "the [Debtors] may
enter into transactions . . . and may use property of the
estate in the ordinary course of business without notice
and a hearing," and section 503(c) of the Bankruptcy Code,
which severely limits the Debtors' ability to pay retention
bonuses, severance, and other amounts.  More specifically,
the motion concerns the scope of the Court's inquiry in
determining whether to approve the Debtors' use of property
in the ordinary course of business to make payments
governed by section 503(c) of the Bankruptcy Code.  Is the
Court's inquiry limited to whether the Debtors are making
payments in the ordinary course of business and application
of the standard governing such transactions or does section
503(c) of the Bankruptcy Code impose additional criteria
(and, if so, what criteria) that must be satisfied before
such payments can be approved by the Court?

In evaluating the motion, the Court must address the
following questions: (i) is the Debtors' proposed
modification to the 2006 OCP a transaction or use of
property that is "in the ordinary course of business" under
363(c)(1) of the Bankruptcy Code and, if so, have the
Debtors satisfied the standard governing such transactions;
(ii) is section 503(c)(1) of the Bankruptcy Code, which

3

limits retention payments to insiders, applicable to an otherwise valid transfer made in the ordinary course of business to "an insider of the debtor for the purpose of inducing such person to remain with the debtor's business;" (iii) assuming section 503(c)(1) is applicable, is the modification of the 2006 OCP a transfer to "an insider of the debtor for the purpose of inducing such person to remain with the debtor's business;" and (iv) is section 503(c)(3) of the Bankruptcy Code, which limits "other transfers . . . that are outside the ordinary course of business," including payments to officers, managers or consultants, applicable to an otherwise valid transfer made in the ordinary course of business, notwithstanding the limitation on the face of the statute to the contrary.

Applying the horizontal and vertical dimensions test articulated by the Third Circuit, the Court finds that the modification of 2006 OCP is within the ordinary course of the Debtors' business under 363(c)(1) of the Bankruptcy Code. The Court further finds that the Debtors have satisfied the standard governing transactions in the ordinary course of business.

The Court also finds that section 503(c)(1) is applicable to an otherwise valid "transfer made in the ordinary course of business to an insider of the debtor for

the purpose of inducing such person to remain with the debtor's business." Nonetheless, the Court finds that the modification of the 2006 OCP is not such a transfer.

Finally, the Court finds that section 503(c)(3) is specifically limited to transactions outside of the ordinary course of business and, thus, is not applicable to the modification of the 2006 OCP.

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) (B), (M) and (O).

### Statement of Facts

**General Background**

On January 28, 2006, Nellson Nutraceutical, Inc. and certain of its affiliates (collectively, the Debtors) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors are contract manufacturers of nutritional bars and powders. As such, the Debtors do not manufacture or sell products under their own label. Rather, the

5

Debtors develop and produce products for sale by their customers.

**2006 Employee Incentive Programs**

In January, 2006, prior to the filing of these Chapter 11 cases, the Debtors implemented a key employee retention plan (the "KERP") that provided for payment to nine management employees (all of which are "insiders" under section 101(31) of the Bankruptcy Code) in the aggregate amount of $710,000 upon the occurrence of the earlier of a termination of employment without cause or a "capital event" involving a sale of the Debtors' business or a restructuring of its capital structure.

Almost immediately after the filing of these Chapter 11 cases, in April, 2006, the Debtors implemented two separate incentive plans for certain of its employees. The first such plan was a management incentive plan ("MIP"), which replaced the KERP. Under the MIP, the Debtors established a bonus pool of approximately $1.4 million to provide incentive to the same nine management employees (and insiders) covered under the KERP to assist the Debtors in the effort to restructure the Debtors' business. Unlike the original KERP, payment of the bonuses under the MIP was to be earned by the achievement of certain EBITDA targets

for 2006, which were described as "performance milestones."[3]
After conducting a two-day trial on the matter, the Court
entered an order in July, 2006, approving the MIP.
Ultimately, the Debtors paid bonuses totaling approximately
$550,000 under the MIP as the Debtors did not achieve all
of the performance milestones.   No further payments under
the KERP or the MIP are due to any of the Debtors'
employees.

In April 2006, the Debtors also implemented the 2006
OCP.   The 2006 OCP is an employee incentive plan covering
approximately 130-140 employees divided into six
categories.   Under the 2006 OCP, the Debtors established a
bonus pool of approximately $2.1 million to motivate
employees to "keep[] momentum going forward . . . in both
sales and EBITDA." Hr'g. Tr. 40, Apr. 23, 2007. *But see*
Debtors Ex. 2 ("For 2006, the purpose is to build
EBITDA.").   The categories under the 2006 OCP and their
respective share of the bonus pool are set forth below:

---

[3]  "EBITDA" means earnings before interest, taxes, depreciation and
amortization.

7

60

| Category | Description of Covered Employees | Approximate Number of Covered Employees | Bonus Pool ('000) |
|---|---|---|---|
| **Level I** | Management level officers, including the Chief Executive Officer, Chief Financial Officer and various vice presidents of the Debtors | 8 | $1,037 |
| **Level II** | Operational directors[4] of the Debtors, including Director of Purchasing, Director of Manufacturing and Director of Finance | 14 | $490 |
| **Level III** | Managers, including R&D Managers, Materials Managers and Maintenance Managers | 32 | $469 |
| **Sales Directors** | Director level employees in charge of sales to customers | 3 | $27 |
| **Sales Managers** | Manager level employees in charge of sales to customers | 5 | $16 |
| **Line Managers/ Office Staff** | Employees responsible for managing the day-to-day tasks of the Debtors | 71 | $87.6 |
| **Total** | | **131** | **$2,126.6** |

For Level I, Level II and Level III employees, payment of the bonuses under the 2006 OCP was "totally based on

---

[4] The Debtors' use of "director" in describing certain of its employees does not mean that these employees are members of the board of directors. In fact, the only employee that is also a member of the board of directors is the Debtors' Chief Executive Officer, Mr. Dias. Hr'g Tr. 45-50.

8

achievement of the Consolidated Budgeted EBITDA level" for 2006, which was $43.2 million. Debtors Ex. 2.  For the remaining employees, payment of the bonuses was based on other criteria, such as sales, earnings or hours worked. Id.[5]

Under the 2006 OCP, the Level I, II and III employees would receive a bonus calculated as a percentage of base salary in the event the Debtors achieved their target EBITDA of $43.2 million for 2006.  This "target bonus" was 50% of base salary for Level I employees; 30% of base salary for Level II employees; and 20% of base salary for Level III employees.[6]  In the event the Debtors did not achieve their target EBITDA of $43.2 million but achieved at least 93% of their target, i.e., EBITDA of $40.2 million, the Level I, II and III employees would still receive a bonus at 50% of the target level.  Thus, under the 2006 OCP, if the Debtors achieved EDITDA in the range of $40.2 - $43.2 million, the Debtors would pay bonuses of 25% of base salary for Level I employees;[7] 15% of base

---

[5] At the conclusion of the hearing on the motion, the UST withdrew her objection to the 2006 OCP as it pertains to Sales Directors, Sales Managers and Line Managers/Office Staff and the Court entered an order approving bonuses for those employees.  Thus, the Court will focus its recitation of the facts to those applicable to the Level I, II and III employees.

[6] The "target bonus" for the Debtors' Chief Executive Officer was 60% of base salary.

[7] 30% for the Debtors' Chief Executive Officer.

9

salary for Level II employees; and 10% of base salary for Level III employees.[8]

The Debtors' Chief Executive Officer, Mr. Jeffrey Dias, testified that the target EBITDA of $43.2 million established in March 2006 was a "stretch" and did not take into account the possible negative effects to the Debtors' business that might result from the Debtors' bankruptcy. Nonetheless, Mr. Dias testified that the Debtors set a target of $43.2 million of EBITDA because: (i) it exceeded the Debtors' results for the last 12 months as of March 2006, which had been trending positively in late 2005 and early 2006; (ii) the initial reaction of the Debtors' customers, employees and suppliers to the bankruptcy had been favorable; (iii) there was no reason to believe the Debtors' performance would decline; and (iv) it would not successfully motivate the employees to establish a bonus program contingent upon the Debtors performing more poorly than the most recent operating results.

Ultimately, the Debtors did not achieve their target EBITDA for 2006. In fact, the Debtors' EBITDA for 2006 was $37.1 million or 86% of the target EBITDA of $43.2 million.

---

[8] The Debtors' Chief Executive Officer testified that he was authorized to pay bonuses under the 2006 OCP if the Debtors achieved 90% of target EBITDA. Nonetheless, the documentation implementing the 2006 OCP established 93% of target EBITDA as the minimum threshold for payment of bonuses.

10

Thus, under the terms of the 2006 OCP as implemented in April, 2006, no bonuses are due to the Level I, II or III employees.[9]

**2007 Modification of the 2006 OCP Program**

Notwithstanding that the Debtors did not achieve their target EBITDA for 2006, in January 2007, the Debtors modified the 2006 OCP to authorize paying bonuses to all of the employees covered under the program. Under the modified 2006 OCP (as adopted in January 2007), the Level I, II and III employees would receive bonuses in *excess* of those payable under the original 2006 OCP had the Debtors achieved EDITDA in the range of $40.2 - $43.2 million. In order to mollify the Debtors' primary creditor constituencies, the Debtors subsequently reduced the bonuses payable to the Level I employees (including the Chief Executive Officer) to an amount slightly below that which would have been payable had the Debtors achieved 93% of the target EBITDA. The specific bonuses payable under the modified 2006 OCP to Level I, II and III employees (after the reduction described above) are as follows:

---

[9] In addition, under the terms of the 2006 OCP as implemented in April, 2006, no bonuses are due to the Sales Directors, Sales Managers or Office Staff. It is unclear from the record whether any bonuses are due to the Line Managers.

11

| Category | Original Bonus at 100% Target EBITDA (% Base Salary) | Original Bonus at 93% EBITDA (% Base Salary) | Modified Bonus at 87% EBITDA (% Base Salary) | Modified Bonus Pool at 87% EBITDA ('000) |
|---|---|---|---|---|
| Level I | 50%[10] | 25%[11] | 23.5% | $487.7 |
| Level II | 30% | 15% | 22.5% | $355.7 |
| Level III | 20% | 10% | 15% | $350.6 |
| Total | | | | $1,194.0 |

In addition, under the modified 2006 OCP, the Sales Directors would receive bonuses at 98% of the level that would have been due had the Debtors achieved their target. The Sales Managers, Line Managers and Office Staff would receive bonuses under the modified 2006 OCP at 100% of the level that would have been due had the Debtors achieved their target. The total bonus pool under the modified 2006 OCP for the employees below Level III is $130,000 compared to approximately $1.2 million in the aggregate for Level I, II and III employees.

Mr. Dias testified that, notwithstanding the failure to achieve the lowest threshold for payment of bonuses under the original plan, the payment of bonuses under the modified 2006 OCP is justified because the Debtors' failure

---

[10] 60% for the Debtors' Chief Executive Officer.

[11] 30% for the Debtors' Chief Executive Officer.

to achieve those targets was not a result of any failure by the employees.

> The Board looked back across the year, said now we can understand at least some of the impact of bankruptcy and other effects on the business which were not the responsibility of either the management or the employees, and they decided that . . . should not be a basis for denying people compensation when the things they could influence, they had done, frankly a great job on.

Hr'g Tr. 62.

Rather, Mr. Dias testified that the failure to achieve the EBITDA target was primarily the result of (i) a reduction in new business from existing customers related directly to the ongoing bankruptcy; and (ii) currency fluctuations that adversely affected the earnings of the Debtors' Canadian operations. Thus, Mr. Dias testified that it made "good business sense" to modify the 2006 OCP to allow for payment of bonuses.

> The EBITDA target was set in an environment where we had no idea of the impact of [bankruptcy], and we said so. We told our employees – I told them that I didn't want them to have in their mind thinking about any impact of [bankruptcy]. I wanted them to perform as though this was better than a normal year for the company. The numerical analysis when you do a look back shows that if you add back the amount of money that was due to the hit on sales from bankruptcy, and you make an adjustment for the currency effect, even by the very original rules of the plan that I presented to the Board, a 70 percent payment of target would have been justified.

Hr'g Tr. 66 - 67.

13

**Pre-2006 Employee Incentive Programs**

The Debtors had previously adopted employee incentive programs for 2003, 2004 and 2005 that were substantially similar to the 2006 OCP. In each of those years, the Debtors established an EBITDA target, divided the employees into different categories, and established a bonus as a percentage of base salary based upon achieving the EBITDA target (with an increased bonus if the employees outperformed the objective and a reduced bonus if the employees underperformed the objective).

In addition, in each of those years the Debtors made *ex-post* adjustments to the employee incentive program. Mr. Dias testified that:

> two things typically happen every year. One is, you design a program for that year that addresses the unique circumstances of the year, and then you also look back across the year, and the Board always reserves the right to make changes in a plan based on what it sees as operationally significant for the year.

Hr'g Tr. 42.

Thus, in early 2004, the Debtors decided to make bonus payments under the 2003 employee incentive program even though the Debtors failed to achieve the target for 2003. Those payments were at 30% to 50% of what would have been payable had the Debtors achieved the target for 2003.

14

Similarly, in early 2005, the Debtors decided to make bonus payments to certain employees under the 2004 employee incentive program even though the Debtors failed by a wide margin to achieve the target for 2004. In this instance, the Debtors did not grant bonuses to senior management but did make payments to junior managers and other employees.

Finally, in early 2006, the Debtors decided to make bonus payments under the 2005 employee incentive program even though the Debtors failed to achieve the target for 2005. The Debtors made bonus payments at 66% of what would have been payable had the Debtors achieved the 2005 target.

**The Motion and the Hearing**

The Debtors did not seek Court approval when the 2006 OCP was established in April 2006. In July 2006, during the trial on approval of the MIP, the Debtors' counsel represented to the Court that the Debtors would seek Court approval prior to making any payments to employees under the 2006 OCP in the event the performance milestones under the 2006 OCP were not met.

In March 2007, after negotiations with the UST, the Official Committee of Unsecured Creditors (the "Committee"), UBS AG, Stamford Branch, the agent for the First Lien Lenders and the Second Lien Lenders ("UBS"), and the Informal Committee of First Lien Lenders (the "Informal

Committee"), the Debtors filed the motion.    On April 23,
2007, the Court conducted a hearing on the motion.

At the hearing, the Debtors' Chief Executive Officer,
Mr. Dias, testified in favor of the motion.    In addition,
the Debtors offered the testimony of a compensation
expert.[12]    The Debtors' expert, Jeff Visithpanich, offered
the following opinions[13] at the hearing:

i)    it is common for companies comparable to the
      Debtors to have bonus programs similar to the
      2006 OCP;

ii)   it is common for companies comparable to the
      Debtors to modify bonus programs in a manner
      similar to the Debtors' modification of the 2006
      OCP;

iii)  the 2006 OCP as modified is reasonable because
      the total compensation (including base salary and
      all bonuses) to be paid to the Debtors' Level I
      and II employees is within market norms for
      companies comparable to the Debtors; and

iv)   the payment of bonuses to the Level I, II and III
      employees under the 2006 OCP as modified is
      consistent with the Debtors' payment of bonuses
      in 2003, 2004 and 2005.

The UST opposed the motion, cross-examined each of the
witnesses and submitted a number of exhibits into evidence
in opposition to the motion.

---

[12] The Debtors also submitted numerous exhibits into evidence in support
of the motion.

[13] Mr. Visithpanich was qualified under Rule 702 of the Federal Rules of
Evidence (without objection) as an expert in compensation.

Counsel for the Committee stated at the hearing that, based upon the agreed reduction of the bonus payable to the Level I employees and the clarification that no further payments were due to any employees under the MIP or the KERP, the Committee did not object to the motion.  In addition, counsel for UBS and the Informal Committee both expressed support for the motion.  Thus, the motion has the tacit or active support of the parties with an economic stake in the outcome of these Chapter 11 cases.

### Legal Analysis

**The Debtors' modification of the 2006 OCP is "in the ordinary course of business" under 363(c)(1) of the Bankruptcy Code and the Debtors have satisfied the standard governing such transactions.**

Under sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors (as debtors in possession) are authorized to operate their business.  11 U.S.C. §§ 1107(a) and 1108. Section 363(c)(1) of the Bankruptcy Code provides that, unless the Court orders otherwise, a debtor in possession may enter into transactions, including the use, sale or lease of estate property in the ordinary course of business, without notice and a hearing. 11 U.S.C. § 363(c)(1). In contrast, section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "*after notice and a hearing*, may use, sell, or lease, other than in the

17

ordinary course of business, property of the estate." 11
U.S.C. § 363(b)(1) (emphasis added).[14]  Thus, whether notice
and a hearing are required depends on whether a transaction
is "in the ordinary course of business."

The distinction between transactions in the ordinary
course of business and those outside the ordinary course of
business, however, goes beyond the procedural requirements
of notice and a hearing.  "The framework of section 363 is
designed to allow a trustee (or debtor in possession) the
flexibility to engage in ordinary transactions without
unnecessary creditor and bankruptcy court oversight, while
protecting creditors by giving them an opportunity to be
heard when transactions are not ordinary." *In re Roth*
*American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).

Indeed, "the discretion [for a debtor in possession]
to act with regard to *ordinary* business matters without
prior court approval has been said to be 'at the heart' of
the powers of a . . . debtor in possession, and courts have
shown a reluctance to interfere, in the making of routine,
day-to-day business decisions." 7 COLLIER ON BANKRUPTCY ¶
1108.07 (Alan N. Resnick and Henry J. Sommer eds. 15th ed.
2006) (emphasis in original).  As such, if the Court

---

[14] Absent notice and a hearing, a transaction outside the ordinary
course of business is avoidable. 11 U.S.C. § 549(a)(2)(B).

18

determines that a transaction is in the ordinary course of
a debtor's business, the Court will not entertain an
objection to the transaction, provided that the conduct
involves a business judgment made in good faith upon a
reasonable basis and within the scope of authority under
the Bankruptcy Code. *In re Curlew Valley Associates*, 14
B.R. 506, 513 (Bankr. D. Utah 1981). Put another way, the
Court will not disturb a transaction within the ordinary
course of business if "the trustee can articulate reasons
for his conduct (as distinct from a decision made
arbitrarily or capriciously)" *Id*. at 513 n.11a.

Although the determination of whether a transaction is
in the ordinary course of business can have broad
implications, "[n]either the Bankruptcy Code nor its
legislative history provides a framework for analyzing
whether particular transactions are in the ordinary course
of a debtor's business." *Roth American*, 975 F.2d at 952.
In order to determine whether or not a transaction falls in
the ordinary course of business most courts, including the
Third Circuit, have adopted a two-step inquiry. *Id*. This
inquiry consists of looking at the transaction from
horizontal and vertical dimensions. *Id*. The test for the
horizontal dimension "is whether, from an industry-wide

perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Id*. at 953.

The vertical dimension, which is also known as the creditor's expectation test, "analyzes the transactions from the vantage point of a hypothetical creditor and the inquiry is whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit." *Id*. (quotations omitted). Under the vertical test, "the touchstone of ordinariness is the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of business." *Id*. Thus, a debtor's pre-petition business practices and conduct is the primary focus of the vertical analysis. *Id*. The Court must "also consider the changing circumstances inherent in the hypothetical creditor's expectations." *Id*. (citations omitted.)

In this case, the Debtors' modification of the 2006 OCP satisfies both the horizontal and vertical dimensions tests and, thus, is within the ordinary course of the Debtors' business. First, with regard to the horizontal dimension test, Mr. Visithpanich's testified that not only is it common for companies comparable to the Debtors to have bonus programs similar to the 2006 OCP, it is also

20

common for those comparable companies to modify bonus programs in a manner similar to the Debtors' modification of the 2006 OCP.

Specifically, Mr. Visithpanich identified 20 companies that he opined were comparable, based upon revenue, EBITDA and products, to the Debtors.    Mr. Visithpanich "then analyzed, based upon publicly available documents, what [the comparable companies'] bonus plans look like and from analyzing those bonus plans, [determined] that the measures there are very similar to what we have at [the Debtors]." H'rg Tr. 137.    Mr. Visithpanich testified that 12 of the 20 comparable companies have bonus programs containing measures very similar to those applicable to the Level I, II, and III employees as well as the sale professionals.

Mr. Visithpanich further testified that 10 of those 20 companies had language in their bonus plans allowing for *ex post* adjustments and 6 of those 20 companies actually made *ex post* adjustments to their bonus plans similar to the modification of the 2006 OCP by the Debtors.    Moreover, Mr. Visithpanich testified that, because he relied upon publicly available data, the frequency of *ex post* adjustments may be even higher than he observed in that many of those cases where the comparable companies were not identified as having similar programs or making similar *ex*

21

*post* adjustments there was insufficient information available to determine whether the company's bonus program was similar to the Debtors' program. Thus, Mr. Visithpanich's testimony established that the horizontal dimension test is satisfied because "from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Roth American*, 975 F.2d at 953.

Second, with regard to the vertical dimension test, Mr. Dias testified that the Debtors' modification of the 2006 OCP is consistent with the Debtors' pre-petition business practices. Specifically, Mr. Dias testified that the Debtors had previously adopted employee incentive programs for 2003, 2004 and 2005 that were substantially similar to the 2006 OCP. Each of those bonus programs established an EBITDA target, divided the employees into different categories, and established a bonus as a percentage of base salary based upon achieving the EBITDA target. Moreover, in each of those years, the Debtors awarded bonuses to some or all of the covered employees at reduced levels, notwithstanding that in each year the Debtors failed to achieve the target for that year. Finally, Mr. Visithpanich opined that the payment of bonuses to the Level I, II and III employees under the 2006

22

75

OCP as modified is consistent with the Debtors' payment of bonuses in 2003, 2004 and 2005.

Thus, the testimony of Mr. Dias and Mr. Visithpanich established that the Debtors' modification of the 2006 OCP was consistent with the Debtors' pre-petition business practices – at least for the somewhat limited period of 2003-2005. As a result, the modification of the 2006 OCP is consistent with "the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of business" and, thus, the vertical dimension test is satisfied. *Id.*

The finding that the Debtors' modification of the 2006 OCP is in the ordinary course of the debtors' business is consistent with the holdings of two recent cases where bankruptcy courts have determined that an incentive plan established post-petition by a debtor-in-possession for the benefit of senior management is in the ordinary course of the debtor's business. *See In re Dana Corp.*, 358 B.R. 567 (Bankr. S.D.N.Y 2006); and *In re Global Home Products, LLC*, No. 06-10340 (KG), 2007 Bankr. LEXIS 758 (Bankr. D. Del. March 6, 2007).

In *Dana Corp.*, the debtors sought court approval of an executive compensation package, including a long term incentive plan, but took the position that Court approval

was not necessary with respect to a separate, short-term annual bonus program. *Dana Corp.*, 358 B.R. at 579-80. The short-term program was a "refinement of the [pre-petition] short-term incentive program, reflecting the current business conditions and a reduction in the number of participants, and [was] similar to [the debtor's] previous short-term incentive programs." *Id.* at 579. Applying the horizontal and vertical tests, the court in *Dana Corp.* found that the short-term incentive plan was within the ordinary course of the debtor's business. *Id.* at 581. In so ruling, the court specifically stated that a short-term incentive plan similar to that before the *Dana Corp.* court had "been a common component of compensation plans at [the debtor] for the past fifty years and does not differ significantly from [the debtor's] pre-petition practice." *Id.* Notwithstanding the ruling that the short-term incentive plan was within the ordinary course of the debtor's business, the court reviewed the short-term incentive plan "in the context of determining whether the overall compensation proposal is a proper exercise of [the debtor's] business judgment." *Id.*

In other words, while the court did not rule on the merits of the short-term incentive plan, it considered the payments to be made under the short-term plan as evidence

24

77

in determining the reasonableness of the long-term incentive plan, the adoption of which was not in the ordinary course of the debtor's business. Indeed, in approving the long-term incentive plan, the Court required the imposition of limits on the total compensation payable to the covered employees based, in part, on the payments to be made under the short-term plan. *Id.* at 583-84. In considering whether to approve the long-term incentive plan, the court, citing numerous cases, applied a number of factors generally used by courts to determine whether a compensation program established outside the ordinary course of business meets the "sound business judgment" test. *Id.* at 576-77.

A similar result was reached in *Global Home Products*. *Global Home Products*, 2007 Bankr. LEXIS 758. In *Global Home Products*, the debtors sought approval of a "performance and incentive based bonus plan" for senior management and an "incentive based sales bonus plan." *Id.* at *1. The focus of the court's opinion in *Global Home Products* is whether the proposed plans were retention or severance arrangements subject to review under section 503(c) of the Bankruptcy Code. *Id.* at *4-7. In addition, while not specifically applying the horizontal and vertical dimension tests, the court found that the adoption of the

25

78

incentive plans was "clearly in the ordinary course of the [d]ebtors' businesses." *Id.* at \*7.  The court then found that the adoption of the incentive plans was a reasonable exercise of the debtors' business judgment, applying the factors identified by the *Dana Corp.* court. *Id.*

The modification of the 2006 OCP before the Court is very similar to the short-term incentive plan that the court in *Dana Corp.* found to be in the ordinary course of business.  Because the entire incentive program before the Court in this case is within the ordinary course of the Debtors' business judgment, however, the criteria developed in *Dana Corp.* for analyzing whether an incentive plan adopted outside the ordinary course of business is a reasonable exercise of a debtor's business judgment are not applicable here.  To the extent that the court in *Global Home Products* held that the *Dana Corp.* factors are applicable to an incentive program adopted in the ordinary course of a debtor's business, this Court respectfully disagrees with that holding.

Rather, since the modification of the 2006 OCP is within the ordinary course of the Debtors' business, the Court will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope

26

79

of authority under the Bankruptcy Code. *See In re Curlew Valley Associates*, 14 B.R. at 513. The evidence established that the Debtors' modification of the 2006 OCP involves a business judgment made in good faith upon a reasonable basis. Mr. Dias testified at length as to why the payment of bonuses under the modified 2006 OCP "made good business sense," notwithstanding the failure to achieve the lowest threshold for payment of bonuses under the original plan.

In addition, Mr. Visithpanich testified that the 2006 OCP as modified is reasonable because the total compensation (including base salary and all bonuses) to be paid to the Debtors' Level I and II employees is within market norms for companies comparable to the Debtors. Mr. Visithpanich's testimony on this point, however, is of limited utility because Mr. Visithpanich's analysis did not consider financial performance. For example, Mr. Visithpanich did not analyze whether the compensation to be paid to the Level I and II employees was within market norms for companies with poor financial performance.

Nonetheless, the evidence presented by the Debtors was more than sufficient to satisfy the relatively light evidentiary burden of establishing that the Debtors made a business judgment in good faith upon a reasonable basis.

27

*Id.*  Whether that business judgment is "within the scope of authority under the Bankruptcy Code" is discussed below.

**Section 503(c)(1) of the Bankruptcy Code, which limits retention payments to insiders, is applicable to the Debtors' modification of the 2006 OCP.**

Section 503(c) of the Bankruptcy Code is the result of an amendment to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 331, 119 Stat. 23, 102-03 (2005), that was proposed by Senator Edward Kennedy during the Judiciary Committee's mark-up of the bill. *See Dana Corp.*, 358 B.R. at 575 (discussing the origins of Section 503(c) of the Bankruptcy Code). Although there is little in the way of legislative history, it is widely acknowledged that the amendment was a response to perceived abuses of the bankruptcy system by "the executives of giant companies . . . who lined their own pockets, but left thousands of employees and retirees out in the cold." *Id.* (quoting Statement of Senator Edward Kennedy (March 1, 2005)).  In this vein, Section 503(c) imposes a variety of restrictions on the compensation that can be paid both to executives and other employees of companies that are in bankruptcy.

Section 503(c)(1) of the Bankruptcy Code limits retention payments that can be made to insiders of the debtor.  Specifically, Section 503(c)(1) provides, subject

to certain exceptions not applicable in this case, that "[t]here shall neither be allowed, nor paid . . . a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1).

Relying on *Dana Corp.*, the Debtors argue that section 503(c)(1) is not applicable to the modification of the 2006 OCP because the modification was adopted in the ordinary course of the Debtors' business. *Dana Corp.*, 358 B.R. at 575 ("Section 503(c) . . . restricts transfers or payments by debtors to the extent that such payments are outside the ordinary course."). The Debtors argue that the holding in *Dana Corp.* is that section 503(c) *only* restricts payments made outside the ordinary course of business. As the word "only" does not appear in the sentence, the Court disagrees with the Debtors' interpretation. Nonetheless, to the extent that the court in *Dana Corp.* so held, this Court respectfully disagrees.

Nothing in section 503(c)(1) of the Bankruptcy Code limits its applicability to transactions or payments made outside the ordinary course of business. The only limitation in section 503(c)(1) is that the transfer be "for the benefit of, an insider of the debtor for the

29

82

purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1). Under well-established canons of statutory construction, the Court need go no further than the plain meaning of the statute to determine its meaning. *Perrin v. United States*, 444 U.S. 37, 42 (1979) (The plain meaning rule stands for the fact that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").

This reading of the plain meaning of the statute is reinforced by the language of section 503(c)(3), which is part of the same amendment proposed by Senator Kennedy. Section 503(c)(3) provides that it is applicable to "transfers or obligations that are *outside* the ordinary course of business." 11 U.S.C. § 503(c)(3) (emphasis added). Under the principle of *noscitur a sociis*, the meaning of an unclear word or phrase should be determined by the words immediately surrounding it. *James v. United States*, 127 S. Ct. 1586, 1605 (2007) (Scalia, J., dissenting). "Of course *noscitur a sociis* is just an erudite (or some would say antiquated) way of saying what common sense tells us to be true: '[A] word is known by the company it keeps,' -- that is to say, which of various possible meanings a word should be given must be determined in a manner that makes it 'fit' with the words with which

it is closely associated. *Id.* (citing *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S. Ct. 1579 (1961)). The inclusion of the limiting language "outside the ordinary course of business" in section 503(c)(3) counsels against reading such a limitation into section 503(c)(1).

Thus, under the established canons of statutory construction, section 503(c)(1) of the Bankruptcy Code is applicable to the Debtors' modification of the 2006 OCP, provided that the payments under the bonus program are to "an insider of the debtor for the purpose of inducing such person to remain with the debtor's business."

**Modification of the 2006 OCP is not a transfer to "an insider of the debtor for the purpose of inducing such person to remain with the debtor's business."**

Having held that section 503(c)(1) is applicable, the Court must determine whether the modification of the 2006 OCP is, in fact, a transfer to an insider of the debtor for the purpose of inducing such person to remain with the debtor's business.

As a preliminary matter, section 503(c)(1) only applies to transfers to "insiders," which includes the directors and officers of the Debtors. 11 U.S.C. § 101(31). Only the Level I employees under the 2006 OCP are "insiders" as defined in the Bankruptcy Code. Thus, section 503(c)(1) does not preclude or restrict any

31

payments under the 2006 OCP to the Level II or Level III employees.[15]

The more difficult question is whether the bonus payments to the Level I employees under the modified 2006 OCP are "for the purpose of inducing such person to remain with the debtor's business." "It is well established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Tr.*, 540 U.S. 526, 534 (U.S. 2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6, 120 S. Ct. 1942 (2000) (in turn quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S. Ct. 1026 (1989) (in turn quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S. Ct. 192 (1917)))).

Any payment to an employee, including regular wages, has at least a partial purpose of retaining the employee. Therefore if the Court did not apply a materiality standard, all payments to insiders would be subject to 503(c)(1), which would be an absurd result. At the same time, applying a "sole purpose" standard goes too far.

---

[15] Neither does section 503(c)(1) restrict any payments to the Sales Directors, Sales Managers, Office Staff or Line Managers.

Thus, the Court reads section 503(c)(1) to mean "a transfer made to . . . an insider of the debtor for the *[primary]* purpose of inducing such person to remain with the debtor's business." 11 U.S.C §503(c)(1) (emphasis added).

This reading of section 503(c)(1) is consistent with the holdings in *Dana Corp.* and *Global Home Products.* The court in *Dana Corp.* held that "merely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature." *Dana Corp.*, 358 B.R. at 571. The court then held that "[b]y presenting an executive compensation package that properly [motivates senior management] to produce and increase the value of the estate, the [debtor has] established that section 503(c)(1) does not apply to [the debtor's motion]." *Id.* at 584.

Similarly, in discussing whether a bonus plan satisfies the criteria of section 503(c), the court in *Global Home Products* noted that "[t]he entire analysis changes if a bonus plan is not *primarily* motivated to retain personnel." *Global Home Products*, 2007 Bankr. LEXIS 758 at *6 (emphasis added). The court went on to find that:

> [the bonus plans] are primarily incentivizing and
> only coincidently retentive because [the debtors]
> employed virtually identical plans prepetition when

33

86

retention was not the motive. The fact, as [the debtors] pointed out, that all compensation has a retention element does not reduce the Court's conviction that [the debtor's] primary goal [is] to create value by motivating performance. All companies seek to retain employees by fairly compensating them.

Id. at *7.

Under the facts of this case, although the modification of the 2006 bonus program has some retentive effect, it is for the primary purpose of motivating employees and, thus, the limitations of section 503(c)(1) are not applicable. Mr. Dias testified that the 2006 OCP was designed to motivate employees to "keep[] momentum going forward . . . in both sales and EBITDA." He further testified that the target EBITDA of $43.2 million established in March 2006 was a "stretch" and did not take into account the possible negative effects to the Debtors' business that might result from the Debtors' bankruptcy.[16]

Mr. Dias also testified that the payment of bonuses under the modified 2006 OCP is justified, notwithstanding the failure to achieve the lowest threshold for payment of

---

[16] The testimony that the target EBITDA of $43.2 million established in March 2006 was a "stretch" is consistent with previous evidence before this Court in connection with a different matter. *See In re Nellson Nutraceutical, Inc.*, No. 06-10072 (CSS), 2007 Bankr. LEXIS 99 at *38-9 (Bankr. D. Del. Jan. 18, 2007) (In April, 2006, "Mr. Dias proposed a base revenue goal of $305 million and EBITDA of $41.05, *with the previous goals suggested at the March 16 Board Meeting of revenue $314 and EBITDA $43.02 being relegated to "stretch" goals*.") (emphasis added).

34

bonuses under the original plan, because the Debtors' failure to achieve those targets was not a result of any failure by the employees, who, in fact, had done a "great job." Thus, Mr. Dias testified that it made "good business sense" to modify the 2006 OCP to allow for payment of bonuses even though the Debtors missed their EBITDA target.

Finally, both Mr. Dias and Mr. Visithpanich testified that the payment of bonuses under the modified 2006 OCP was consistent with the Debtors' pre-petition practices. Mr. Dias went on to testify that departing from the pre-petition practice would have an adverse affect on employee morale.

The UST argues with some force that if an incentive plan is based on achievement of EBITDA targets and those targets are not achieved, yet the bonus is still received, that the plan cannot be an incentive plan but must, in fact, be solely a retention plan.

> [I]f you have an incentive plan that's analyzed after the fact and the incentive plan is based on achievement of EBITDA targets and you don't achieve those EBITDA targets but yet you still get a bonus . . . I don't understand what other purpose it could serve other than to be a retention plan when the threat is that it will cause destruction, and these people will leave.

Hr'g Tr. 196.

While the Court agrees that the payment of bonuses under the modified 2006 OCP has some retentive effect, the Court disagrees with the UST's argument that its sole or primary purpose is retention. Consistent with the Debtors' pre-petition practice, the 2006 OCP must be considered as a whole. It consists of two parts: the establishment of "aspirational goals" in the early part of the year; and a review at the end of the year to consider whether those goals have been met and, if not, why. In this case, the Debtors' did just that and determined that the 2006 OCP served its purpose by motivating the employees to do a "great job" in connection with the matters that those employees could reasonably be expected to influence. As such, the Debtors seek to award bonuses at a reduced level to compensate the employees for their success (albeit somewhat limited) in 2006 and to motivate the employees in 2007.

Thus, the Court finds that the bonus payments to the Level I employees under the modified 2006 OCP are not for the primary purpose of inducing the Level I employees to remain with the Debtors' business and, thus, they are not precluded or restricted by section 503(c)(1) of the Bankruptcy Code.

**Section 503(c)(3) of the Bankruptcy Code, which limits payments to officers, managers or consultants, is not applicable to the Debtors' modification of the 2006 OCP.**

Section 503(c)(3) of the Bankruptcy Code limits payment of obligations outside of the ordinary course of business that are not covered by subsection (1) or (2), providing:

> [there shall neither be allowed, nor paid-] (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).

Section 503(c)(3) applies to "officers, managers, or consultants" -- a broad category of employees that includes all Level I, II and III employees under the 2006 OCP.[17] Nonetheless, section 503(c)(3) only limits "transfers or obligations that are *outside* the ordinary course of business." 11 U.S.C. § 503(c)(3) (emphasis added). As discussed at length above, the Court finds that the Debtors' modification of the 2006 OCP was in the ordinary course of the Debtors' business. Thus, under the plain

---

[17] In addition, it would appear that the employees in the Sales Directors, Sales Managers and Line Managers categories under the 2006 OCP are covered by this section. It is unclear whether any employees in the Office Staff category are covered.

meaning of the statute, section 503(c)(3) is simply inapplicable here. *Perrin*, 444 U.S. at 42.

The UST argues that section 503(c)(3) should not be read so restrictively. Rather, the UST argues that section 503(c)(3) requires that all transfers to officers, managers, or consultants, including transfers outside the ordinary course of business, must be justified by the facts and circumstances of the case. The Court disagrees with the UST's reading of the statute.

In effect, the UST wants to rewrite section 503(c)(3) to read as follows:

> [there shall neither be allowed, nor paid-] (3) other transfers or obligations that are ~~outside the ordinary course of business and~~ not justified by the facts and circumstances of the case, including transfers **outside the ordinary course of business** and made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

In other words, the UST wants to read the phrase "outside the ordinary course of business" as illustrative as opposed to exclusive. While Senator Kennedy could certainly have written his amendment that way, he did not. Moreover, reading the statute as written does not lead to an absurd result. *See Lamie,* 540 U.S. at 534 (Where the disposition required by the text is not absurd the function of the Court is to apply the text as written). Indeed, such a

91

reading is wholly consistent with section 363 of the Bankruptcy Code, which is the source of the distinction between transfers within and outside the ordinary course of business and is "designed to allow a trustee (or debtor in possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *Roth American*, 975 F.2d at 952.

Thus, under the plain meaning of section 503(c)(1) of the Bankruptcy Code, the statute is inapplicable to the Debtors' modification of the 2006 OCP.[18]

### Conclusion

In this case and under the facts established at the hearing, the Court finds that the Debtors' modification of the 2006 OCP was within the ordinary course of the Debtors' business. The Court further finds that section 503(c)(1) of the Bankruptcy Code is not applicable because the Debtors' modification of the 2006 OCP was not for the primary purpose of inducing employees to remain with the Debtors' business. Because section 503(c)(3) is also not applicable, the Court's inquiry is limited to the standard

---

[18] Having determined that section 503(c)(3) is inapplicable, the Court need not determine whether the modification of the 2006 OCP is "justified by the facts and circumstances of the case."

under section 363(c)(1), i.e., whether the Debtors' modification of the 2006 OCP was a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code, which the Court finds satisfied.

Debtors' counsel is instructed to submit a proposed order consistent with this opinion under certification of counsel.

B-5

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) | Case No. 06-10072 (CSS) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Related to Docket Nos. 1222, 1269, 1339** |

## SECOND ORDER GRANTING DEBTORS' PRECAUTIONARY MOTION FOR ORDER APPROVING MODIFICATION TO ORDINARY COURSE BONUS COMPENSATION PROGRAM FOR EMPLOYEES

Upon consideration of the *Debtors' Precautionary Motion for Order Approving*

*Modification to Ordinary Course Bonus Compensation Program for Employees* (the "Motion"),[2]

filed by the above-captioned debtors and debtors-in-possession (the "Debtors"); and it appearing

that the relief requested in the Motion is in the best interests of the Debtors, their creditors and

other parties in interest, and may be authorized pursuant to section 363 of the Bankruptcy Code;

and notice of the Motion having been provided to the (a) the Office of the United States Trustee,

(b) counsel to the Official Committee of Unsecured Creditors, (c) counsel to UBS AG,

(d) counsel to Fremont Investors VII, LLC, (e) counsel to the Ad Hoc Committee of First Lien

Lenders, and (f) the persons who have requested notice pursuant to Rule 2002 of the Federal

---

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc., a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion.

59903-002\DOCS_DE:126835.4

Rules of Bankruptcy Procedure; and it appearing that no other or further notice need be given;
and after due deliberation and sufficient cause appearing therefore; and upon the hearing
conducted on April 23, 2007, the testimony taken at that hearing, and the arguments of counsel;
it is hereby

ORDERED that, for the reasons expressed in the Opinion of the Court (Docket
No. 1339), which Opinion constitutes the Court's findings of fact and conclusions of law and
which Opinion is incorporated herein by reference, the Motion is GRANTED in its entirety, and
the ordinary course employee honus compensation program for calendar year 2006 as modified
and described as the Lender-Approved Modified Bonus (the "Modified OCP Bonus Program") is
approved; and it is further

ORDERED that this Order is without prejudice or effect to the relief previously
granted by that Order Approving in Part and Reserving in Part Decision Upon Debtors' Motion
for Order Approving Modification to Ordinary Course Bonus Compensation Program for
Employees (Docket No. 1269); and it is further

ORDERED that Debtors are authorized to pay the Modified OCP Bonus Program
as it pertains to Level I, Level II, and Level III participants and to take all appropriate steps to
implement and effectuate the Modified OCP Bonus Program; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order.

Dated: ___May 24_____, 2007

Honorable Christopher S. Sontchi
United States Bankruptcy Judge

97

B-6

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) | Case No. 06-10072 (CSS) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

Objection Deadline to Sale Motion: July 9, 2007, 2007 at 4:00 p.m.
Deadline for Submitting Bids: July 13, 2007 at 4:00 p.m.
Auction Date: July 18, 2007 at 10:00 a.m.
Hearing Date on Sale Motion: July 19, 2007 at 1:00 p.m.

**NOTICE OF MOTION OF THE DEBTORS FOR AN ORDER:
(I) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
OPERATING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS
363(b), (f) AND (m) OF THE BANKRUPTCY CODE, (II) ASSUMING AND
ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; AND (III) GRANTING RELATED RELIEF**

To:     (i) Office of the United States Trustee; (ii) counsel to the Official Committee of
Unsecured Creditors; (iii) counsel to UBS, AG; (iv) counsel to the Ad Hoc Committee of First
Lien Lenders; (v) counsel to Fremont Investors VII, LLC; (vi) parties known by the Debtors to
assert liens, claims, rights, interests or encumbrances of record in the Saleable Assets (as defined
in the Sale Motion); (vii) federal, state and local taxing authorities who have a reasonably known
interest in the Saleable Assets; (viii) the United States Attorney for the District of Delaware; (ix)
the Internal Revenue Service; (x) the United States Department of Justice; (xi) those parties that
have expressed an interest in purchasing the Saleable Assets; (xii) the counterparties to the
Assumed Executory Contracts (as defined in the Sale Motion); and (xiii) those persons who have
requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

        **PLEASE TAKE NOTICE** that, on the date hereof, the above-captioned debtors

and debtors in possession (collectively, the "Debtors") filed the enclosed *Motion of the Debtors*

*for an Order: (i) Approving Sale of Substantially All of the Debtors' Operating Assets Free and*

---

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows:
(a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware
corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id.
#0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical
Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc.,
a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

59903-002\DOCS_SF:54281.3

*Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f)*
*and (m) of the Bankruptcy Code, (ii) Assuming and Assigning Certain Executory Contracts and*
*Unexpired Leases, and (iii) Granting Related Relief* (the "Sale Motion"), with the United States
Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington,
Delaware 19801 (the "Bankruptcy Court").

      **PLEASE TAKE FURTHER NOTICE** that, on May 24, 2007, the Bankruptcy
Court entered its *Order (A) Approving Sale Procedures in Connection with Sale of Substantially*
*All of the Debtors' Operating Assets; (B) Scheduling Auction and Hearing to Consider Approval*
*of Sale; (C) Approving Notice of Respective Dates, Times, and Places for Auction and for*
*Hearing on Approval of (i) Sale and (ii) Assumption and Assignment of Certain Executory*
*Contracts and Unexpired Leases; (D) Approving Forms of Notice; and (E) Granting Related*
*Relief* (the "Procedures Order").

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Procedures Order
and subject to the provisions thereof, (i) any response or objection to the relief sought in the Sale
Motion must be filed with the Bankruptcy Court on or before 4:00 p.m. (prevailing Eastern
Time) on July 9, 2007; (ii) the deadline for submitting bids on the Saleable Assets is July 13,
2007 at 4:00 p.m. (prevailing Eastern Time); (iii) the date and time of the auction for the
Saleable Assets shall take place on July 18, 2007 at 10:00 a.m. (prevailing Eastern Time); and
(iv) the hearing on the Sale Motion shall take place on July 19, 2007 at 11:00 a.m. (prevailing
Eastern Time).

      **PLEASE TAKE FURTHER NOTICE** that at the time of filing any response or
objection to the Sale Motion, you must also serve a copy of the response or objection upon: (i)

the Debtors: Nellson Nutraceutical, Inc., 5801 Ayala Avenue, Irwindale, CA 91706, Attn:

Jeffrey Dias; (ii) counsel to the Debtors: Pachulski Stang Ziehl Young Jones & Weintraub LLP,

10100 Santa Monica Blvd., #1100, Los Angeles, CA 90067, Attn: Brad R. Godshall, Esq.; (iii)

financial advisors for the Debtors: A&M Securities, LLC, 3399 Peachtree Road, NE, Suite

1900, Atlanta, GA 30326, Attn: James D. Decker; (iv) counsel to the Official Committee of

Unsecured Creditors: Reed Smith LLP, 1201 N. Market Street, Suite 1500, Wilmington, DE

19801, Attn: Kurt F. Gwynne, Esq., and Reed Smith LLP, 2500 One Liberty Place, 1650 Market

Street, Philadelphia, PA 19103-7301, Attn: Claudia Z. Springer, Esq.; (v) counsel to the Ad Hoc

Committee of First Lien Lenders: Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue,

New York, NY 10022, Attn: Fred S. Hodara, Esq.; (vi) counsel to UBS AG: Milbank, Tweed,

Hadley and McCloy LLP, 601 South Figueroa Street, Los Angeles, CA 90017, Attn: Gregory A.

Bray, Esq., and (vii) the Office of the United States Trustee: William K. Harrington, United

States Trustee's Office, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801.

PLEASE TAKE FURTHER NOTICE THAT IF YOU FAIL TO RESPOND IN

ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE

RELIEF REQUESTED BY THE SALE MOTION WITHOUT FURTHER NOTICE OR

HEARING.

*(Remainder of page intentionally left blank)*

PLEASE TAKE FURTHER NOTICE THAT THE BANKRUPTCY COURT

HAS SET A HEARING TO CONSIDER THE RELIEF SOUGHT IN THE SALE MOTION TO

BE HELD BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, UNITED STATES

BANKRUPTCY JUDGE, 824 MARKET STREET, 5TH FLOOR, COURTROOM 6,

WILMINGTON, DELAWARE 19801, ON JULY 19, 2007 AT 1:00 P.M. (PREVAILING

EASTERN TIME).

Dated: June 15, 2007

PACHULSKI STANG ZIEHL YOUNG
JONES & WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
Richard M. Pachulski (CA Bar No. 90073)
Brad R. Godshall (CA Bar No. 105438)
Michael R. Seidl (Bar No. 3889)
Maxim B. Litvak (CA Bar No. 215852)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszyjw.com
       rpachulski@pszyjw.com
       bgodshall@pszyjw.com
       mseidl@pszyjw.com
       mlitvak@pszyjw.com

Counsel for Debtors and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) | Case No. 06-10072 (CSS) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

**Objection Deadline to Sale Motion: July 9, 2007, 2007 at 4:00 p.m.**
**Deadline for Submitting Bids: July 13, 2007 at 4:00 p.m.**
**Auction Date: July 18, 2007 at 10:00 a.m.**
**Hearing Date on Sale Motion: July 19, 2007 at 1:00 p.m.**

### MOTION OF THE DEBTORS FOR AN ORDER: (I) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' OPERATING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363(b), (f) AND (m) OF THE BANKRUPTCY CODE; (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the

"Debtors" or "Nellson") hereby move this Court (this "Sale Motion") for entry of an Order (I)

Approving Sale of Substantially All of the Debtors' Operating Assets Free and Clear of All

Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the

Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts and Unexpired

Leases, and (III) Granting Related Relief.

---

[1]  The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc., a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

On May 24, 2007, the Court entered its *Order (A) Approving Sale Procedures in Connection with Sale of Substantially All of the Debtors' Operating Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on Approval of (i) Sale and (ii) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Forms of Notice; and (E) Granting Related Relief* (the "Procedures Order"). Pursuant to the Procedures Order, the Court approved certain procedures in connection with the sale proposed herein and set a hearing on this Sale Motion for July 19, 2007 at 1:00 p.m. (the "Sale Hearing"). The Procedures Order also required the Debtors to file this Sale Motion by no later than June 15, 2007.[2]

By this Sale Motion, the Debtors request authority to sell substantially all of their tangible and intangible operating assets, including either the equity interests or assets of any non-debtor subsidiaries of the Debtors (together, the "Saleable Assets"), to the highest bidder (the "Prevailing Purchaser") or, alternatively, the back-up bidder (the "Back-Up Bidder") at the auction contemplated by the Procedures Order (the "Auction"). The Prevailing Purchaser and the Back-Up Bidder are referred to collectively herein as the "Purchaser." The Debtors also seek to assume and assign certain executory contracts and unexpired leases to the Purchaser as part of the sale of the Saleable Assets.

In support of this Sale Motion, the Debtors respectfully state as follows:

---

[2] As set forth in the Procedures Order, the Debtors have elected to proceed at this time without a lead bidder or "stalking horse." The Debtors continue to reserve the right, however, to select a "stalking horse" bidder and to return to court to seek approval of appropriate buyer protections or modifications of the Procedures Order.

## Jurisdiction

1.     The Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

2.     Venue of these proceedings and this Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief sought herein are sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4.     On January 28, 2006 (the "Petition Date"), the Debtors commenced these cases by each filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their affairs as a debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     The Debtors are leading formulators and manufacturers of functional nutrition "bars" and "powders," consumed for weight loss, sports training and wellness and medical categories.

6.     On February 9, 2006, an official committee of unsecured creditors (the "Committee") was appointed in these chapter 11 cases (the "Debtors' Cases").

7.     No trustee has been appointed in the Debtors' Cases; on March 6, 2006, a fee examiner was appointed in the Debtors' Cases, and on January 11, 2007, an examiner was appointed for certain limited purposes.

8.      On April 28, 2006, the Debtors filed the *Motion of Debtors to Determine: (1) Enterprise Value of Debtors, and (2) Secured Claims of Prepetition Secured Lenders Pursuant to Section 506(a) of the Bankruptcy Code; Notice of Status Conference and Request that Court Enter Proposed Scheduling and Procedures Order in Respect Thereon* (Docket No. 333).

9.      On or around September 13, 2006, the Court commenced a trial to determine the enterprise value of the Debtors pursuant to Bankruptcy Code section 506(a).

10.     On January 18, 2007, the Court issued its *Order* and *Findings of Fact and Conclusions of Law* (Docket Nos. 992 and 993), concluding that the Debtors' enterprise value, as of December 31, 2006, was $320 million.

11.     On January 25, 2007, the Debtors filed their *Motion for Order Approving Compromise and Settlement Agreement with Fremont Investors VII, LLC and the Second Lien Lenders* (the "Settlement Motion"). Pursuant to the Settlement Motion, the Debtors sought approval of a global settlement agreement between (a) the Debtors, (b) their principal equity holder, Fremont Investors VII, LLC ("Fremont"), and (c) UBS AG, Stamford Branch ("UBS"), in its capacity as agent on behalf of the lenders (the "Second Lien Lenders") under that certain *Second Lien Credit Agreement*, dated as of February 11, 2004. The Ad Hoc Committee of First Lien Lenders (the "FLLs") objected to the Settlement Motion. At the conclusion of a contested hearing on March 12, 2007, the Court denied the Settlement Motion.

12.     Since the denial of the Settlement Motion and given the present hurdles facing the Debtors in terms of a stand-alone reorganization, UBS and the FLLs urged the Debtors

to commence a process for the sale of substantially all of the Debtors' operating assets. The Debtors concurred with this approach, as described below.

### The Debtors' Marketing Efforts

13.    On April 27, 2007, the Debtors engaged A&M Securities, LLC ("A&M") as financial advisors to assist the Debtors in their efforts to market and sell the Saleable Assets.

14.    A&M initially conducted extensive due diligence on the company, including tours of each of Nellson's facilities and lengthy interviews with management. With the information obtained, A&M prepared for distribution to potential purchasers an Executive Summary that described the opportunity to bid on Nellson in general terms and concisely presented a non-confidential summary view of the company and its operations.

15.    In May 2007, A&M began the process of communicating with potential buyers. To date, A&M has contacted approximately 160 potential financial purchasers and 70 potential strategic purchasers. Unless a party expressed no interest, each contact received the Executive Summary, along with a request to sign a confidentiality agreement precedent to receiving additional information.

16.    Concurrently, A&M completed a Confidential Information Memorandum ("CIM") providing a greater level of detail regarding Nellson, its finances, and its operations. Parties who executed an acceptable confidentiality agreement were provided with the CIM and access to an electronic data room (the "Data Room") established by A&M. The Data Room contains contracts and documents pertaining to the operations and financial performance of the company, which may be instantly accessed by potential bidders through the internet. To date,

A&M has distributed over 75 CIMs to parties who have executed satisfactory confidentiality agreements.

      17.    A&M set a deadline of June 6, 2007, for parties to submit expressions of interest in the Debtors' assets. So far, the Debtors have received 20 indications of interest from various parties. A&M and the Debtors are currently in the process of negotiating with certain of these potential buyers.

### The Asset Purchase Agreement

      18.    As noted above, the Debtors are currently proceeding towards a sale without a lead bidder or "stalking horse." Although this may change depending on the outcome of negotiations with interested parties, the Debtors have prepared a form of Asset Purchase Agreement (the "Purchase Agreement")[3] for the sale of the Saleable Assets. A copy of the Purchase Agreement, without schedules, is attached as Exhibit A hereto.[4]

      19.    The Procedures Order contemplates that the Debtors may provide the proposed Purchase Agreement to potential bidders and that Qualifying Bids (as defined in the Procedures Order) must be upon the terms and conditions substantially set forth in the Purchase Agreement or through an alternative structure that is no less favorable than the Purchase Agreement. The Procedures Order also requires that Qualifying Bids are accompanied by clean and marked versions of the Purchase Agreement reflecting any changes proposed by each potential buyer.

---

[3]  Unless otherwise noted, capitalized terms used herein have the meanings set forth in the Purchase Agreement. To the extent of any inconsistency between this Sale Motion and the Purchase Agreement, the terms of the Purchase Agreement shall govern.

[4]  The schedules to the Purchase Agreement can be obtained from counsel for the Debtors, subject to appropriate confidentiality restrictions.

20.    The principal terms of the Purchase Agreement are summarized as

follows:

**Purchase Price**:  The aggregate purchase price for the Saleable Assets has yet to be determined.

**Deposit**:  Pursuant to the Procedures Order, a Qualifying Bid must be accompanied by a cash deposit at least equal to 10% of the purchase price.

**Saleable Assets**:  On the terms and subject to the conditions of the Purchase Agreement, on the Closing Date, the Debtors shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from the Debtors, all of the following assets of the Debtors, wherever located, Related to the Business, in each case to the extent, and only to the extent, of the Debtors' right, title and interest therein as of the Closing Date (other than the Excluded Assets):

(a)    the Improvements;

(b)    the Closing Date Tangible Personal Property;

(c)    the Intangible Property;

(d)    the Facilities Leases;[5]

(e)    the Personal Property Leases;

(f)    the Other Leases and Contracts;

(g)    the Receivables;

(h)    the Closing Date Inventory;

(i)    all shares of capital stock of the Canadian Subsidiary; and

(j)    the Business Records.

**Excluded Assets**:  Notwithstanding anything to the contrary in the Purchase Agreement, the Saleable Assets shall not include any of the following Excluded Assets:

(a)    any asset of the Debtors not Related to the Business;

(b)    all Liquid Assets and Financial Instruments;

(c)    all minute books, stock transfer records and corporate seals of the Debtors;

---

[5] The Facilities Leases were previously assumed by the Debtors pursuant to prior order of the Court. The Debtors now seek to assign such leases to the Purchaser.

(d)     all Tax returns of Debtors and all Business Records of the Debtors relating thereto, including working papers;

(e)     all rights and claims in or to any refunds or credits of or with respect to any Taxes paid by Debtors in respect of a pre-Closing period;

(f)     all Rights of Action;

(g)     the Debtors' rights under, and all cash and non-cash consideration payable to Debtors pursuant to the terms and provisions of, the Purchase Agreement or any other agreements between any Debtor, on the one hand, and Purchaser or any of its Affiliates, on the other hand, entered into on or after the date of the Purchase Agreement;

(h)     any rights, claims, and causes of action relating to any Excluded Asset;

(i)     all Plans of Debtors and all rights in connection therewith or with respect to the assets thereof;

(j)     all insurance policies of Debtors in effect on the Closing Date, and all claims to insurance proceeds thereunder;

(k)     any Contract or permit (i) that terminates or expires prior to the Closing Date in accordance with its terms or in the ordinary course of the Business, (ii) that is not capable of being assigned to Purchaser at the Closing with the consent of the other party or parties thereto or the issuer thereof or any third party (including any Government Entity), or (iii) the assignment or attempted assignment of which without such consent would constitute a breach thereof or a violation of any law;

(l)     any assets not expressly to be assigned to Purchaser pursuant to Section 1.1 of the Purchase Agreement;

(m)     any assets not otherwise included in the definition of Saleable Assets;

(n)     any obligations owing to the Debtors by any Affiliate of the Debtors;

(o)     the Retained Contracts;

(p)     any Receivables arising out of any Contract of the Debtors not a Section 365 Contract assumed by Purchaser; and

(q)     Inventory sold or consumed by the Debtors in the ordinary course of the Business prior to the Closing Date.

**Assumed Liabilities**:  The Purchaser shall assume certain obligations of the Debtors, as set forth in section 2.4 and the definition of "Assumed Liabilities" in the Purchase Agreement.

**Assignment of Contracts and Leases**:  The Agreement provides for the assumption and assignment to the Purchaser of certain of the Debtors' executory contracts and unexpired leases.

**Closing**: The Closing shall be held no later than the third (3rd) Business Day following the satisfaction or waiver of all conditions precedent to the parties' obligations under the Purchase Agreement, but in no event later than the Outside Date unless the parties mutually agree in writing to an extension thereof. The Outside Date is August 19, 2007.

**Representations and Warranties**: The Purchase Agreement is subject to certain representations and warranties, as set forth in section 5 therein.

\*      \*      \*

## Assumption and Assignment of Assumed Executory Contracts

21.     In accordance with the Purchase Agreement, and subject to, and at the time of, the Closing, the Debtors seek to assume and assign to the Purchaser certain executory contracts and unexpired leases to be designated by the Purchaser (the "Assumed Executory Contracts").

22.     At least initially, the Assumed Executory Contracts will be those executory contracts and unexpired leases that the Debtors believe should be assumed and assigned as part of the orderly transfer of the Saleable Assets. Under the Purchase Agreement, the Purchaser has the right, by written notice to the Debtors from time to time on or before the Closing Date, to exclude or add executory contracts or unexpired leases from or to the list of previously designated Assumed Executory Contracts.

23.     Pursuant to the Procedures Order, the Debtors are required to serve this Sale Motion and the cure notice substantially in the form approved pursuant to the Procedures Order (the "Cure Notice") upon each counterparty to the Assumed Executory Contracts (each a "Counterparty") by no later than June 15, 2007. The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served. The Cure Notice also

will identify the amounts, if any, that the Debtors believe are owed to each Counterparty to an

Assumed Executory Contract in order to cure any defaults that exist under such contract (i.e., the

"Cure Amounts"). If a contract or lease is assumed and assigned pursuant to this Court's order

approving same, then unless the Counterparty to the Assumed Executory Contract properly files

and serves an objection to the Cure Amount contained in the Cure Notice, the Counterparty to

the Assumed Executory Contract will receive at the time of the Closing (or as soon as reasonably

practicable thereafter), the Cure Amount as set forth in the Cure Notice, with payment made

pursuant to the terms of the Purchase Agreement. If an objection is filed by a Counterparty to an

Assumed Executory Contract, such objection must set forth a specific default in any executory

contract or unexpired lease and claim a specific monetary amount that differs from the amount, if

any, specified by the Debtors in the Cure Notice.

24.    Pursuant to the Procedures Order, if any Counterparty objects for any

reason to the assumption and assignment of the Assumed Executory Contract, then the

Counterparty must file the objection by no later than (i) 4:00 p.m. Eastern time on July 9, 2007

or such later date, if any, set forth in the Procedures Order, or (ii) the date otherwise specified in

the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed

Executory Contract if such contract is to be assumed and assigned after the Sale Hearing),

provided however that any counterparty may raise at the Sale Hearing an objection to the

assumption and assignment of the Assumed Executory Contract solely with respect to the

Purchaser's ability to provide adequate assurance of future performance under the Assumed

Executory Contract.

25.    Pursuant to the Procedures Order, the Purchaser shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract. The Court shall make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to 11 U.S.C. §365(b) at the Sale Hearing. Cure Amounts disputed by any counterparty also will be resolved by the Court at the Sale Hearing.

26.    Pursuant to the Procedures Order, except to the extent otherwise provided in the Purchase Agreement with the Purchaser, subject to the payment of any Cure Amounts, the assignee of the Assumed Executory Contracts will not be subject to any liability to the assigned contract counterparty that accrued or arose before the closing date of the sale of the Saleable Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

## **Relief Requested**

27.    By this Sale Motion, the Debtors are requesting that this Court, inter alia, (a) authorize the sale of the Saleable Assets to the Purchaser pursuant to the terms of the Purchase Agreement, as revised or amended in accordance with the Procedures Order, free and clear of all liens, claims, encumbrances or other interests pursuant to sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, with such liens, claims, rights, interests and encumbrances (collectively, the "Interests") to attach to the sale proceeds of the Saleable Assets with the same validity (or invalidity), priority and perfection as existed immediately prior to such sale; and (b) approve the assumption and assignment of the Assumed Executory Contracts under section 365

of the Bankruptcy Code, subject to, and at the time of, the Closing under the Purchase

Agreement.

28.    The Debtors are currently in discussions with various creditor

constituencies regarding the possible distribution and allocation of certain proceeds from the

sale, but have not yet concluded such discussions.  The form of proposed sale order filed

concurrently herewith contemplates that a distribution will be made to the Debtors' first lien

lenders out of the proceeds of the sale in an amount to be determined.[6]  The Debtors believe that

it is in the best interests of their estates to disburse a very significant portion of the sale proceeds

to UBS, as the Agent for the First Lien Lenders, for prompt remittal to the secured lenders in

accordance with the provisions of the applicable credit agreements and related documentation, at

closing of the sale transaction.  Such disbursement of sale proceeds is cost effective to the

estates, is consistent with practice in this District and is an appropriate means of adequately

protecting the interests of the secured lenders in the proceeds of the sale that constitute their

collateral.  Based on the Debtors' analysis of what would constitute a prudent reserve in respect

of potential administrative claims and other potential rights with respect to the proceeds, the

Debtors believe that at least 75% of the sale proceeds should be disbursed to the Agent for the

First Lien Lenders at the closing of the sale.

---

[6]  The Debtors also intend to promptly file a final fee application seeking approval of, and authority to pay, the fees
and expenses incurred by A&M Securities, LLC, as financial advisor to the Debtors in connection with the sale.
Upon approval by the Court, such fees and expenses will be paid out of the proceeds of the sale, as contemplated by
the Court's *Amended Order Authorizing the Debtors to Retain Alvarez & Marsal Securities, LLC as Financial
Advisor Nunc Pro Tunc to April 30, 2007* (Docket No. 1366), entered June 8, 2007.

## Basis for Relief

**A.     Approval of the Sale**

29.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

30.     A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business justification exists for doing so. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); In re Titusville Country Club, 128 B.R. 396 (W.D. Pa. 1991); In re Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991). The Delaware & Hudson Railway court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under McClung and Lionel, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the assets; and whether the asset is decreasing or increasing in value.

124 B.R. at 176.

      31.    The <u>Delaware & Hudson Railway</u> court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith." <u>Id.</u>

      32.    The Debtors have proposed the sale of the Saleable Assets after thorough consideration of all viable alternatives, and have concluded that the sale is supported by a number of sound business reasons. The Debtors' cannot sustain a stand-alone operational reorganization. The Court has also determined that the value of the Debtors' enterprise is significantly below the total amount of its existing secured debt. Hence, the Debtors have determined, with the full support of their principal secured creditor constituencies, that a going concern sale of the Debtors' operations provides the best and most efficient means for reorganizing the Debtors' affairs at this time.

      33.    The Debtors, through their investment bankers at A&M, have extensively marketed the Saleable Assets and will conduct the sale process (including the Auction) in accordance with the Procedures Order, which implements certain procedures designed to maximize the value that will be realized from the sale of the Saleable Assets.

      34.    As a result of the Debtors' marketing efforts, the Debtors believe that the Purchaser's offer will be fully tested by the market and will constitute fair and reasonable consideration for the Saleable Assets.

35.     Based on the foregoing, the sale of the Saleable Assets is justified by sound business reasons and is in the best interests of the Debtors and their estates. Accordingly, pursuant to section 363(b) of the Bankruptcy Code, the Debtors request approval of the sale to the Purchaser as set forth herein.

### The Asset Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free And Clear of Liens, Claims, and Interests

36.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such Saleable Assets;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.     As quoted above, section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor, JV, 209 F.3d 252, 259 (3d Cir. 2000).

38.     In Folger Adam, the Third Circuit specifically addressed the scope of the term "any interest." 209 F.3d at 258. The court observed that while some courts have "narrowly

interpreted that phrase to mean only in rem interests in property," the trend in modern cases is

towards "a broader interpretation which includes other obligations that may flow from ownership

of the property." Id. at 258 (citing 3 COLLIER ON BANKRUPTCY 363.06[1]).

        39.     As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co.,

99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third

Circuit in Folger Adam, the scope of 11 U.S.C. § 363(f) is not limited to in rem interests. Thus,

the Third Circuit in Folger Adam stated that Leckie held that the debtors "could sell their assets

under §363(f) free and clear of successor liability that otherwise would have arisen under federal

statute." Folger Adam, 209 F.3d at 258.

        40.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of

the requirements enumerated therein will suffice to warrant the sale of the Saleable Assets free

and clear of all liens, claims, rights, interests or encumbrances as provided in the Purchase

Agreement (collectively, the "Interests"), except with respect to any Interests that are Assumed

Liabilities under the Purchase Agreement. See Citicorp Homeowners Servs., Inc. v. Elliot, 94

B.R. 343, 345 (E.D. Pa. 1988).

        41.     The Debtors submit that each Interest that is not an assumed liability

satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any

such Interest will be adequately protected by either being paid in full at the time of closing, or by

having it attach to the net proceeds of the sale, subject to any claims and defenses the Debtors

may possess with respect thereto. The Debtors accordingly request authority to convey the

Saleable Assets to the Purchaser, free and clear of all Interests (except for the Interests that are

Assumed Liabilities under the express terms of the Agreement), with such Interests to attach to

the proceeds of the sale, with the same validity (or invalidity), priority and perfection as existed immediately prior to the sale.

42.     The Debtors are informed and believe that UBS, the lienholder on the Debtors' first and second lien secured debt, respectively, will consent to the sale of its collateral (which will satisfy 11 U.S.C. § 365(f)(2)); provided, however, the UBS has expressly reserved all of its rights with respect to any and all issues regarding the allocation and distribution (including, without limitation, the timing thereof) of any sale proceeds.  The Debtors have conducted a UCC search of purported lienholders of the Debtors' assets in conjunction with the proposed sale of the Saleable Assets.  The Debtors have served such purported lienholders notice of this Sale Motion, and will serve such parties with notice of any Order approving the relief requested by this Sale Motion.

43.     Accordingly, this Court should approve the sale of the Saleable Assets to the Purchaser, free and clear of Interests under Bankruptcy Code section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

### Good Faith Under Section 363(m) of the Bankruptcy Code

44.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

45.    While the Bankruptcy Code does not define "good faith," the Third Circuit

in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986), has stated:

> [t]he requirement that a purchaser act in good faith . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

46.    As contemplated by the Procedures Order, the Debtors intend to make an

appropriate showing at the Sale Hearing that the Purchase Agreement with the Purchaser is the

result of a negotiated, arm's-length transaction, in which such buyer at all times acted in good

faith under the standard set forth in Abbotts Dairies.  The Debtors thus request that the Court find

that the Purchaser will be purchasing the Saleable Assets in good faith within the meaning of

section 363(m) of the Bankruptcy Code.

**B.    Authorization of Assumption and Assignment of the
Assumed Executory Contracts**

47.    As required by the Purchase Agreement, and in order to enhance the value

to the Debtors' estates, the Debtors request approval of the assumption and assignment of the

Assumed Executory Contracts to the Purchaser, subject to, and at the time of, the Closing of the

transactions contemplated under the Purchase Agreement.[7]

48.    The Assumed Executory Contracts are those contracts or leases that are to

be assumed by the Debtors and assigned to the Purchaser as part of the sale transaction under the

---

[7] The Facilities Leases were previously assumed by the Debtors pursuant to prior order of the Court.  The Debtors
now seek to assign such leases to the Purchaser.

Purchase Agreement. The Debtors further request that the Sale Order provide that the Assumed

Executory Contracts will be assigned to, and remain in full force and effect for the benefit of, the

Purchaser, notwithstanding any provisions in the Assumed Executory Contracts, including those

described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such

assignment.

49.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of
the debtor only if –

(A)     the trustee assumes such contract or lease in accordance
with the provisions of this section; and

(B)     adequate assurance of future performance by the assignee
of such contract or lease is provided, whether or not there has been
a default in such contract or lease.

11 U.S.C. § 365(f)(2).

50.     Under section 365(a), a debtor "subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or

executory contract of a debtor, providing that:

(b)(1)  If there has been a default in an executory contract or
unexpired lease of the debtor, the trustee may not assume such
contract or lease unless, at the time of assumption of such contract
or lease, the trustee --

(A) cures, or provides adequate assurance that the trustee will
promptly cure, such default . . . ;

(B) compensates, or provides adequate assurance that the trustee
will promptly compensate, a party other than the debtor to such
contract or lease, for any actual pecuniary loss to such party
resulting from such default; and

121

(C) provides adequate assurance of future performance under such
contract or lease.

11 U.S.C. § 365(b)(1).

51.    Although section 365 of the Bankruptcy Code does not set forth standards
for courts to apply in determining whether to approve a debtor in possession's decision to
assume an executory contract, it is well established that the decision to assume or reject an
executory contract or unexpired lease is a matter within the "business judgment" of the debtor.
See In re Taylor, 913 F.2d 102 (3d Cir. 1990); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib.
Corp., 872 F.2d 36 (3d Cir. 1989). Accordingly, assumption or rejection of any executory
contract is appropriate where the assumption or rejection would benefit the estate. Sharon Steel,
872 F.2d at 40.

52.    The assumption and assignment of the Assumed Executory Contracts will
be a necessary part of the Purchaser Agreement and, as stated above, will therefore benefit the
Debtors' estates.

53.    The Debtors will send the Cure Notices to all Counterparties in
accordance with the Procedures Order, notifying such Counterparties of the potential assumption
by the Debtors and assignment to the Purchaser of the Assumed Executory Contracts at the Sale
Hearing. The Cure Notices set forth the "cure" amounts, if any, owing on each of the Assumed
Executory Contracts, according to Debtors' books and records.

54.    Counterparties to the Assumed Executory Contracts will have a sufficient
opportunity to file an objection to the proposed cure amounts set forth in the Cure Notices. To
the extent no objection is filed with regard to a particular cure amount, such cure amount shall be

binding on the applicable contract or lease counterparty. The payment of the cure amounts

specified in the Cure Notices (or a different amount either agreed to by the Debtors or resolved

by the Court as a result of a timely-filed objection filed by a contract or lease counterparty) will

be in full and final satisfaction of all obligations to cure defaults and compensate the

counterparties for any pecuniary losses under such contracts or leases pursuant to section

365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular lease or

contract is not truly executory, and does not need to be cured to transfer the Saleable Assets to

the Purchaser or, alternatively, the Purchaser subsequently elects not to have any Assumed

Executory Contract assumed or assigned to it prior to the Closing.

   55. Cure Amounts disputed by any Counterparty will be resolved by the Court

at the Sale Hearing. In accordance with the Purchase Agreement, the Purchaser shall bear and

pay any Cure Amounts that are determined to be owed.

   56. As set forth in the Purchase Agreement, the Purchaser is responsible for

providing evidence of "adequate assurance of future performance" to the extent required in

connection with the assumption and assignment of any Assumed Executory Contract. The

meaning of "adequate assurance of future performance" for the purpose of the assumption of

executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code

depends on the facts and circumstances of each case, but should be given "practical, pragmatic

construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538

(Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(adequate assurance of future performance does not mean an absolute assurance that debtor will

thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill.

1985). If necessary, the Purchaser shall provide evidence of its ability to provide adequate

assurance to Counterparties to the Assumed Executory Contracts at the Sale Hearing.

### Notice

57.    The Debtors have served, or will serve, this Sale Motion (and the Purchase

Agreement without the schedules) and the Notice of Sale Motion on: (i) Office of the United

States Trustee; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to

UBS; (iv) counsel to the FLLs; (v) counsel to Fremont; (vi) parties known by the Debtors to

assert liens, claims, rights, interests or encumbrances of record in the Saleable Assets; (vii)

federal, state and local taxing authorities who have a reasonably known interest in the Saleable

Assets; (viii) the United States Attorney for the District of Delaware; (ix) the Internal Revenue

Service; (x) the United States Department of Justice; (xi) those parties that have expressed an

interest in purchasing the Saleable Assets; (xii) the counterparties to the Assumed Executory

Contracts; and (xiii) those persons who have requested notice pursuant to Rule 2002 of the

Federal Rules of Bankruptcy Procedure.

58.    Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the

sufficiency of notice and adequacy of service. As discussed below, the content and manner of

service of this Sale Motion in accordance with the Procedures Order and the notices related

thereto satisfies all such requirements:

> Section 363 Notice: Section 363 of the Bankruptcy Code provides
> that a trustee may sell assets other than in the ordinary course of
> business "after notice and hearing." Under section 102(1) of the
> Bankruptcy Code, the phrase "after notice and hearing" means
> "notice as is appropriate in the particular circumstances, and such
> opportunity for a hearing as is appropriate in the particular
> circumstances." 11 U.S.C. § 102(1)(A). In accordance with the
> Procedures Order, creditors have been provided notice of the

salient details regarding this Sale Motion and the hearing on the relief requested hereby. Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

Federal Rule of Bankruptcy Procedure 2002: Bankruptcy Rule 2002 requires twenty days' notice of proposed sales of assets other than in the ordinary course of business. In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." FED. R. BANKR. P. 2002. Local Rule 2002-1(b) specifies the parties on whom a motion for a sale other than in the ordinary course of business must be served in cases pending in this jurisdiction. In accordance with the Procedures Order, the Debtors have provided sufficient notice of the Auction and Sale Hearing to the appropriate parties.

Federal Rules of Bankruptcy Procedure 6004 and 6006: Bankruptcy Rule 6004 requires that notices of sales of assets out of the ordinary course of business comply with Rule 2002. As set forth above, the Debtors have complied with Bankruptcy Rule 2002. Bankruptcy Rule 6006 requires notice of a motion to assume or assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as this Court may direct. The Cure Notices and notice of the Sale Motion (as well as the Sale Motion itself) will be served on counterparties to the Assumed Executory Contracts as provided in the Procedures Order, and thus satisfies this requirement.

Procedural Due Process: The notice of this Sale Motion that is being provided is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Sale Motion and the hearing on the relief requested hereby.

59.    The Debtors submit that the notice that they have provided and intend to

provide of this Sale Motion is reasonable and appropriate and should be approved by this Court

as adequate and sufficient notice.

60.    The Debtors request, pursuant to Bankruptcy Rules 6004(g) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

### Conclusion

61.    The Debtors' proposed sale of the Saleable Assets as described in this Sale Motion, including the assumption and assignment of the Assumed Executory Contracts, is supported by sound business reasons, as set forth herein. The proposed sale is proper, necessary and serves the best interests of the Debtors, their estates, their creditors and all parties in interest. The Debtors thus request that the Court approve the proposed sale of the Saleable Assets free and clear of all interests, liens, claims, and encumbrances including successor liabilities, as requested, including, without limitation, the assumption and assignment of the Assumed Executory Contracts, to the Purchaser.

### No Prior Request

62.    No prior request for the relief sought in this Sale Motion has been made to this or any other court.

*(Remainder of page intentionally left blank)*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Sale

Motion and authorize the sale of the Saleable Assets to the Purchaser on substantially the terms

of the proposed Purchase Agreement in accordance with the Procedures Order; (ii) approve the

assumption and assignment of the Assumed Executory Contracts in accordance with the

Purchase Agreement and the Procedures Order entered by the Court; and (iii) grant such other

and further relief as is just and proper.

Dated:  June 15, 2007     PACHULSKI STANG ZIEHL YOUNG
             JONES & WEINTRAUB LLP


             Laura Davis Jones (Bar No. 2436)
             Richard M. Pachulski (CA Bar No. 90073)
             Brad R. Godshall (CA Bar No. 105438)
             Michael R. Seidl (Bar No. 3889)
             Maxim B. Litvak (CA Bar No. 215852)
             919 North Market Street, 17th Floor
             P.O. Box 8705
             Wilmington, DE  19899-8705 (Courier 19801)
             Telephone:  (302) 652-4100
             Facsimile:  (302) 652-4400
             Email: ljones@pszyjw.com
               rpachulski@pszyjw.com
               bgodshall@pszyjw.com
               mseidl@pszyjw.com
               mlitvak@pszyjw.com

             Counsel for Debtors and Debtors in Possession

# EXHIBIT A

## PURCHASE AGREEMENT

.

.

**ASSET PURCHASE AGREEMENT**

**dated as of July \_\_\_, 2007**

**by and among**

**Nellson Nutraceutical, Inc., Nellson Holdings, Inc., Nellson Intermediate Holdings, Inc., Nellson Northern Operating, Inc., Nellson Nutraceutical Eastern Division, Inc., Nellson Nutraceutical Powder Division, Inc., and Vitex Foods, Inc.,**

**as Sellers,**

**and**

**_____,**

**as Purchaser**

.

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of this [___] day of July, 2007 (the "*Execution Date*"), by and among Nellson Nutraceutical, Inc., a Delaware corporation ("*NNI*"), Nellson Holdings, Inc., a Delaware corporation ("*NHI*"), Nellson Intermediate Holdings, Inc., a Delaware corporation ("*NIH*"), Nellson Northern Operating, Inc., a Delaware corporation ("*NNO*"), Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation ("*NNE*"), Nellson Nutraceutical Powder Division, Inc., a Delaware corporation ("*NNP*"), Vitex Foods, Inc., a California corporation ("*VFI*") (NNI, NHI, NIH, NNO, NNE, NNP, and VFI being sometimes referred to herein individually as a "*Seller*" and collectively as "*Sellers*") and [_____], a _____ [corporation] [limited liability company] ("*Purchaser*"). Capitalized terms used in this Agreement that are not otherwise defined herein shall have the meanings ascribed to such terms in Section 9 below.

## RECITALS

A.    Each of the Sellers is a debtor and debtor in possession in chapter 11 proceedings before the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") and is entering into this Agreement in such capacity.

B.    Sellers, having their principal executive offices in Irwindale, California, are engaged in the Business.

C.    On August 24, 2007, the Bankruptcy Court entered an Order (A) Approving Sale Procedures in Connection With Sale of Substantially All the Debtors' Operating Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on Approval of (i) Sale and (ii) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Forms of Notice; and (E) Granting Related Relief in respect of Sellers (the "*Procedures Order*").

D.    On the other terms and subject to the conditions set forth in this Agreement and the Procedures Order, Sellers wish to sell and transfer to Purchaser, and Purchaser wishes purchase and acquire from Sellers, certain assets used by Sellers in connection with the Business.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1. Transfer of Assets.

    1.1 Purchase and Sale of Assets. On the terms and subject to the conditions of this Agreement, on the Closing Date (as defined below), Sellers shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, all of the following assets of Sellers, wherever located, Related to the Business, in each case to the extent, and only to the extent, of Sellers' right, title and interest therein as of the Closing Date, and other than the Excluded Assets (such assets, other than any of the Excluded Assets, the "*Saleable Assets*"):

    1.1.1  Leasehold Improvements. Any improvements located on real property occupied by Sellers under the Facilities Leases, as described on Schedule 1.1.1 (the "*Improvements*").

    1.1.2  Tangible Personal Property. The Tangible Personal Property, a description of certain items of which is set forth on Schedule 1.1.2 as of the date therein indicated (any such Tangible Personal Property as of the Closing Date, "*Closing Date Tangible Personal Property*").

    1.1.3  Intangible Property. The Intangible Property, including but not limited to the Intellectual Property described in Schedule 1.1.3.

    1.1.4  Leases and Contracts. Sellers' right, title and interest (a) as lessee under the Facilities Leases, as described on Schedule 1.1.4-1, (b) as lessee under those Personal Property Leases described on Schedule 1.1.4-2, but in the case of intangible property held pursuant to licenses from third parties, only to the extent the same are transferable over the licensor's objection pursuant to applicable law (collectively, the "*Other Leases*"), and (c) as a party to those other Contracts described on Schedule 1.1.4-3 (collectively, the "*Other Contracts*," and together with the Other Leases, the "*Other Leases and Contracts*") in each case, as and to the extent designated by Purchaser on or prior to the Closing Date as a Section 365 Contract (as defined in Section 8.4.1.2) and assumed by Purchaser at the Closing.

    1.1.5  Accounts Receivable. Any accounts receivable, notes receivable, deposits of the Sellers with third parties, refunds and all rights, claims and causes of action Related to the Business as of the Closing Date (collectively, the "*Receivables*").

    1.1.6  Inventory. The Inventory as of the Closing Date (the "*Closing Date Inventory*").

    1.1.7  Canadian Subsidiary. All of the shares of capital stock of the Canadian Subsidiary held by Sellers.

    1.1.8  Business Records. The Business Records.

    1.2 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, the Saleable Assets shall not include any of the Excluded Assets.

1.3 <u>Instruments of Transfer</u>. The sale, assignment, transfer, and conveyance of the Saleable Assets to Purchaser shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance provided for in <u>Section 3</u> below and such other instruments as may reasonably be requested by Purchaser to transfer, convey, and assign the Saleable Assets to Purchaser, but in all events only to the extent that the same do not impose any monetary obligations upon any of the Sellers or in any other material respect increase the burdens imposed by the other provisions of this Agreement upon any of the Sellers.

2.  <u>Consideration</u>.

2.1 <u>Purchase Price</u>. Upon the terms and subject to the conditions contained in this Agreement, as consideration for the purchase of the Saleable Assets contemplated herein, Purchaser shall pay to Sellers in cash on the Closing Date an aggregate amount of $_____ (the *"Purchase Price"*) and shall assume the Assumed Liabilities in accordance with <u>Section 2.4</u>.

2.2 <u>Deposit</u>.

2.2.1    Before the execution and delivery of this Agreement by the parties, Purchaser has delivered the Deposit to Sellers, who shall hold the funds pursuant to the terms of the Procedures Order and this Agreement. No interest need accrue on the Deposit during the period during which it is held by Sellers.

2.2.2    The Deposit shall be held by Sellers until the earlier of the Closing or the Termination Date. If there is a Closing, at the Closing the Deposit shall be applied against the Purchase Price as a credit to Purchaser. In the event of a termination of this Agreement, the Deposit shall be treated in accordance with <u>Section 2.3</u> hereof.

2.3 <u>Treatment of Deposit Upon Termination</u>.

2.3.1    Subject to <u>Section 10.2</u>, Purchaser shall be entitled to a refund of the Deposit in cash upon any termination of this Agreement by Purchaser pursuant to (i) <u>Section 4.3(d)</u> or (ii) <u>Section 4.2(e)</u> on the grounds that any one or more of the conditions set forth in <u>Section 4.2.1</u>, <u>Section 4.2.2</u> or <u>Section 4.2.3</u> have not been satisfied.

2.3.2    Sellers shall be entitled to retain the Deposit, together with any interest earned on such sum, upon any termination of this Agreement other than a termination described in <u>Section 2.3.1</u>. The Deposit shall not constitute liquidated damages, and retention thereof by Sellers shall not be in limitation of any other remedies available to Sellers under this Agreement or applicable law.

2.4 <u>Assumed Liabilities</u>. On the Closing Date, Purchaser shall assume and agree to perform, and indemnify Sellers in respect of, all of the Assumed Liabilities.

3.  <u>Closing</u>.

3.1 <u>Closing Conference</u>. The closing of the purchase and sale of the Saleable Assets under this Agreement (the *"Closing"*) shall take place at the offices of Pachulski Stang

3

Ziehl Young, Jones & Weintraub LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19899-8705.

    3.2 <u>Closing Date</u>.

        3.2.1   The Closing shall be held no later than the third (3rd) Business Day following the satisfaction or waiver of all conditions precedent to the parties' obligations hereunder (the "***Closing Date***"), but in no event later than the Outside Date unless the parties hereto mutually agree in writing to an extension thereof.

        3.2.2   Until this Agreement is either terminated or the parties have agreed upon an extended Closing Date, the parties shall diligently continue to work to satisfy all conditions to Closing and the Contemplated Transactions shall close as soon as such conditions are satisfied or waived.

        3.2.3   All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

    3.3 <u>Sellers' Deliveries to Purchaser at Closing</u>.  On the Closing Date, Sellers shall make the following deliveries to Purchaser:

        3.3.1   A counterpart of an Assignment and Assumption of Real Property Lease, substantially in the form attached as <u>Exhibit 3.3.1</u> hereto, duly executed by Sellers, pursuant to which Sellers assign the Improvements and the Facilities Leases to Purchaser (the "***Assignments of Real Property Lease***").

        3.3.2   A counterpart of an Assignment of Personal Property Leases and Contracts in the form attached as <u>Exhibit 3.3.2</u> hereto, duly executed by Sellers, pursuant to which Sellers assign the Other Leases and Contracts to Purchaser (the "***Assignment of Other Contracts***").

        3.3.3   A bill of sale, duly executed by Sellers, in the form attached hereto as <u>Exhibit 3.3.3</u> pursuant to which Sellers transfers any Closing Date Tangible Personal Property, Closing Date Inventory, Receivables, and Business Records to Purchaser (the "***Bill of Sale***").

        3.3.4   A counterpart of an Assignment of Intangible Property, duly executed by Sellers, in the form attached as <u>Exhibit 3.3.4</u> hereto, pursuant to which Sellers assign to Purchaser their interests, if any, in and to the Intangible Property (the "***Assignment of Intangible Property***").

        3.3.5   Stock certificates, duly endorsed in blank or accompanied by a duly executed stock power, assigning all of the outstanding shares of the capital stock of the Canadian Subsidiary to Purchaser.

        3.3.6   Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Sellers to Purchaser at the Closing.

4

3.4 <u>Purchaser's Deliveries to Sellers at Closing</u>. On the Closing Date, the Deposit shall be applied against the Purchase Price as a credit to Purchaser as provided in <u>Section 2.2,</u> and Purchaser shall make or cause to be made the following payments and deliveries to Sellers:

3.4.1    The full amount of all due and unpaid Broker Compensation, to be paid by Purchaser directly to the Broker on behalf of Sellers.

3.4.2    The Purchase Price, less the Deposit and less any Broker Compensation paid pursuant to <u>Section 3.4.1</u>.

3.4.3    A counterpart of each of the Assignments of Real Property Leases, duly executed by Purchaser.

3.4.4    A counterpart of the Assignment of Other Contracts, duly executed by Purchaser.

3.4.5    A counterpart of the Assignment of Intangible Property, duly executed by Purchaser.

3.4.6    An Assumption Agreement, in the form attached hereto as <u>Exhibit 3.4.6</u> with respect to the Assumed Liabilities, duly executed by Purchaser (the "*Assumption Agreement*").

3.4.7    Appropriate evidence of all necessary corporate action by Purchaser in connection with the Contemplated Transactions, including, without limitation: (i) certified copies of resolutions duly adopted by Purchaser's [directors] [managers] approving the Contemplated Transactions and authorizing the execution, delivery, and performance by Purchaser of this Agreement and (ii) a certificate as to the incumbency of the officers of Purchaser executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transactions.

3.4.8    Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Purchaser to Sellers at the Closing.

3.5 <u>Transferred Employees</u>. With respect to each Business Employee, <u>Schedule 3.5</u> lists, to the extent such information is permitted to be disclosed under applicable law, (i) each such person's title or job/position; (ii) such person's 2007 salary; and (iii) each such person's location of employment.

3.5.1    Not later than 7 days prior to the Closing Date, Sellers will provide Purchaser with an updated Schedule 3.5.

3.5.2    Not later than 5 days prior to the Closing Date, and effective as of the Closing Date, Purchaser shall offer employment to substantially all Business Employees identified on Schedule 3.5 (as updated in accordance with <u>Section 3.5.1</u>.). Each such offer of employment shall comply with the requirements of this <u>Section 3.5</u>. The new employment of each Business Employee who accepts Purchaser's offer of employment shall commence with effect from the later of the Closing or the date of acceptance. Each Business Employee who

5

accepts Purchaser's offer of employment and who becomes an employee of the Purchaser as of the Closing shall be a ***"Transferred Employee."***

        3.5.3    Purchaser's offer of employment will be at a level of base compensation not less than the level of base compensation as applied to such Person immediately prior to the Closing and with benefits that are substantially similar in the aggregate to those provided by Sellers immediately prior to the Closing Date. Purchaser will grant to all Transferred Employees service credit for previous service recognized by Sellers for purposes of vacation and other benefits (whether or not accrued on the financial statements of Sellers) for purposes of calculating vacation time earning in the period following the Closing Date.

        3.5.4    Purchaser shall not be under any obligation to assume any Plans or any liabilities under or with respect to Plans (except, in Purchaser's sole discretion, as to any permitted "rollover" accepted by the applicable plan of Purchaser or one of its Affiliates that is elected by a Transferred Employee under a Plan intended to be qualified under Section 401(a) of the Internal Revenue Code).

        3.5.5    Effective as of the Closing Date, Buyer shall establish a medical plan for the Transferred Employees and their dependents and beneficiaries, without preexisting condition exclusions, waiting times to commence coverage, or other lapses in coverage. In addition, commencing on the Closing Date, Purchaser shall provide the Transferred Employees and their dependents and beneficiaries coverage under any other pension, retirement, welfare and fringe benefit plans, programs, policies or arrangements established by Purchaser for such persons, who for all purposes of this sentence will be credited, to the extent permissible under applicable law, with all service with Sellers or their affiliates. Sellers shall not have any liability or responsibility for any benefits or other amounts that may become payable to Transferred Employees and their dependents or beneficiaries on or after the Closing Date under any pension, retirement, welfare and fringe benefit plans, programs, policies or arrangements established or maintained by Purchaser, except to the extent that Sellers have an obligation to make a direct roll-over described in Section 401(a)(31) of the Internal Revenue Code. This Agreement shall not, however, limit the ability of the Sellers to amend or terminate any Plan at any time.

        3.5.6    Purchaser shall be responsible for and shall pay any and all liabilities or obligations arising under the WARN Act, if any, arising out of or resulting from layoffs of employees or any termination of their employment in the Business in connection with the Contemplated Transactions. Purchaser agrees to indemnify, and hold Sellers and their successors harmless from or against, any and all claims, losses, damages, expenses, obligations and liabilities (including costs of collection, attorney's fees and other costs of defense) which Sellers may incur in connection with any suit or claim of violation brought against Sellers under the WARN Act or any similar state or foreign law, which relates to transactions effected in connection with the Contemplated Transactions or any other action taken by Purchaser after the Closing Date.

        3.5.7    Sellers and Purchaser shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable law to carry out their obligations under this Section 3.5.

6

3.5.8    No provision of this Agreement confers rights or remedies upon any Person, including any Business Employee or Transferred Employee, other than the parties hereto.

3.5.9    The parties agree that, pursuant to the "Alternative Procedure" provided in Section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, with respect to filing and furnishing IRS Forms W-2, W-3, and 941, (a) Sellers shall report on a "predecessor-successor" basis, as set forth therein, (b) Sellers shall be relieved from furnishing Forms W-2 to any of the employees of Sellers who become employees of Purchaser, and (c) Purchaser shall assume the obligations of Sellers to furnish such Forms W-2 to such employees for the year in which the Closing occurs.

3.6 Taxes.

3.6.1    All Transfer Taxes payable by reason of the purchase and sale of the Saleable Assets under this Agreement or the Contemplated Transactions shall be borne and timely paid by Purchaser. In addition, Purchaser shall pay all costs, fees or expenses required with respect to the recording or consummation of transfers of the Saleable Assets pursuant to this Agreement, including, without limitation, any Transfer Taxes or other costs associated with such transfers. Purchaser shall file all necessary documentation and returns with respect to such Taxes and other amounts.

3.6.2    Tax Returns. Sellers shall prepare or cause to be prepared all Tax Returns relating to the Saleable Assets for the periods ending on or prior to the Closing Date. Purchaser shall prepare and file all Tax Returns relating to all real property Taxes, personal property Taxes, or similar ad valorem obligations levied with respect to the Saleable Assets for any taxable period beginning on or before and ending after the Closing Date (a "***Straddle Period,***" and such Taxes, "***Straddle Period Taxes***"), whether imposed or assessed before or after the Closing Date, other than Straddle Period Tax Returns that Sellers are required to file by applicable law. The Liability for payment of each such Straddle Period Tax shall be prorated between Purchaser and Sellers at the Closing Date based on 100% of the amount of such Straddle Period Tax imposed for the prior taxable period. The portion of each such Straddle Period Tax that is allocable to the Sellers shall be the product of (i) 100% of the amount of such Tax for the prior taxable period and (ii) a fraction, the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period. The amount of Tax allocable to the Sellers pursuant to this section shall be withheld from the Purchase Price, and the Purchaser shall be responsible for remitting all Straddle Period Taxes to the appropriate Taxing authority when due.

3.6.3    Cooperation. Sellers and Purchaser agree to furnish to each other upon request, as promptly as practicable, such information and assistance relating to the Saleable Assets and the Business (including access to Business Records Related to the Business) as is reasonably necessary for the filing of all Tax Returns and other Tax filings, the making of any election related to Taxes, the preparation for any audit by any Taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return. Sellers and Purchaser shall cooperate with each other in the conduct of any audit or other proceeding related to Taxes. Sellers and Purchaser shall provide timely notice to each other in writing of any

7

pending or threatened Tax audits, assessments or litigation with respect to the Saleable Assets or the Business for any taxable period for which the other party may have Liability under this Agreement.

3.7 <u>Possession</u>. Right to possession of the Saleable Assets shall transfer to Purchaser on the Closing Date. On the Closing Date, Sellers shall:

3.7.1 Transfer and deliver to Purchaser on the Closing Date such keys, locks and safe combinations and other similar items as Purchaser may reasonably require to obtain occupation and control of the Facilities and the other Saleable Assets;

3.7.2 Make available to Purchaser at their then existing locations the originals of all documents in Sellers' possession that are required to be transferred to Purchaser by this Agreement; and

3.7.3 Transfer to Purchaser all electronic data (including, without limitation, data relating to customers, sales history, inventory, accounts receivable, vendors, employees (except to the extent prohibited by law with respect to certain employee records) and accounts payable) relating to the operation of the Business and that is located or stored on computer files, with such electronic data to be in a form acceptable to Purchaser.

4. <u>Conditions Precedent to Closing</u>.

4.1 <u>Conditions to Sellers' Obligations</u>. Sellers' obligation to make the deliveries required of Sellers at the Closing and otherwise to close the Contemplated Transactions, shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date, unless any such unsatisfied condition is waived by Sellers:

4.1.1 Purchaser shall have performed and complied with, in all material respects, each and every covenant or other obligation required to be performed by it prior to the Closing.

4.1.2 All of the representations and warranties of Purchaser contained herein shall continue to be true and correct at the Closing in all material respects.

4.1.3 Purchaser shall have paid, delivered or funded all items required under <u>Section 3.4</u> of this Agreement to be paid, delivered or funded by Purchaser on or before the Closing.

4.1.4 The Procedures Order shall not have been stayed, reversed, or vacated.

4.1.5 The Bankruptcy Court shall have entered the Sale Order in accordance with <u>Section 8.4.2</u> below, and the Sale Order shall, within eleven (11) days after its entry, have become final and non-appealable and no longer subject to appeal, reconsideration or stay.

8

4.1.6    The Case shall not have been converted to a case under chapter 7 of the Bankruptcy Code, a trustee shall not have been appointed in the Case and the Case shall not have been dismissed.

4.1.7    Sellers shall have received or obtained all other consents and approvals that may be legally required in connection with the consummation of the Contemplated Transactions.

4.1.8    No action, suit or other proceedings shall be pending before any Government Entity seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Government Entity.

4.1.9    There shall be no injunction or court order restraining consummation of the Contemplated Transactions and there shall not have been adopted any law or regulation making all or any portion of the Contemplated Transactions illegal.

4.1.10    The waiting period under the Hart-Scott-Rodino Law, as modified by Section 363(b)(2) of the Bankruptcy Code, including any extensions thereof, shall have expired.

4.2 Conditions to Purchaser's Obligations.  Purchaser's obligation to make the deliveries required of Purchaser at the Closing, and otherwise to close the Contemplated Transactions, shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date, unless any such unsatisfied condition is waived by Purchaser:

4.2.1    Sellers shall have performed and complied with, in all material respects, each and every covenant or other obligation required to be performed by them prior to the Closing.

4.2.2    All representations and warranties of Sellers contained herein shall continue to be true and correct at the Closing in all material respects.

4.2.3    Sellers shall have delivered all items required under Section 3.3 of this Agreement to be delivered by Sellers on or before the Closing.

4.2.4    The Procedures Order shall not have been stayed, reversed, or vacated.

4.2.5    The Bankruptcy Court shall have entered the Sale Order in accordance with Section 8.4.2 below, and the Sale Order shall, within eleven (11) days after its entry, have become final and non-appealable and no longer subject to appeal, reconsideration or stay.

4.2.6    The Case shall not have been converted to a case under chapter 7 of the Bankruptcy Code, a trustee shall not have been appointed in the Case and the Case shall not have been dismissed.

9

4.2.7    No action, suit or other proceedings shall be pending before any Government Entity seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Government Entity.

4.2.8    There shall be no injunction or court order restraining consummation of the Contemplated Transactions and there shall not have been adopted any law or regulation making all or any portion of the Contemplated Transactions illegal.

4.2.9    The waiting period under the Hart-Scott-Rodino Law, as modified by Section 363(b)(2) of the Bankruptcy Code, including any extensions thereof, shall have expired.

4.2.10    All consents and approvals required to be obtained from, and all notices or applications required to be given or submitted to or filed with, any (A) Person that is a party to any material contract or agreement to which the Canadian Subsidiary is a party or by which its properties are bound or (B) Governmental Entity having jurisdiction over the Canadian Subsidiary, if the failure to obtain, give, submit or file such consent, approval, notice or application would constitute a material default under such contract or agreement or have a material adverse affect on the business or operations of the Canadian Subsidiary, shall have been obtained, given, submitted or filed, as required.

4.3 Grounds for Termination. This Agreement may be terminated prior to Closing only as follows:

(a)    by mutual written consent of Purchaser and Sellers;

(b)    by Sellers, at any time that there has been (i) a material breach by Purchaser of any of its representations and warranties herein or (ii) a material failure on the part of Purchaser to  comply with its obligations herein;

(c)    by Sellers, if any of the conditions in Section 4.1 has not been satisfied (other than by reason of the failure of Sellers to comply with Sellers' obligations under this Agreement), and Sellers have not waived such condition;

(d)    by Purchaser, at any time that there has been (i) a material breach by Sellers of any of their representations and warranties herein or (ii) a material failure on the part of Sellers to  comply with their obligations herein;

(e)    by Purchaser, if any of the conditions in Section 4.2 has not been satisfied (other than by reason of the failure of Purchaser to comply with Purchaser's obligations under this Agreement), and Purchaser has not waived such condition; or

(f)    by Purchaser or Sellers if the Closing shall not have occurred prior to the Outside Date; provided, that the terminating party is not in breach of this Agreement.

10

4.4 <u>Manner and Effect of Termination</u>. Any termination of this Agreement pursuant to <u>Section 4.3</u> shall be effected by written notice from the terminating party to the other party, which notice shall specify the basis for the termination. Upon termination of this Agreement, this Agreement shall forthwith become null and void and of no further force and effect and all rights and obligations of the parties hereunder shall terminate without any Liability by any party to any other party, except for (a) subject to any limitation on Purchaser's rights hereunder or under the Procedures Order, the rights and obligations of any party arising out of the breach of this Agreement prior to termination and (ii) the rights and obligations of the parties under <u>Section 2.2</u>, <u>Section 2.3</u>, <u>Section 10.2</u>, <u>Section 10.3</u>, <u>Section 10.4</u>, <u>Section 10.13</u>, and <u>Section 10.19</u> hereof.

5. <u>Sellers' Representations and Warranties</u>. Sellers hereby represent and warrant to Purchaser as follows:

5.1 <u>Due Organization</u>. Each of the Sellers (other than VFI) is a corporation duly organized and validly existing under the laws of the State of Delaware. VFI is a corporation duly organized and validly existing under the laws of the State of California. The Canadian Subsidiary is a corporation duly organized and validly existing under the Canada Business Corporations Act. The authorized capital stock of the Canadian Subsidiary consists of an unlimited number of Common Shares, of which an aggregate of one hundred (100) are issued and outstanding. All issued and outstanding Common Shares of the Canadian Subsidiary are held of record by NNI. There are no outstanding subscriptions, options, warrants, rights, calls, convertible securities, stock appreciation rights (phantom or otherwise), joint venture, partnership or other commitments of any nature relating to the Common Shares of the Canadian Subsidiary. There is no Liability by the Canadian Subsidiary for dividends or other distributions declared or accumulated but unpaid with respect to any of the Common Shares of the Canadian Subsidiary.

5.2 <u>Power and Authority</u>. Subject to the authority of the Bankruptcy Court and the provisions of the Bankruptcy Code, each of the Sellers has all requisite corporate power and authority to own, lease and operate its properties, to carry on the Business and, upon obtaining the Sale Order, to execute, deliver and perform this Agreement.

5.3 <u>Authorization and Validity of Agreement</u>. Upon obtaining the Sale Order (as defined in <u>Section 8.4.1.1</u> below), (a) all corporate action on the part of Sellers necessary to approve the execution, delivery and performance of this Agreement by Sellers will have been duly taken and (b) this Agreement, when executed and delivered by Sellers, shall constitute the valid and binding obligation of Sellers enforceable in accordance with its terms.

5.4 <u>No Conflicts</u>. Upon entry of the Sale Order, the execution, delivery and performance of this Agreement by Sellers will not: (i) conflict with or result in a breach of the articles of incorporation or the by-laws of any of the Sellers; (ii) materially violate any material statute, law, rule or regulation, or any order, writ, injunction or decree of any Government Entity binding any of the Sellers; or (iii) materially violate or conflict with or constitute a material default under any Contract to which any of the Sellers is a party or by which any of the Sellers or its assets or properties may be bound.

11

5.5 <u>Title</u>.

    5.5.1   Except as disclosed on Schedule 5.5.1, and to the Knowledge of Sellers, Sellers have, in the aggregate, good and marketable title to the Saleable Assets; provided, however, Sellers make no representation or warranty whatsoever as to title to the Intangible Property. At the Closing, Buyer will acquire all of Seller's right, title and interest in and to all the Saleable Assets, free and clear of any Liens except for Permitted Liens.

    5.5.2   Attached as Schedule 5.5.2 is certain information regarding the Canadian Subsidiary. To the Knowledge of Sellers, Schedule 5.5.2 is accurate as of the date of this Agreement and as of such date the Canadian Subsidiary has good and marketable title to its assets as described in Schedule 5.5.2, free and clear of any Liens except for any Liens described in Schedule 5.5.2; provided, however, Sellers make no representation or warranty whatsoever as to title to any Intangible Property of the Canadian Subsidiary.

   6.   <u>Purchaser's Warranties and Representations</u>. Purchaser represents and warrants to Sellers as follows:

    6.1 <u>Due Organization</u>. Purchaser is a [corporation] [limited liability company] duly organized, validly existing and in good standing under the laws of the State of _____.

    6.2 <u>Power and Authority</u>. Purchaser has all requisite [corporate] [limited liability company] power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement.

    6.3 <u>Authorization and Validity of Agreement</u>. All [corporate] [limited liability company] action on the part of Purchaser necessary to approve the execution, delivery and performance of this Agreement by Purchaser has been taken. This Agreement, when executed and delivered by Purchaser, shall constitute the valid and binding obligation of Purchaser enforceable in accordance with its terms.

    6.4 <u>No Conflicts</u>. The execution, delivery and performance of this Agreement by Purchaser do not and will not: (i) conflict with or result in a breach of the [by-laws or certificate of incorporation] [certificate of formation or limited liability company agreement] of Purchaser; (ii) materially violate any material statute, law, rule or regulation, or any order, writ, injunction or decree of any Government Entity binding on Purchaser; or (iii) materially violate or conflict with or constitute a material default under any agreement, instrument or writing of any nature to which Purchaser is a party or by which Purchaser or its assets or properties may be bound.

   **7.  "AS IS" TRANSACTION. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE BUSINESS OR THE SALEABLE ASSETS (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED THEREFROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THEREWITH, THE VALIDITY OR ENFORCEABILITY, OR THE EXISTENCE OF ANY DEFENSES TO THE ENFORCEABILITY, OF ANY CONTRACTS OR LEGAL RIGHTS INCLUDED WITHIN THE SALEABLE ASSETS, THE CONFORMITY OF THE BUSINESS OR THE**

12

**SALEABLE ASSETS TO ANY FEDERAL OR STATE REGULATORY REQUIREMENTS APPLICABLE THERETO, THE PHYSICAL CONDITION OF ANY TANGIBLE PROPERTY THAT IS INCLUDED WITHIN THE SALEABLE ASSETS OR THE SUBJECT OF ANY CONTRACT TO BE ASSUMED BY PURCHASER PURSUANT HERETO, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS WHICH ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY PURCHASER AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OR TRANSFERABILITY OF THE SALEABLE ASSETS OR ANY PORTION THEREOF, OR THE TERMS, AMOUNT, VALIDITY, COLLECTIBILITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES). SELLERS HEREBY DISCLAIM ANY WARRANTY (EXPRESS OR IMPLIED) OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE SALEABLE ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL PORTIONS THE SALEABLE ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE SALEABLE ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE SALEABLE ASSETS, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS, THE SUFFICIENCY AND ADEQUACY OF WHICH PURCHASER HEREBY ACKNOWLEDGES. ACCORDINGLY, PURCHASER WILL ACCEPT THE SALEABLE ASSETS AT THE CLOSING "AS IS, "WHERE IS," AND "WITH ALL FAULTS."**

8. <u>Other Agreements of the Parties.</u>

        8.1 <u>Access to Business Information of Sellers.</u> From and after the date of this Agreement until the Closing Date, Sellers shall, upon reasonable advance notice, afford to Purchaser and its Representatives reasonable access during normal business hours to the Facilities and all records pertaining to the Facilities or the Business. Purchaser shall not exercise its rights to access in any manner that interferes with the conduct of the Business by Sellers. Purchaser, however, shall not be entitled to access to any materials containing: (i) communication or information subject to attorney-client, work product or any other privilege or requirement to maintain confidentiality; (ii) communications or information about employees, disclosure of which might violate an employee's reasonable expectation of privacy; or (iii) information with respect to any items excluded from the definition of Business Records. Purchaser shall have no right hereunder to conduct any environmental or other assessment of the Facilities other than visual inspection and document review, *provided, however,* that Purchaser at its own cost and expenses may cause a Phase I environmental assessment of the Facilities to be conducted by an environmental consultant of Purchaser's choice and pursuant to a mutually acceptable access agreement between Purchaser and Sellers. Purchaser shall refrain from disclosing the results of any such assessment to Sellers. Purchaser expressly acknowledges that nothing in this Section 8.1 is intended to give rise to any contingency to Purchaser's obligations to proceed with the Contemplated Transactions.

13

8.2 <u>Conduct of Business Before Closing</u>. During the period prior to the Closing Date, Sellers shall carry on its business diligently and in the ordinary course only, and shall use its diligent and commercially reasonable efforts (taking into account its status as a chapter 11 debtor and the financial and other constraints that such status may impose upon Sellers) to preserve its current business organization intact and to preserve its current relationships with customers and other persons having business dealings with the Business.

8.3 <u>Hart-Scott-Rodino Cooperation</u>. Purchaser and Sellers shall cooperate with each other (at their respective sole cost and expense) to comply with, and provide the information required by, the pre-merger notification and waiting period rules of the Hart-Scott-Rodino Law. In that connection, Purchaser and Sellers shall use diligent efforts to make their joint pre-merger notification filing with the applicable Government Entities no later than five days following the Execution Date.

8.4 <u>Bankruptcy Court Approvals</u>.

8.4.1    <u>Procedures Order</u>.

8.4.1.1 The Procedures Order was entered by the Bankruptcy Court on _____, 2007. A copy of the Procedures Order is attached hereto as <u>Exhibit 8.4.1</u> and incorporated herein by this reference. The sale procedures governing the sale of the Saleable Assets shall be those set forth in the Procedures Order. In the event of any conflict between the terms and provisions hereof and those of the Procedures Order, the terms and provisions of the Procedures Order shall govern and control.

8.4.1.2 Purchaser has designated in writing the Facilities Leases and all other Contracts to be assumed and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code (collectively, the *"Section 365 Contracts"*). Such designation is subject to Purchaser's right, by written notice to Sellers from time to time on or before the Closing Date, to exclude or add executory contracts or unexpired leases from or to the list of previously designated Section 365 Contracts.

8.4.2    <u>Sale Order</u>.

8.4.2.1 Both Purchaser's and Sellers' obligations to consummate the Contemplated Transactions shall be conditioned upon the entry by the Bankruptcy Court of an order (the *"Sale Order"*), which Sale Order (i) approves the sale of the Saleable Assets to Purchaser on the terms and conditions set forth in this Agreement and authorizes the Sellers to proceed with the Contemplated Transactions, (ii) includes a specific finding that Purchaser is a good faith purchaser of the Saleable Assets, (iii) states that the sale of the Saleable Assets to Purchaser shall be free and clear of all Liens, except for Permitted Liens; (iv) approves the Sellers' assumption and assignment of the Section 365 Contracts (subject to Purchaser providing adequate assurance of future performance to the counter-party thereto); and (v) orders the Purchaser to pay any Cure Amounts payable to the other parties to the Section 365 Contracts as a condition to such assumption and assignment.

8.4.2.2 Sellers have filed the Sale Motion (as defined in the Procedures Order) with the Bankruptcy Court, and the Sale Hearing (as defined in the

14

Procedures Order) has been scheduled for July 20, 2007. Sellers shall use commercially reasonable efforts to obtain the Sale Order and to have the Sale Order entered by the Bankruptcy Court no later than July 25, 2007.

8.5 <u>Executory Contracts</u>.

8.5.1    Sellers shall take all steps necessary under the Bankruptcy Code to seek authority to assume and assign to the Purchaser the Section 365 Contracts. Purchaser shall provide adequate assurance of future performance as necessary to allow Sellers to assume and assign all Section 365 Contracts and shall pay, as and when required by the Sale Order, as applicable, the Cure Amounts for the assumption of the Section 365 Contracts. Pursuant to the Procedures Order, Sellers shall notify all parties to the Section 365 Contracts of the Cure Amounts for each such contract in accordance with the Procedures Order, so as to enable any such party to object to the proposed Cure Amounts and the Bankruptcy Court to determine such Cure Amounts as promptly as reasonably possible.

8.6 <u>Certain Notices</u>. Sellers shall provide notice of the Sale Motion to all applicable Taxing authorities and to all other parties having Liens of record in the Saleable Assets.

8.7 <u>Access to Information and Other Post-Closing Cooperation</u>.

8.7.1    The parties acknowledge that after the Closing, Sellers or their successors may need access to Business Records in the control of Purchaser for the purposes of concluding the Contemplated Transactions, preparing or filing Tax returns or responding to audits, to wind up the affairs of Sellers, to close the Case, to satisfy other legal requirements, or to prosecute or defend third party claims (including, without limitation, the pursuit of any avoidance, preference or similar actions).

8.7.2    Purchaser shall not dispose of or destroy any of the Business Records prior to the fourth anniversary of the Closing Date. If Purchaser wishes to dispose of or destroy any Business Records after that time, it shall first give sixty (60) days' prior written notice to Sellers, and Sellers shall have the right, at their option and expense, upon prior written notice to Purchaser within such sixty-day period, to take possession of the Business Records within ninety (90) days after the date of the notice from Sellers.

8.7.3    Purchaser shall permit Sellers, Sellers' Representatives, and other professionals employed in the Case reasonable access to the Business Records for the purposes described in Section 8.7.1, which access shall include (a) the right of such Persons to copy, at the Sellers' expense, such documents and records as they may request in furtherance of such purposes and (b) Purchaser's copying and delivering to such Persons such documents and records as they may request, but only to the extent such Persons furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the Sellers reimburse Purchaser for the reasonable costs and expenses thereof.

8.7.4    Purchaser shall cooperate with, and shall cause its current and former employees and officers to cooperate with, the Sellers and their Representatives (at no cost to Sellers) on or after the Closing Date in furnishing information, evidence, testimony and other

15

assistance in connection with any action, proceeding, arrangement or dispute of any nature with respect to the Business or the Saleable Assets and pertaining to periods prior to the Closing Date.

        8.7.5   So long as the Case is pending, Purchaser shall permit Sellers and their Representatives to use and occupy, without cost to Sellers or the Estate, such portion of the Irwindale Facilities as the Sellers reasonably request (the "***Reserved Headquarters Space***").

        8.7.6   Purchaser shall provide the Sellers with a non-exclusive, royalty-free license to use words "Nellson," "Nellson Nutraceutical," and "Vitex" in the corporate names of the Sellers until such time as the Sellers are wound up and dissolved at the conclusion of the Case.

        8.8  <u>Brokerage Obligations</u>.  Except for A&M Securities, LLC (the "***Broker***") which Sellers have engaged in connection with the Contemplated Transactions and whose Broker Compensation Sellers shall be responsible to pay or cause to be paid at Closing out of the Purchase Price, Sellers and the Purchaser each represent and warrant to the other that, such party has incurred no Liability to any broker or agent with respect to the payment of any commission regarding the consummation of the Contemplated Transactions. It is agreed that other than any commission payable to the Broker (for which Sellers shall be solely responsible), if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions, are ever asserted against Purchaser or the Sellers in connection with the Contemplated Transactions, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify, defend (with counsel reasonably satisfactory to the party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the Contemplated Transactions.

        8.9  <u>Further Assurances</u>.  Each party hereto shall execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other party hereto for the purpose of giving effect to the Contemplated Transactions or the intentions of the parties with respect thereto. Each party hereto shall act in good faith in connection with the performance of any obligations under this Agreement to the other parties hereto, whether before or after the Closing.

       9.  <u>Definitions</u>.  For purposes of this Agreement, the following terms have the meanings set forth below:

       "<u>Affiliate</u>" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified. For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 50% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

       "<u>Assumed Liabilities</u>" means the following Liabilities to the extent any such Liability is outstanding on the Closing Date: (a) all Liabilities of Sellers to pay any Cure Amounts with

16

respect to the Section 365 Contracts as and when required in accordance with the Sale Order; (b) all Liabilities of Sellers accruing under the Section 365 Contracts on or after the Closing Date; (c) all obligations arising out of the use of or required to be performed with respect to the Saleable Assets or the Business on or after the Closing Date; (d) all Liabilities of Sellers for post-petition trade payables of the Business as of the Closing Date (excluding any expenses incurred with respect to the administration of the Case) which would qualify as administrative priority expenses under Section 503(b) of the Bankruptcy Code; (e) all Liabilities of Sellers for any required COBRA continuation coverage to "M&A Qualified Beneficiaries" (as defined in Treasury Regulation Section 54.4980B-9, Q/A-4) resulting from the sale of the Business, regardless of whether Purchaser is or becomes a "successor employer" (as defined in Treasury Regulation Section 54.4980B-9, Q/A-8(c)); (f) all Liabilities of Sellers for accrued wages, benefits and payroll Taxes of Sellers as of the Closing Date with respect to the Transferred Employees, (g) all Liabilities of Sellers for Taxes to the extent provided in Section 3.6; (h) any Liabilities under the WARN Act arising solely as a result of the Contemplated Transactions, and (i) any severance obligations to employees (by contract or otherwise) arising by reason of Purchaser's failure or refusal to offer employment to such employee on terms which, if accepted, would not give rise to severance obligations to such employee.

"Bankruptcy Code" means title 11 of the U.S. Code.

"Broker Compensation" means all fees and compensation to which A&M Securities, LLC is entitled from the Sellers under its engagement letter with Sellers.

"Business" means the formulation and manufacture of food bars and powders for weight loss, sports training and wellness, and medical categories for sale in the United States and Canada, as and where conducted immediately before the Closing Date.

"Business Day" means any day of the year on which national banking institutions in the state of California are open to the public for conducting business and are not required or authorized to close.

"Business Employee" means any individual who is employed by any of the Sellers immediately before the Closing whose position is indicated on Schedule 3.5 of this Agreement.

"Business Records" means business records (in any form or medium), including, without limitation, all books, ledgers, files, reports, plans, records, manuals, sales and credit records, studies, surveys, reports, advertising and sales material, customer lists, customer records, test records, financing records, and personnel and payroll records, to the extent they are Related to the Business and not related primarily to an Excluded Asset, other than (a) any Bankruptcy Court filings or documents related to or necessary for winding up of the Sellers and the administration of the Case, (b) any materials about employees, disclosure of which would violate an employee's reasonable expectation of privacy, (c) any materials that are subject to attorney-client or any other privilege or requirement to maintain confidentiality, or (d) that relate to events or periods prior to the Closing and are reasonably necessary for purposes of the prosecution, settlement or enforcement by Sellers of the Rights of Action.

"Canadian Subsidiary" means Nellson Nutraceutical Canada, Inc., a Canadian federal corporation.

"Case" means those proceedings before the Bankruptcy Court designated as Case No. 06-10072 (Jointly Administered).

"Champlain Facility" means the Sellers' facility located in Champlain, New York.

"Champlain Lease" means the lease of the Champlain Facility, as amended, under which NNO is the tenant or lessee.

"Contemplated Transactions" means the purchase and sale of the Saleable Assets and all other transactions contemplated by the Transaction Documents.

"Contract" means any agreement, contract, lease, sublease, rental agreement, or similar agreement, purchase orders, arrangement, commitment or license (other than this Agreement or any instruments executed or delivered in connection herewith) in effect as of the Closing and Related to the Business, or to which any of the Saleable Assets are subject, whether written or oral, except to the extent included in the Excluded Assets.

"Cure Amounts" means all cure amounts owing under any of the Facilities Leases and Other Leases and Contracts as of the Closing Date that the Bankruptcy Court may order to be paid as a condition to Purchaser's assumption and assignment of any of the Facilities Leases or Other Leases and Contracts.

"Debtor" means the Sellers in its capacity as debtor and debtor-in-possession under the Bankruptcy Code.

"Deposit" means the Deposit accompanying a Qualifying Bid in accordance with the Procedures Order.

"Environmental Law" means applicable federal, state and local statutes, ordinances, regulations, rules, orders and requirements of common law concerning the protection of human health, safety or the environment, including, without limitation, those concerning discharges or releases to the air, soil, surface water or groundwater and concerning the use, handling, transport, generation, storage, treatment, disposal or remediation of any waste or any Hazardous Substances.

"EPA" means the U.S. Environmental Protection Agency.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business, whether or not incorporated, that together with any of the Sellers would be deemed a "single employer" within the meaning of Section 40019b) of ERISA or Section 414 of the Internal Revenue Code.

"ERISA Affiliate Reimbursement" means any trade or business, whether or not incorporated, that together with any of the Sellers would be deemed a "single employer" within the meaning of Section 40019b) of ERISA or Section 414 of the Internal Revenue Code.

"Estate" means each estate created pursuant to Section 541(a) of the Bankruptcy Code upon the commencement of each of the Debtors' bankruptcy cases.

"Excluded Assets" means any of the following:  (a) any asset of Sellers not Related to the Business; (b) all Liquid Assets and Financial Instruments; (b) all minute books, stock transfer records and corporate seals of Sellers; (c) all Tax returns of Sellers and all Business Records of Sellers relating thereto, including working papers; (d) all rights and claims in or to any refunds or credits of or with respect to any Taxes paid by Sellers in respect of a pre-Closing period; (e) all Rights of Action; (f) the Sellers' rights under, and all cash and non-cash consideration payable to Sellers pursuant to the terms and provisions of, this Agreement or any other agreements between any Seller, on the one hand, and Purchaser or any of its Affiliates, on the other hand, entered into on or after the date of this Agreement; (g) any rights, claims, and causes of action relating to any Excluded Asset; (h) all Plans of Sellers and all rights in connection therewith or with respect to the assets thereof; (i) all insurance policies of Sellers in effect on the Closing Date, and all claims to insurance proceeds thereunder; (j) any Contract or permit (i) that terminates or expires prior to the Closing Date in accordance with its terms or in the ordinary course of the Business, (ii) that is not capable of being assigned to Purchaser at the Closing with the consent of the other party or parties thereto or the issuer thereof or any third party (including any Government Entity) or (iii) the assignment or attempted assignment of which without such consent would constitute a breach thereof or a violation of any law; (k) any assets not expressly to be assigned to Purchaser pursuant to Section 1.1 hereof; (l) any assets not otherwise included in the definition of Saleable Assets, (m) any obligations owing to Sellers by any Affiliate of Sellers; (n) the Retained Contracts; (o) any Receivables arising out of any Contract of Sellers not a Section 365 Contract assumed by Purchaser; and (p) Inventory sold or consumed by Sellers in the ordinary course of the Business prior to the Closing Date.

"Facilities" means the Irwindale Facilities, the Salt Lake City Facilities and the Champlain Facility.

"Facilities Leases" means the Irwindale Leases, the Salt Lake City Leases and the Champlain Lease.

"Government Entity" means any federal, state or local court, administrative body or other governmental entity with competent jurisdiction.

"Hart-Scott-Rodino Law" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (codified in Section 18(a) of Title 15, U.S. Code) and any related Federal Trade Commission regulations.

"Hazardous Substances" means materials, substances or wastes that are or contain "hazardous substances," "pollutants" or "contaminants," as defined pursuant to any Environmental Law, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§9601 et seq., as amended, "regulated substances"

as defined pursuant to any Environmental Law, including, without limitation, §6991 of the Resource Conservation and Recovery Act, 42 U.S.C. §§6901 et seq., as amended, or any hazardous materials, toxic substances, hazardous wastes, or other substances regulated pursuant to any Environmental Law.

"Intangible Property" means all intangible personal property Related to the Business, including, without limitation, all goodwill of the Business; all Intellectual Property; all Business Records; all guaranties, warranties, indemnities and similar rights in favor of Sellers to the extent related to any of the Saleable Assets; all credits, prepaid expenses, deferred charges, security deposits, prepaid items and duties to the extent primarily related to a Purchased Asset; all licenses and permits issued to Sellers by any Government Entity Related to the Business, to the extent such licenses and permits are assignable under the Bankruptcy Code; all income, royalties or payments due and payable, including, without limitation, all claims for damages by reason of past, present and future infringement, and all legal privileges associated therewith; all suits, claims, charges and causes of action against third parties; and, to the extent transferable or assignable, telephone exchange numbers identified with the Business. As used in this Agreement, Intangible Property shall in all events exclude, (i) any Excluded Asset; (ii) any Bankruptcy Court filings or documents related to or necessary for winding up of the Sellers and the administration of the Case, (iii) any materials containing communications or information about employees, disclosure of which would violate an employee's reasonable expectation of privacy; (iv) any other materials subject to attorney-client, work product or any other privilege or requirement to maintain confidentiality; (v) any Intangible Property held by the Sellers pursuant to a license or other Contract which is not a Section 365 Contract assumed by Purchaser, and (vi) any license, permit or approval which would be deemed to be an executory contract pursuant to Section 365 of the Bankruptcy Code.

"Intellectual Property" means the following assets of the Sellers, to the extent Related to the Business: (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names and other indicia of origin, all applications and registrations for the foregoing, including all renewals of same (collectively, "*Trademarks*"); (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues (collectively, "*Patents*"); (iii) trade secrets, confidential information and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, "*Trade Secrets*"); (iv) published and unpublished works of authorship, whether copyrightable or not (including without limitation databases and any compilations or information); and (v) any other intellectual property or proprietary rights.

"Inventory" means all supplies, goods, materials, raw and finished goods, work in process, inventory and stock in trade owned by Sellers as of the Closing Date exclusively for use or sale in the Ordinary course of business, including but not limited to spare parts, supplies of business forms, and packing materials, other than any Excluded Assets.

"Irwindale Facilities" means the Sellers' facilities located in Irwindale, California, including all improvements and fixtures.

20

"Irwindale Leases" means the leases of the Irwindale Facilities, as amended, under which NNI is the tenant or lessee.

"Knowledge" means, with respect to Sellers, the actual knowledge of Jeffrey Dias, without having performed any investigation.

"Liability" means any claim, debt, liability or obligation of any kind whatsoever, whether arising under contract or applicable law or in connection with a business, and whether conditioned or absolute, liquidated or unliquidated, contingent or non-contingent.

"Lien" means any lien, claim, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Liquid Assets and Financial Instruments" means the following assets of Sellers (a) cash, cash on hand, and cash equivalents, including accounts at any bank or financial institution, (b) securities (whether capital stock or debt) of or held by Sellers (other than capital stock of the Canadian Subsidiary); (c) retainers paid by Sellers for legal, accounting or other professional services; and (d) any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Sellers.

"Ordinary course of business" means the ordinary course of the Business and no other business of Sellers.

"Outside Date" means August 19, 2007.

"Person" means an individual, partnership, corporation, limited liability company, limited liability partnership, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit or other entity of whatever nature.

"Personal Property Leases" means any equipment, personal property or intangible property leases, subleases, rental agreements, licenses, contracts and similar arrangements, except to the extent included in the Excluded Assets.

"Permitted Liens" means (a) Liens for current year taxes, assessments or other governmental charges accrued but not yet due and payable; (b) statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen and other similar liens imposed by law, which are incurred in the Ordinary course of business; (c) Liens incurred or deposits made in the Ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, and other statutory obligations; (d) easements, rights-of-way, restrictions, and other similar charges or encumbrances not interfering in any material respect with the ordinary conduct of the Business; (e) any rights of landlords, lessors or licensors under real or personal property leases or licenses, to the extent such may be characterized as Liens on property, tangible or intangible; (f) restrictions on, or rights with respect to, the Common Shares of the Canadian Subsidiary under any shareholders agreement or under applicable law, to the extent such rights or restrictions may be characterized as Liens; (g) imperfections of title, restrictions or encumbrances, if any, that cannot be released or cured under

21

the Bankruptcy Code pursuant to a sale of assets under Sections 363 or 365 thereof; and (h) Liens that Purchaser expressly agrees in writing to accept.

"Petition Date" means January 28, 2006, the date on which Sellers filed their petition for relief under chapter 11 of the Bankruptcy Code.

"Plan" means each deferred compensation and each bonus, retention, incentive compensation, stock purchase, stock option, restricted stock, phantom stock and other equity compensation plan, program, agreement, or arrangement; each severance or termination pay, medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA; each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, consulting, retention, change in control, termination or severance agreement; and each other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Sellers or by any ERISA Affiliate, or to which any Seller or any ERISA Affiliate is party, whether written or oral, for the benefit of any director, employee or former employee of Sellers or with respect to which Sellers or any ERISA Affiliate otherwise has Liability or reasonable expectation of Liability.

"Related to the Business" means required for, arising out of, or primarily used in connection with the Business as conducted by Sellers before the Closing Date.

"Representatives" of any Person means that Person's officers, independent public accountants, counsel, consultants and other representatives.

"Retained Contracts" means any Contracts or Leases that are not Section 365 Contracts assumed by the Purchaser.

"Rights of Action" means any and all claims, lawsuits, causes of action, choses in action, rights of recovery, rights of set off, rights of recoupment, refunds, demands, defenses, judgments, accounts, and rights, claims, powers or privileges of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by any of the Sellers against any Person, including but not limited to: (i) rights of setoff, counterclaim, or recoupment, and claims on contracts or for breaches of duties imposed by law; (ii) the right to object to Claims, pursuant to Bankruptcy Code § 362; (iii) such claims and defenses as fraud, mistake, duress and usury; (iv) all avoidance powers, actions, rights, remedies or affirmative defenses under Bankruptcy Code §§ 544-553 and 724, under any similar or related law, or under fraudulent transfer or preference laws; and (v) all claims under any and all directors and officers errors and omissions and/or similar insurance policies maintained by or on behalf of any Seller or any Affiliate of any Seller or their respective Estates and all proceeds of such policies.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court at which Sellers will seek approval of the sale of the Saleable Assets pursuant to the Procedures Order.

"Salt Lake City Facilities" means the Sellers' facilities located in Salt Lake City, Utah, including all improvements and fixtures.

"Salt Lake City Leases" means the leases of the Salt Lake City Facilities, as amended, under which NNI is the tenant or lessee.

"Section 365 Contract" has the meaning given to such term in Section 8.4.1.

"Tangible Personal Property" means all furniture, fixtures, furnishings, equipment, machinery, motor vehicles, tools, computers, computer hardware, photocopiers, facsimile machines and other business equipment and devices (including data processing hardware and related telecommunications equipment, media, and tools), tools, racking, molds, forms, dies and tooling and miscellaneous items and other tangible personal property of Sellers Related to the Business; *provided, however*, that Tangible Personal Property shall not include Excluded Assets, Inventory or any tangible property held by the Sellers subject to a Personal Property Lease or other Contract unless such Personal Property Lease or other Contract is a Section 365 Contract assumed by Purchaser.

"Tax" and "Taxes" means all taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, local or foreign governmental authority, including income, gross receipts, excise, property, sales, use, license, custom duty, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable to any failure to comply with any requirement regarding Tax Returns and any transferee or secondary Liability in respect of Taxes, including, in any case, any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any schedule, attachment or other related or supporting information) filed or required to be filed with any Governmental Entity in connection with the determination, assessment or collection of any Tax (whether or not such Tax is imposed on Sellers) or the administration of any laws, regulations or administrative requirements relating to any Tax, including any such document prepared on a consolidated, combined or unitary basis and including any amendment of a Tax Return.

"Termination Date" means the date on which the termination of this Agreement has first become effective in accordance with Section 4.4.

"Transaction Documents" means this Agreement, as amended, including any schedules or exhibits hereto and any agreements, instruments, certificates or other documents executed and delivered in connection herewith, including but not limited to the Procedures Order.

"Transfer Tax" means any sales, purchase, transfer, stamp, stamp duty, documentary stamp, use, value added, or similar Tax under applicable state laws which may be payable by reason of the purchase and sale of assets.

"WARN Act" means the U.S. Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state or local law, regulation or ordinance (including, for the avoidance of doubt, the California Worker Adjustment and Retraining Notification Act, as amended).

10. Miscellaneous.

49081-001\DOCS_LA:71153.7

10.1   Survival. Except as set forth in the following sentence, all representations, warranties and covenants of Sellers made hereunder or in connection with any of the Transaction Documents shall terminate and expire, and shall cease to be of any force or effect, on the Closing Date and all Liability of Sellers with respect to any such representations, warranties and covenants shall thereupon be extinguished. All covenants of Sellers or Purchaser that contemplate actions to be taken or obligations in effect after the Closing or termination of this Agreement, as the case may be, shall survive in accordance with their terms and to the extent so contemplated.

10.2   Purchaser's Sole Remedy. Notwithstanding any other provision of this Agreement, Purchaser's sole and exclusive remedy against the Sellers and the Estate for any breach of this Agreement by Sellers shall be to terminate this Agreement and receive the Deposit pursuant to the terms and conditions hereof.

10.3   Expenses. Except as otherwise provided herein, Sellers and Purchaser shall bear their own expenses in connection with the negotiation and execution of the Transaction Documents and the consummation of the Contemplated Transactions.

10.4   Liability of the Sellers' Agents. No past, present or future officer, director, employee, stockholder, Affiliate, agent or attorney of the Sellers will have any Liability by reason of the breach of any term, provision or representation set forth in this Agreement, with the Purchaser's recourse, if any, under such circumstances being limited to the assets of the Estate.

10.5   Attorneys' Fees. In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

10.6   Notices. All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (c) sent by reputable next-day or overnight mail or courier or (d) sent by facsimile transmission. All such notices, requests, demands, waivers and other communication shall be deemed to have been received (i) if by personal delivery, upon delivery, (ii) if by certified or registered mail, on the third business day after the mailing thereof, (iii) if by next-day or overnight mail or courier, on the business day after such mailing, (iv) if by facsimile, three hours after the sender receives a fax confirmation, unless the fax is sent after 5:00 p.m. on a business day or on a non-business day, in which case it shall be deemed received on the next business day.

If to Sellers:      Nellson Nutraceutical, Inc.
                    5801 Ayala Avenue
                    Irwindale, California  91706
                    Attn:  Mr. Jeffrey Dias

24

With a copy (which shall not constitute notice) to:

> David J. Barton, Esq.
> Pachulski Stang Ziehl Young Jones & Weintraub LLP
> 10100 Santa Monica Boulevard, Suite 1100
> Los Angeles, CA 90067

If to Purchaser:   _____

_____

_____

Attn:   _____

With a copy (which shall not constitute notice) to:

_____

_____

_____

Attn:   _____

or in each case, to such other address as may be specified in writing to the other parties.

Any party may give any notice, instruction or communication in connection with this Agreement using any other means (including personal delivery, telecopy or ordinary mail), but no such notice, instruction or communication shall be deemed to have been delivered unless and until it is actually received by the party to whom it was sent. Any party may change the address to which notices, instructions, or communications are to be delivered by giving the other parties to this Agreement notice thereof in the manner set forth in this Section.

10.7    Entire Agreement. The Transaction Documents (including any schedules or exhibits thereto) contain the entire understanding and agreement between the parties with respect to the subject matter hereof.

10.8    Amendment. This Agreement may be amended, modified or supplemented only by a written instrument duly executed by all the parties hereto and, where required, the Bankruptcy Court.

10.9    Assignments. This Agreement shall not be assigned by either party hereto without the prior written consent of the other party hereto; provided, that Purchaser shall be permitted to assign its right to purchase all or any portion of the Saleable Assets to any one or more Affiliates of Purchaser and provided further that any such assignment(s) shall in no way release or relieve Purchaser from any Liability under this Agreement.

10.10   Binding Effect. Subject to any restrictions hereunder on the assignment of this Agreement, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors and assigns of the parties.

25

10.11   Severability. Any term or provision of this Agreement that is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable or affecting the validity or enforceability of any of the other terms or provisions of this Agreement. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall be ineffective in such jurisdiction, without rendering invalid or unenforceable or effecting the validity or enforceability of any terms or provisions of this Agreement in any other jurisdiction.

10.12   Waiver. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by any party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.13   Bankruptcy Court Jurisdiction. **BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE SALEABLE ASSETS AND/OR ASSUMED LIABILITIES, AND BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.**

10.14   Interpretation. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

10.14.1      This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the rules of conflict of laws of such state.

10.14.2      This Agreement shall not be deemed to have been drafted by either party hereto but rather drafted as the result of extensive negotiations between the parties.

10.14.3      When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

10.14.4      Any reference in this Agreement to $ shall mean U.S. dollars.

10.14.5      The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All exhibits and

26

49081-001\DOCS_LA:71153.7

schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any schedule or exhibit but not otherwise defined herein shall be defined as set forth in this Agreement.

10.14.6    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

10.14.7    The provision of a table of contents, the division of this Agreement into articles, sections or other subdivisions, and the insertion of captions, titles or headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

10.14.8    The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

10.14.9    The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

10.15    Counterparts. This Agreement may be executed by facsimile signature and in any number of counterparts, each of which shall be deemed an original and all which together shall constitute one and the same instrument.

10.16    Time is of the Essence. Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

10.17    Third Party Beneficiaries. This Agreement is not intended to create any third party beneficiaries.

10.18    Tax Effect. None of the parties (nor such parties' counsel or accountants) has made or is making in this Agreement or any of the Transaction Documents any representation to any other party (or such party's counsel or accountants) concerning any of the Tax effects or consequences on the other party of the transactions provided for in this Agreement. Each party represents that it has obtained, or may obtain, independent Tax advice with respect thereto and upon which it, if so obtained, has solely relied.

10.19    Confidentiality Agreement. Any confidentiality agreement between Purchaser and Sellers or any of their respective Affiliates executed in connection with this Agreement shall remain in full force and effect during the term specified therein.

27

**IN WITNESS WHEREOF**, Purchaser and Sellers have executed this Asset Purchase Agreement as of the day and year first above written.

**PURCHASER**:

_____

a _____

By: _____
Name:_____
Its:_____


**SELLERS:**

**NELLSON NUTRACEUTICAL, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON HOLDINGS, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON INTERMEDIATE
HOLDINGS, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

*[SIGNATURE PAGES TO ASSET PURCHASE AGREEMENT]*

28

**NELLSON NORTHERN OPERATING, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON NUTRACEUTICAL EASTERN DIVISION, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON NUTRACEUTICAL POWDER DIVISION, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**VITEX FOODS, INC.,**
a California corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

*[SIGNATURE PAGES TO ASSET PURCHASE AGREEMENT]*

29

# SCHEDULES AND EXHIBITS

## Schedules

| Number | Title |
|---|---|
| Schedule 1.1.1 | Real Property Improvements |
| Schedule 1.1.2 | Tangible Personal Property |
| Schedule 1.1.3 | Intangible Property |
| Schedule 1.1.4-1 | Facilities Leases |
| Schedule 1.1.4-2 | Other Leases |
| Schedule 1.1.4-3 | Other Contracts |
| Schedule 3.5 | Business Employee Data |
| Schedule 5.5.1 | Liens and Encumbrances – Sellers |
| Schedule 5.5.2 | Canadian Subsidiary |

## Exhibits

| Number | Title |
|---|---|
| Exhibit 3.3.1 | Assignment and Assumption of Real Property Lease |
| Exhibit 3.3.2 | Assignment and Assumption of Personal Property Leases and Contracts |
| Exhibit 3.3.3 | Bill of Sale |
| Exhibit 3.3.4 | Assignment of Intangible Property |
| Exhibit 3.4.6 | Assumption Agreement |
| Exhibit 8.4.1. | Sale Procedures Order |

## Exhibit 3.3.1

### ASSIGNMENT AND ASSUMPTION OF REAL PROPERTY LEASE

This Assignment and Assumption of Real Property Lease (this "*Assignment*") made and entered into as of this __ day of _____, 2007 by and among Nellson Nutraceutical, Inc., a Delaware corporation ("*NNI*"), Nellson Holdings, Inc., a Delaware corporation ("*NHI*"), Nellson Intermediate Holdings, Inc., a Delaware corporation ("*NIH*"), Nellson Northern Operating, Inc., a Delaware corporation ("*NNO*"), Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation ("*NNE*"), Nellson Nutraceutical Powder Division, Inc., a Delaware corporation ("*NNP*"), Vitex Foods, Inc., a California corporation ("*VFI*") (NNI, NHI, NIH, NNO, NNE, NNP, and VFI being sometimes referred to herein individually as an "*Assignor*" and collectively as "*Assignors*") and [_____], a _____ [corporation] [limited liability company] ("*Assignee*").

Assignors and Assignee acknowledge that:

A.     Each of the Assignors is a debtor and debtor in possession in chapter 11 proceedings before the United States Bankruptcy Court for the District of Delaware.

B.     One or more of the Assignors (the "*Tenant*") is the tenant of certain real property premises located at _____ (the "*Facility*") under that certain _____ [IDENTIFY LEASE] dated _____, _____ as amended (the "*Lease*") by and between Tenant and _____, a _____, as landlord (the "*Landlord*").

C.     Assignors, as Sellers, and Assignee, as Purchaser, have heretofore entered into that certain Asset Purchase Agreement dated [_____], 2007 (the "*Purchase Agreement*"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

D.     Concurrently with the mutual execution and delivery of this Assignment, Assignors and Assignee are consummating the transactions contemplated by the Purchase Agreement. Assignors and Assignee are executing and delivering this Assignment in satisfaction of their respective obligations pursuant to Sections 3.3.1 and 3.4.3 of the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which Assignors and Assignee hereby acknowledge, and intending to be legally bound hereby, Assignors and Assignee hereby agree as follows:

1.     **Assignment.**  Assignors hereby sell, assign and transfer to Assignee, all interest of Assignors, as tenant, in and to the Facility and the Lease, a copy of which is attached hereto as *Exhibit "A."*  Assignor makes no representations and warranties of any kind whatsoever with respect to the Lease.

2.     **Assumption.**  Assignee hereby accepts the foregoing assignment of such Lease, and does hereby assume the duties and obligations of tenant under the Lease, thereunder accruing from and after the Effective Date, and does hereby agree to be bound by and to perform or cause to be performed, as a direct obligation to Landlord, each and all of the terms, conditions,

covenants and provisions to be done, kept and performed under such Lease accruing from and after the Effective Date, to the same extent as if Assignee had been an original party thereto.

      3.    **Assignee's Indemnification.**  Assignee shall indemnify, defend (with counsel reasonably satisfactory to Assignors) and hold Assignors free, clear and harmless from and against any and all claims, demands, suits, causes of actions, penalties, liabilities, costs, fees and expenses of any kind or nature whatsoever, including, without limitation, reasonable attorneys' fees and costs for the performance or nonperformance of Assignee's obligations under the Lease, which accrued from and after the Effective Date.

      4.    **Attorneys' Fees.**  In the event that either party hereto brings and action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

      5.    **Amendments.**  This Assignment may only be amended by a writing signed by both Assignors and Assignee.

      6.    **Delivery Pursuant to Purchase Agreement.**  Notwithstanding anything to the contrary herein, Assignors and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Purchase Agreement, and the acknowledgement and disclaimer set forth in Section 7 thereof).

      7.    **Governing Law.**  This Assignment shall be governed by and construed and enforced in accordance with the laws of Delaware, without giving effect to the conflicts of laws provisions thereof.

      8.    **Counterparts.**  This Assignment may be executed in separate counterparts, each of which shall be deemed to be an original, but both of which, taken together, shall be deemed one original document.

      9.    **Execution in Counterparts.**  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

45081-001\DOCS_LA:71153.7

161

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the date first written above.

**ASSIGNORS:**

**NELLSON NUTRACEUTICAL, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON HOLDINGS, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON INTERMEDIATE
HOLDINGS, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON NORTHERN OPERATING,
INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

*[SIGNATURE PAGES TO ASSIGNMENT AND ASSUMPTION OF
REAL PROPERTY LEASE]*

33

**NELLSON NUTRACEUTICAL
EASTERN DIVISION, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**NELLSON NUTRACEUTICAL
POWDER DIVISION, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**VITEX FOODS, INC.,**
a California corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**ASSIGNEE:**


_____,
a _____

By: _____
Name: _____
Its: _____



*[SIGNATURE PAGES TO ASSIGNMENT AND ASSUMPTION OF
REAL PROPERTY LEASE]*

34

Exhibit 3.3.2

## ASSIGNMENT AND ASSUMPTION OF PERSONAL PROPERTY LEASES AND CONTRACTS

This Assignment and Assumption of Personal Property Leases and Contracts (this "**Assignment**") is made and entered into as of this [___] day of [_____], 2007 by and among [_____], a _____ [corporation] [limited liability company] ("**Purchaser**"), Nellson Nutraceutical, Inc., a Delaware corporation ("**NNI**"), Nellson Holdings, Inc., a Delaware corporation ("**NHI**"), Nellson Intermediate Holdings, Inc., a Delaware corporation ("**NIH**"), Nellson Northern Operating, Inc., a Delaware corporation ("**NNO**"), Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation ("**NNE**"), Nellson Nutraceutical Powder Division, Inc., a Delaware corporation ("**NNP**"), and Vitex Foods, Inc., a California corporation ("**VFI**") and [_____], a _____ [corporation] [limited liability company] ("**Assignee**"). NNI, NHI, NIH, NNO, NNE, NNP and VFI being sometimes referred to herein individually as an "**Assignor**" and collectively as "**Assignors.**"

Assignors and Assignee acknowledge that:

A.      Each of the Assignors is a debtor and debtor in possession in chapter 11 proceedings before the United States Bankruptcy Court for the District of Delaware.

B.      Assignors, as Sellers, and Assignee, as Purchaser, have heretofore entered into that certain Asset Purchase Agreement dated [_____], 2007 (the "**Purchase Agreement**"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

C.      Concurrently with the mutual execution and delivery of this Assignment, Assignors and Assignee are consummating the transactions contemplated by the Purchase Agreement. Assignors and Assignee are executing and delivering this Assignment in satisfaction of their respective obligations pursuant to Sections 3.3.2 and 3.4.4 of the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which Assignors and Assignee hereby acknowledge, and intending to be legally bound hereby, Assignors and Assignee hereby agree as follows:

1. **Assignment.** To the extent of their respective interests therein, the Assignors hereby assign to Assignee all of their respective right, title and interest in and to the Contracts and Leases described on **Exhibit "A"** attached hereto and incorporated herein by this reference (collectively, the "**Assigned Contracts**").

2. **Assumption.** Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assigned Contracts and to faithfully perform all of Assignors' obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting party thereunder.

3. **Assignee's Indemnification.** Assignee shall indemnify, defend (with counsel reasonably satisfactory to Assignors) and hold Assignors free and harmless of, from and against

any and all Liabilities, obligations, claims, demands, actions, causes of action, losses and costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Assignors may suffer or incur by reason of or in connection with Assignee's breach or default or asserted or claimed breach or default of any obligation to the counter-party under the Assigned Contracts (or any of them) to be performed thereunder from and after the Closing Date.

      4. **Attorneys' Fees.** In the event that either party hereto brings and action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

      5. **Amendments.** This Assignment may only be amended by a writing signed by both Assignors and Assignee.

      6. **Counterparts.** This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

      7. **Delivery Pursuant to Purchase Agreement.** Notwithstanding anything to the contrary herein, Assignors and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Purchase Agreement, and the acknowledgement and disclaimer set forth in Section 7 thereof).

      8. **Governing Law.** This Assignment shall be governed by and construed and enforced in accordance with the laws of Delaware, without giving effect to the conflicts of laws provisions thereof.

**IN WITNESS WHEREOF**, Assignors and Assignee have executed this Assignment as of the date first written above.

**ASSIGNORS:**

**NELLSON NUTRACEUTICAL, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON HOLDINGS, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON INTERMEDIATE
HOLDINGS, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON NORTHERN OPERATING,
INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

*[SIGNATURE PAGES TO ASSIGNMENT AND ASSUMPTION OF
PERSONAL PROPERTY LEASES AND CONTRACTS]*

**NELLSON NUTRACEUTICAL
EASTERN DIVISION, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**NELLSON NUTRACEUTICAL
POWDER DIVISION, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**VITEX FOODS, INC.,**
a California corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**ASSIGNEE:**

_____
a _____

By: _____
Name: _____
Its: _____

*[SIGNATURE PAGES TO ASSIGNMENT AND ASSUMPTION OF
PERSONAL PROPERTY LEASES AND CONTRACTS]*

## Exhibit 3.3.3

## BILL OF SALE

This Bill of Sale is dated _____, 2007 and made by Nellson Nutraceutical, Inc., a Delaware corporation ("*NNI*"), Nellson Holdings, Inc., a Delaware corporation ("*NHI*"), Nellson Intermediate Holdings, Inc., a Delaware corporation ("*NIH*"), Nellson Northern Operating, Inc., a Delaware corporation ("*NNO*"), Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation ("*NNE*"), Nellson Nutraceutical Powder Division, Inc., a Delaware corporation ("*NNP*"), and Vitex Foods, Inc., a California corporation ("*VFI*") in favor of _____, a _____ ("*Purchaser*"). In this Bill of Sale, NNI, NHI, NIH, NNO, NNE NNP and VFI collectively are referred to as "*Sellers*."

Sellers are debtors and debtors in possession in chapter 11 proceedings before the United States Bankruptcy Court for the District of Delaware.

Sellers are executing this Bill of Sale pursuant to Section 3.3.3 of the Asset Purchase Agreement dated _____, 2007 by and among Sellers and Purchaser.

For good and valuable consideration, the receipt and sufficiency of which Sellers hereby expressly acknowledges, Sellers hereby sell, transfer, assign and deliver all of their right, title and interest in and to (i) the Closing Date Tangible Personal Property, (ii) the Closing Date Inventory, (iii) the Receivables, and (iv) the Business Records.

Except for terms specifically defined in this Bill of Sale, all capitalized terms used in herein shall have the same meanings as such terms have when utilized in the Agreement.

Notwithstanding anything to the contrary herein, Sellers is executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Agreement, and the acknowledgement and disclaimer set forth in Section 7 of the Agreement).

IN WITNESS WHEREOF, Sellers have caused this Bill of Sale to be executed as of the date first written above.

**SELLERS:**

**NELLSON NUTRACEUTICAL, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON HOLDINGS, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON INTERMEDIATE
HOLDINGS, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON NORTHERN OPERATING,
INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

*[SIGNATURE PAGES TO BILL OF SALE]*

49381-001\DOCS_LA:71153.7

**NELLSON NUTRACEUTICAL
EASTERN DIVISION, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON NUTRACEUTICAL
POWDER DIVISION, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**VITEX FOODS, INC.,**
a California corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

*[SIGNATURE PAGES TO BILL OF SALE]*

Exhibit 3.3.4

## ASSIGNMENT OF INTANGIBLE PROPERTY

The Assignment of Intangible Property (the "*Assignment*") is dated _____, 2007 and entered into between Nellson Nutraceutical, Inc., a Delaware corporation ("*NNI*"), Nellson Holdings, Inc., a Delaware corporation ("*NHI*"), Nellson Intermediate Holdings, Inc., a Delaware corporation ("*NIH*"), Nellson Northern Operating, Inc., a Delaware corporation ("*NNO*"), Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation ("*NNE*"), Nellson Nutraceutical Powder Division, Inc., a Delaware corporation ("*NNP*"), and Vitex Foods, Inc., a California corporation ("*VFI*"), and _____, a _____ (the "*Assignee*") is executing this Assignment of Intangible Property (the "*Assignment*") in favor of _____, a _____ (the "*Assignee*"). In this Assignment, NNI, NHI, NIH, NNO, NNE, NNP and VFI are collectively referred to as "*Assignors*."

Assignors and Assignee acknowledge that:

(A)     Each of the Assignors is a debtor and debtor-in-possession in chapter 11 proceedings before the United States Bankruptcy Court for the District of Delaware.

(B)     Assignor and Assignee have heretofore entered into that certain Asset Purchase Agreement dated [__], 2007 (the "*Agreement*"), by and between Assignors and Assignee. Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Agreement.

(C)     Concurrently with the execution and delivery of this Assignment, Assignors and Assignee are consummating the transactions contemplated by the Agreement. Pursuant to Sections 3.3.4 and 3.4.5 of the Agreement, Assignors and Assignee are required to mutually execute and deliver this Assignment at the Closing.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which Assignors hereby expressly acknowledge, to the extent of its respective interests therein, each Assignor hereby assigns, conveys, transfers and sets over unto Assignee, all of such Assignor's right, title and interest, if any, in and to all Intangible Property, including, but not limited to, its right, title and interest, if any, in and to the Intangible Property identified on Schedule 1 attached hereto and incorporated herein by this reference. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Assignors and Assignee.

Notwithstanding anything to the contrary herein, Assignors are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Agreement, and the acknowledgement and disclaimer set forth in Section 7 of the Agreement).

In the event that any of the Assignors or Assignee brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

This Assignment shall be governed by and construed and enforced in accordance with the laws of Delaware.

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the date first written above.

**ASSIGNORS:**

**NELLSON NUTRACEUTICAL, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON HOLDINGS, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON INTERMEDIATE
HOLDINGS, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON NORTHERN OPERATING,
INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

*[SIGNATURE PAGES TO ASSIGNMENT OF INTANGIBLE PROPERTY]*

**NELLSON NUTRACEUTICAL
EASTERN DIVISION, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**NELLSON NUTRACEUTICAL
POWDER DIVISION, INC.,**
a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**VITEX FOODS, INC.,**
a California corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**ASSIGNEE:**


_____,
a _____

By: _____
Name: _____
Its: _____


*[SIGNATURE PAGES TO ASSIGNMENT OF INTANGIBLE PROPERTY]*

## Exhibit 3.4.6

## ASSUMPTION AGREEMENT

This Assumption Agreement (this **"Assumption"**) is entered into as of this _____ day of August, 2006, by _____, a _____ [corporation] [limited liability company] ( **"Purchaser"**) in favor of Nellson Nutraceutical, Inc., a Delaware corporation ("*NNI*"), Nellson Holdings, Inc., a Delaware corporation ("*NHI*"), Nellson Intermediate Holdings, Inc., a Delaware corporation ("*NIH*"), Nellson Northern Operating, Inc., a Delaware corporation ("*NNO*"), Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation ("*NNE*"), Nellson Nutraceutical Powder Division, Inc., a Delaware corporation ("*NNP*"), and Vitex Foods, Inc., a California corporation ("*VFI*") (NNI, NHI, NIH, NNO, NNE, NNP and VFI being collectively referred to as **"Sellers**."

Purchaser acknowledges as follows:

A.    Sellers and Purchaser have heretofore entered into that certain Asset Purchase Agreement dated as of _____, 2007 (the **"Purchase Agreement"**).  Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.    Concurrently with the execution and delivery of this Assumption, Purchaser and Sellers are consummating the transactions contemplated by the Purchase Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which Purchaser hereby acknowledges, Purchaser hereby agrees as follows:

1.    **Assumption**.  Effective as of the Closing Date, Purchaser hereby assumes and agrees fully and faithfully to perform all of the Assumed Liabilities.  Notwithstanding anything to the contrary herein, this Assumption shall not apply to liabilities and obligations covered by the assignment and assumption of contracts, it being agreed that the disposition of those obligations and liabilities shall be governed by such assignment(s).

2.    **Indemnification**.  Purchaser shall indemnify, defend (with counsel reasonably satisfactory to Sellers) and hold Sellers free and harmless of, from and against any and all liabilities, obligations, claims, demands, actions, causes of action, losses and costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Sellers may suffer or incur by reason of or in connection with Purchaser's breach (or asserted breach) of the covenant and undertaking set forth in Paragraph 1 above.

3.    **Attorneys' Fees**.  In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.  By closing the transaction contemplated by the Purchase Agreement,

Sellers shall be deemed to have agreed to the terms and provisions of this Paragraph 3 and the second sentence of Paragraph 6 below.

     4.    **Amendments.**  This Assumption may only be amended by a writing signed by both Purchaser and Sellers.

     5.    **Governing Law**.  This Assignment shall be governed by and construed and enforced in accordance with the laws of Delaware.

     6.    **Joint and Several Liability**.  Each entity comprising Purchaser shall be jointly and severally liable for all obligations of the Purchaser under this Assumption.  Likewise, each entity comprising Sellers shall be jointly and severally liable for Sellers' obligations under Paragraph 3 above.

**IN WITNESS WHEREOF**, Purchaser and Sellers have executed this Assumption Agreement as of the day and year first set forth above.

**SELLERS:**

**NELLSON NUTRACEUTICAL, INC.,**

a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON HOLDINGS, INC.,**

a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**NELLSON INTERMEDIATE HOLDINGS, INC.,**

a Delaware corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

*[SIGNATURE PAGES TO ASSUMPTION AGREEMENT]*

**NELLSON NORTHERN OPERATING, INC.,**

a Delaware corporation,
Debtor and Debtor in Possession


By: _____
Name:_____
Its:_____


**NELLSON NUTRACEUTICAL EASTERN DIVISION, INC.,**

a Delaware corporation,
Debtor and Debtor in Possession


By: _____
Name:_____
Its:_____


**NELLSON NUTRACEUTICAL POWDER DIVISION, INC.,**

a Delaware corporation,
Debtor and Debtor in Possession


By: _____
Name:_____
Its:_____


*[SIGNATURE PAGES TO ASSUMPTION AGREEMENT]*

**VITEX FOODS, INC.,**

a California corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**PURCHASER:**

_____,

a _____

By: _____
Name: _____
Its: _____

*[SIGNATURE PAGES TO ASSUMPTION AGREEMENT]*

49581-001\DOCS_LA:71153.7

179

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) Case No. 06-10072 (CSS) |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) **Related to Docket No. ___** |

### ORDER (I) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' OPERATING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363(b), (f) AND (m) OF THE BANKRUPTCY CODE, (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

THIS MATTER is before the Court on the motion (the "Sale Motion") of the

above-captioned debtors and debtors-in-possession (together, the "Debtors") for entry of an

order, pursuant to 11 U.S.C. §§ 363(b) and 365 (the "Bankruptcy Code"), and Rules 2002, 6004,

and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (A)

approving the Asset Purchase Agreement, as such agreement may have been amended (the

"Purchase Agreement"),[2] attached hereto as <u>Exhibit A</u>,[3] by and between the Debtors and the

---

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc., a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

[2] Unless otherwise noted, capitalized terms used herein have the meanings set forth in the Purchase Agreement and the Sale Motion.

[3] Certain portions of the schedules to the Purchase Agreement containing confidential or proprietary information have been redacted from the attached exhibit.

Purchaser pursuant to which the Purchaser has offered to acquire the Saleable Assets; (B)

granting the Debtors authority to sell substantially all of their operating assets as further set forth

in the Purchase Agreement free and clear of liens, claims, interests and encumbrances; and (C)

authorizing the Debtors to assume and assign the Assumed Executory Contracts; and

            The Sale Motion having been served upon (i) Office of the United States Trustee;

(ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to UBS, AG; (iv)

counsel to the Ad Hoc Committee of First Lien Lenders; (v) counsel to Fremont Investors VII,

LLC; (vi) parties known by the Debtors to assert liens, claims, rights, interests or encumbrances

of record in the Saleable Assets; (vii) federal, state and local taxing authorities who have a

reasonably known interest in the Saleable Assets; (viii) the United States Attorney for the

District of Delaware; (ix) the Internal Revenue Service; (x) the United States Department of

Justice; (xi) those parties that have expressed an interest in purchasing the Saleable Assets; (xii)

the counterparties to the Assumed Executory Contracts; and (xiii) those persons who have

requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; and

            Notice of the Sale Motion having been provided in accordance with this Court's

*Order (A) Approving Sale Procedures in Connection with Sale of Substantially All of the*

*Debtors' Operating Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale;*

*(C) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on*

*Approval of (i) Sale and (ii) Assumption and Assignment of Certain Executory Contracts and*

*Unexpired Leases; (D) Approving Forms of Notice; and (E) Granting Related Relief* (the

"Procedures Order"); and

It further appearing that the legal and factual bases set forth in the Sale Motion and at the hearing thereon which took place on July 19, 2007 (the "Sale Hearing") establish just cause for the relief granted herein; and after due deliberation thereon,

NOW, THEREFORE, THE COURT HEREBY FINDS THAT:

## A.    **Jurisdiction, Final Order and Statutory Predicates**

1.    This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Rule 7054 of the Federal Rules of Bankruptcy Procedure, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

3.    This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

4.    The proposed sale constitutes a sale of property of the estates outside the ordinary course of business within the meaning of section 363(b) of the Bankruptcy Code.

## B.    **Good Faith of Purchaser**

5.    _____, a _____ corporation (the "Purchaser," except to the extent the Back-Up Bidder is treated as the Purchaser as set forth below) is purchasing the Saleable Assets in good faith and is a good faith purchaser within the meaning of 11 U.S.C. § 363(m), and is therefore entitled to the protection of that provision, and otherwise

3

has proceeded in good faith in all respects in connection with this proceeding in that: (a) the

Purchaser recognized that the Debtors were free to deal with any other party interested in

acquiring the Saleable Assets; (b) the Purchaser complied with the provisions in the Procedures

Order; (c) the Purchaser in no way induced or caused the chapter 11 filing of the Debtors; (d) all

payments to be made by the Purchaser and other agreements or arrangements entered into by the

Purchaser in connection with the sale have been disclosed; (e) the Purchaser has not violated

11 U.S.C. § 363(n) by any action or inaction; and (f) the negotiation and execution of the

Purchase Agreement and any other agreements or instruments related thereto was in good faith.

**C.    Highest and Best Offer**

6.    The Debtors conducted an auction process in accordance with, and have

otherwise complied in all respects with, the Procedures Order. The Auction process set forth in

the Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to

make a higher or otherwise better offer to purchase the Saleable Assets. The Auction was duly

noticed and conducted in a noncollusive, fair and good faith manner and a reasonable

opportunity has been given to any interested party to make a higher and better offer for the

Saleable Assets.

7.    The Purchase Agreement constitutes the highest and best offer for the

Saleable Assets, and will provide a greater recovery for the Debtors' estates than would be

provided by any other available alternative. The Debtors' determination that the Purchase

Agreement constitutes the highest and best offer for the Saleable Assets constitutes a valid and

sound exercise of the Debtors' business judgment.

4

8.    The Purchase Agreement represents a fair and reasonable offer to purchase the Saleable Assets under the circumstances of these chapter 11 cases. No other person or entity or group of entities has offered to purchase the Saleable Assets for greater economic value to the Debtors' estates than the Purchaser.

9.    Approval of the Sale Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their creditors, their estates and other parties in interest.

10.    The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale prior to, and outside of, a plan of reorganization.

11.    The consideration provided by the Purchaser pursuant to the Purchase Agreement constitutes reasonably equivalent value and fair consideration for the Saleable Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

12.    The Debtors have full corporate power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby, and no further consents or approvals are required for the Debtors to consummate the transactions contemplated by the Purchase Agreement, except as otherwise set forth in the Purchase Agreement.

**D.    Purchaser is Not a Mere Continuation of the Debtors**

13.    The Purchaser is not a mere continuation of the Debtors, there is not substantial continuity between the Purchaser and the Debtors, and there is no continuity of enterprise between the Debtors and the Purchaser.

5

14.     No common identity of incorporators, directors or stockholders exists between the Purchaser and the Debtors.

15.     The sale is not being entered into fraudulently.  The sale has been properly noticed.

16.     The Purchaser is not holding itself out to the public as a continuation of the Debtors.

**E.     Successor Liability**

17.     The Purchaser does not constitute a successor to the Debtors or the estates.

18.     The sale does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors

**F.     Assumption and Assignment of Executory Contracts and Unexpired Leases**

19.     Subject to, and at the time of, the Closing, the Debtors may assume the Assumed Executory Contracts, as identified in the Purchase Agreement, and assign each of them to the Purchaser pursuant to section 365 of the Bankruptcy Code free and clear of all Encumbrances, as defined below, and notwithstanding any anti-assignment clause as provided in section 365(f) of the Bankruptcy Code.  The assumption and assignment of the Assumed Executory Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

20.     The respective amounts set forth on the cure notice approved pursuant to the Procedures Order (the "Cure Notice"), and served upon each counterparty to the Assumed Executory Contracts (each a "Counterparty"), are the sole amounts necessary under

6

sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all defaults and

pay all actual pecuniary losses under the Assumed Executory Contracts (the "Cure Amounts").

The Purchaser shall pay the Cure Amounts for each of the Assumed Executory Contracts in

accordance with the Purchase Agreement.

21.    The Purchaser has provided adequate assurance of its future performance

under the relevant Assumed Executory Contracts within the meaning of sections 365(b)(1)(C),

365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

### G.    Section 363 Sale

22.    The conditions of Section 363(f) of the Bankruptcy Code have been

satisfied in full; therefore, the Debtors may sell the Saleable Assets free and clear of any interest

in the property.

23.    With respect to any and all entities and persons asserting any options,

pledges, security interests, claims, equities, reservations, third party rights, replacement liens,

superpriority claims, voting trusts or similar arrangements, Liens (other than easements,

restrictive covenants, leases and licenses encumbering property owned by the Debtors), charges

or other encumbrances or restrictions on or conditions to transfer or assignment of any kind

(including, without limitation, restrictions or conditions on or to the transfer, assignment or

renewal of licenses, permits registrations and authorizations or approvals of or with respect to

governmental units and instrumentalities), whether direct or indirect, absolute or contingent,

matured or unmatured, liquidated or unliquidated on or against the Saleable Assets or the

Debtors (collectively, the "Encumbrances"), either (i) such person or entity has consented to the

sale and transfer, license and assignment, as applicable, free and clear of its Encumbrance, with

7

such Encumbrance to attach to the net proceeds of such sale and transfer, license and assignment, as applicable, respectively, (ii) applicable nonbankruptcy law permits sale of the assets free and clear of such Encumbrance, (iii) such Encumbrance is in bona fide dispute, or (iv) such person or entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Encumbrance.

        24.    The Purchaser would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Saleable Assets to the Purchaser or (to the extent permitted by the Purchase Agreement) its respective assignees, the assumption, assignment and sale of the Assumed Executory Contracts to the Purchaser or (to the extent permitted by the Purchase Agreement) its respective assignees, and the assumption of the Assumed Liabilities by the Purchaser or (to the extent permitted by the Purchase Agreement) its respective assignees were not, except as otherwise provided in the Purchase Agreement with respect to the Assumed Liabilities and Permitted Liens, free and clear of all Encumbrances of any kind or nature whatsoever, or if the Purchaser would, or in the future could (except and only to the extent expressly provided in the Purchase Agreement or any amendments thereto, and with respect to the Assumed Liabilities), be liable for any of such Encumbrances or other future liabilities arising out of past conduct of the Debtors or the Debtors' past ownership of the Saleable Assets.

        25.    The Purchaser is not purchasing all of the Debtors' assets. The Purchaser is only purchasing the Saleable Assets and is not purchasing any assets other than the Saleable Assets, to the extent set forth in the Purchase Agreement. The Saleable Assets do not include the

8

Excluded Assets, as defined in the Purchase Agreement. The Excluded Assets shall remain subject to existing Encumbrances, if any.

26.    The Purchaser is not assuming all of the Debtors' liabilities. The Purchaser is only assuming the Assumed Liabilities, as set forth in the Purchase Agreement, and is not assuming any obligations other than the Assumed Liabilities.

27.    The Debtors are not assuming and assigning all of their contracts and leases to the Purchaser. The Debtors are only assuming and assigning to the Purchaser the Assumed Executory Contracts in accordance with the terms of the Purchase Agreement and are not assuming and assigning any executory contracts or leases other than the Assumed Executory Contracts.

28.    Given all of the circumstances of the Debtors' chapter 11 cases and the adequacy and fair value of the purchase price under the Purchase Agreement, the proposed sale of the Saleable Assets to the Purchaser constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

## H.    Prepetition Secured Lenders

29.    As set forth in the Court's *Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code Authorizing the Use of Cash Collateral and Granting Adequate Protection to UBS, AG*, dated March 21, 2006 (the "Final Cash Collateral Order"), the Debtors are indebted, as of the Petition Date, to (i) the First Lien Prepetition Lenders (as defined in the Final Cash Collateral Order), without defense, counterclaim or offset of any kind, in an amount not less than $259,817,423.98, and (ii) the Second Lien Prepetition Lenders, without defense, counterclaim or offset of any kind, in an amount not less than $76,659,760.27 (collectively, the

9

"Prepetition Obligations"). The Prepetition Obligations are secured by valid, enforceable, duly

perfected liens and security interests granted by the applicable Debtors to the Prepetition Agents

(as defined in the Final Cash Collateral Order), for the ratable benefit of the First Lien Lenders

and Second Lien Lenders (the "Prepetition Lenders"), on and in substantially all of the

applicable Debtors' assets and properties which include, without limitation, the Saleable Assets,

(the "Prepetition Collateral"); provided, however, the Prepetition Collateral does not include

one-third (33.33%) of the capital stock of the Canadian Subsidiary.

**I.    Miscellaneous**

        30.    All findings of fact and conclusions of law announced by the Court at the

Sale Hearing are hereby incorporated herein.

        NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND

DECREED THAT:

        1.    All objections to the Sale Motion or the relief requested therein that have

not been withdrawn, waived, or settled as announced to the Court at the hearing on the Sale

Motion or by stipulation filed with the Court, and all reservations of rights included therein, are,

except as provided in other orders of the Court, hereby overruled on the merits or the interests of

such objections have been otherwise satisfied or adequately provided for.

        2.    The Purchase Agreement is hereby approved in all respects, and shall be

deemed in full force and effect, binding and benefiting the Debtors and the Purchaser.

        3.    The Debtors are authorized and empowered to execute and deliver to the

Purchaser the Purchase Agreement and the other agreements contemplated thereby, and to

implement and consummate all of the transactions and perform all obligations contemplated by

the Purchase Agreement, including, without limitation, to sell the Saleable Assets to the

Purchaser and to assume and assign to the Purchaser the Assumed Executory Contracts, all on

the terms of the Purchase Agreement, for the purchase price set forth therein, and determined in

accordance with the Purchase Agreement. The Debtors are authorized and empowered to deliver

special warranty deeds, bills of sale, assignments and other such documentation that may be

necessary or requested by the Purchaser in accordance with the terms of the Purchase Agreement

to evidence the transfers required or otherwise contemplated by the Purchase Agreement.

4.    Pursuant to the Procedures Order, in the event that the Purchaser fails to

consummate an approved sale because of a breach or failure to perform on the part of the

Purchaser, the Debtors are authorized, but not required, without any other or further order or

authorization from the Court and without any other or further notice, to consummate the sale

with _____, a _____ corporation (the "Back-Up Bidder") on the terms of

the Purchase Agreement with such Back-Up Bidder and the Back-Up Bidder shall have all of the

rights and privileges of the "Purchaser" for purposes of this Order, and shall be treated in all

respects as the "Purchaser" under the terms of this Order.

5.    As contemplated by the Court's *Amended Order Authorizing the Debtors*

*to Retain Alvarez & Marsal Securities, LLC as Financial Advisor Nunc Pro Tunc to April 30,*

*2007* (Docket No. 1366), entered June 8, 2007, upon the Closing and subject to final allowance

of compensation and reimbursement of expenses by a separate order of the Court, the Debtors

are authorized to use the proceeds of the sale to pay the allowed fees and expenses of A&M

Securities, LLC.

59900-002\DOCS_SF:54744.3

6.      Upon the Closing, the Purchaser shall take title to and possession of the

Saleable Assets subject only to the Permitted Liens and Assumed Liabilities.  Pursuant to

Section 363(f) of the Bankruptcy Code and the Purchase Agreement, including any amendments

thereto, with the exception of such Permitted Liens, the transfer of title to the Saleable Assets

and the Assumed Executory Contracts shall be free and clear of any interest and free of all

Encumbrances, including, any options, pledges, security interests, claims, equities, reservations,

third party rights, voting trusts or similar arrangements, Liens, charges or other encumbrances or

restrictions on or conditions to transfer or assignment of any kind, whether direct or indirect,

absolute or contingent, matured or unmatured, liquidated or unliquidated on or against the

Saleable Assets or the Debtors.  All Encumbrances shall attach solely to the net proceeds of the

sale with the same extent, validity and priority as they attached to the Saleable Assets

immediately prior to the Closing.

7.      Contemporaneous with the Closing and without further order of this Court

or any other or further notice, in partial satisfaction of the allowed secured claims of the First

Lien Prepetition Lenders, the Debtors shall distribute a portion of the Net Sales Proceeds (as

defined below) to the First Lien Agent (as defined in the Final Cash Collateral Order) in an

amount equal to $_____ (the "Replacement Collateral").  The

term "Net Sales Proceeds" shall mean the actual cash proceeds from the sale received by the

Debtors from the Purchaser, minus the allowed or anticipated fees and expenses of A&M

Securities, LLC.  The First Lien Agent shall promptly distribute the Replacement Collateral to

the First Lien Lenders, subject to and in accordance with the Prepetition Loan Documents (as

defined in the Final Cash Collateral Order) and Intercreditor Agreement (as defined in the Final

12

Cash Collateral Order) without further order of this Court, and the First Lien Prepetition Lenders shall be entitled to apply their applicable share of the Replacement Collateral to their claims without further order of the Court, provided, however, all rights and defenses of any and all First Lien Prepetition Lenders under the Prepetition Loan Documents are fully reserved. The distribution of the Replacement Collateral to the First Lien Agent and First Lien Prepetition Lenders is permitted pursuant to the terms of the Intercreditor Agreement.

8.     The remaining Net Sales Proceeds shall be deposited in a segregated interest bearing account of the Debtors (the "Escrowed Sale Proceeds"), and shall not be released by the Debtors pending entry of a further order of the Court (i) adjudicating or consensually determining the respective rights of the Prepetition Lenders, the Prepetition Agents, other creditors and the Debtors with regard to the Escrowed Sale Proceeds, and (ii) allocating the Escrowed Sale Proceeds in accordance with such rights (the "Release Order"). The Escrowed Sales Proceeds shall remain subject to the Encumbrances of the Prepetition Agents and Prepetition Lenders pending the issuance of the Release Order. The claims, rights and defenses of all parties with respect to the Escrowed Sales Proceeds are hereby reserved.

9.     Except as otherwise set forth in the Purchase Agreement, the Purchaser is not expressly or impliedly agreeing to assume any of the Debtors' liabilities, the transactions contemplated by the Purchase Agreement do not amount to a consolidation, merger or a de facto merger of the Debtors and any Purchaser, the Purchaser is not a mere continuation of the Debtors nor does the Purchaser constitute a successor to the Debtors, and the transactions contemplated by the Purchase Agreement are not being entered into fraudulently or in order to escape liability from the Debtors' debts.

13

10.     This Order shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, any Debtor (whether known or unknown), any holders of Encumbrances on the Saleable Assets, all non-debtor parties to the Assumed Executory Contracts, all successors and assigns of the Purchaser, each Debtor and its respective affiliates and subsidiaries, the Saleable Assets and any trustees, if any, subsequently appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases. This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser and their respective successors and assigns.

11.     Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding (other than by an appeal timely taken with respect to this Order or a motion timely made under Bankruptcy Rules 9023 or 9024) against the Purchaser, its successors and assigns, or the Saleable Assets with respect to any Encumbrance arising under, out of, in connection with or in any way relating to the Debtors, the Purchaser, the Saleable Assets, the operation of the Saleable Assets prior to the Closing of the sale of the Saleable Assets, including, without limitation, the following actions:

(i)     Commencing or continuing in any manner any action or other proceeding against the Purchaser, its successors, assets or properties;

14

(ii)     Enforcing, attaching, collecting or recovering in any manner any

judgment, award, decree or order against the Purchaser, its successors, assets or properties;

(iii)    Creating, perfecting or enforcing any Lien or other Encumbrance

against the Purchaser, its successors, assets or properties;

(iv)    Asserting any setoff, right of subrogation or recoupment of any

kind against any obligation due the Purchaser or its successors;

(v)     Commencing or continuing any action in any manner or place, that

does not comply or is inconsistent with the provisions of this Order or other orders of the Court,

or the agreements or actions contemplated or taken in respect thereof; or

(vi)    Revoking or terminating any license, permit or authorization to

operate any of the Saleable Assets or conduct any of the businesses operated with the Saleable

Assets.

12.    Without limiting the generality of the foregoing, except as otherwise

specifically set forth in the Purchase Agreement, the Purchaser shall not assume or be obligated

to pay, perform or otherwise discharge any workers' compensation debts, obligations and

liabilities of the Debtors arising pursuant to state law or otherwise.  This Order is intended to be

all inclusive and shall encompass, but not be limited to, workers' compensation claims or suits of

any type, whether now known or unknown, whenever incurred or filed, which have occurred or

which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of

discrimination or other incidents, acts, or injuries prior to the Closing Date, including, but not

limited to, any and all workers' compensation claims filed or to be filed, or reopenings of those

claims, by or on behalf of any of the Debtors' current or former employees, persons on laid-off,

15

inactive or retired status, or their respective dependents, heirs or assigns, as well as any and all

premiums, assessments or other obligations of any nature whatsoever of the Debtors relating m

any way to workers' compensation liability, except as otherwise specifically set forth in the

Purchase Agreement.

13.    In addition, without limiting the generality of the foregoing, except as

otherwise specifically set forth in the Purchase Agreement, the Purchaser shall not assume or be

obligated to pay, perform or otherwise discharge any debts, obligations and liabilities of the

Debtors arising pursuant to the Debtors' ownership or operation of their assets or facilities prior

to the date of the Closing, including, but not limited to, any Successor Liabilities in respect of the

Successor Liability Documents, Statutes and Claims or otherwise, provided that nothing in the

Order shall diminish or derogate from Purchaser's obligations with respect to the Assumed

Liabilities.

14.    All entities that are in possession of some or all of the Saleable Assets on

the Closing Date are directed to surrender possession of such Saleable Assets to the Purchaser or

its assignee at the Closing.

15.    Except for the Assumed Liabilities or as otherwise expressly provided for

in this Order or the Purchase Agreement, the Purchaser shall not have any liability or

responsibility for any liability or other obligation of the Debtors arising under or related to the

Saleable Assets. Without limiting the generality of the foregoing, and except as otherwise

specifically provided herein or in the Purchase Agreement, the Purchaser shall not be liable for

any claims against the Debtors or any of their predecessors or affiliates, whether known or

unknown as of the applicable Closing, now existing or hereafter arising, whether fixed or

16

contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the

Closing, whether relating to or arising out of the Business, the Excluded Assets or the Saleable

Assets or otherwise, other than the Assumed Liabilities. The consideration given by the

Purchaser shall constitute valid and valuable consideration of any potential claims of successor

liability of the Purchaser, which releases shall be deemed to have been given in favor of the

Purchaser by all holders of Encumbrances against the Debtors or the Saleable Assets.

          16.     Subject to, and at the time of, the Closing, the Debtors are authorized to

assume and assign each Assumed Executory Contract to the Purchaser free and clear of all

Encumbrances. The payment of such Cure Amounts (if any) shall (a) effect a cure of all defaults

existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such

non-debtor party resulting from such default, and (c) together with the assumption of the

Assumed Executory Contracts by the Purchaser, constitute adequate assurance of future

performance thereof. The Purchaser shall then have assumed the Assumed Executory Contracts

and, pursuant to section 365(f) and 365(k) of the Bankruptcy Code, the assignment by the

Debtors of such Assumed Executory Contracts shall not be a default thereunder. After the

payment of the relevant Cure Amounts, neither the Debtors nor the Purchaser shall have any

further liabilities to the non-debtor parties to the Assumed Executory Contracts other than the

Purchaser's obligations under the Assumed Executory Contracts that become due and payable on

or after the Closing Date, or otherwise pursuant to the Assumed Liabilities.

          17.     Notwithstanding anything to the contrary herein, in accordance with the

Purchase Agreement, the Purchaser has the right, by written notice to the Debtors from time to

17

time on or before the Closing Date, to exclude or add executory contracts or unexpired leases from or to the list of previously designated Assumed Executory Contracts.

18.     Any provisions in any Assumed Executory Contract that prohibit or condition the assignment of such Assumed Executory Contract or allow the party to such Assumed Executory Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Executory Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of the Assumed Executory Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all rights, title and interest of the relevant Debtor under the applicable Assumed Executory Contracts. Any provisions of any lease of real property constituting an Assumed Executory Contract that purports to permit the landlords thereunder to cancel the remaining term of such lease if the Debtors discontinue their use or operation of the leased real property is void and of no force and effect, and shall not be enforceable against the Purchaser and any sublessees thereof, and the landlord under such lease shall not have the right to cancel or otherwise modify such lease or increase the rent, assert any claim or impose any penalty by reason of such discontinuation, the Debtors' cessation of operations, the assignment of such lease to the Purchaser or its assignee or the interruption of business activities at any of the leased premises.

19.     Upon the Closing and the payment of the relevant Cure Amounts by the Purchaser, the Purchaser shall be deemed to be substituted for each relevant Debtor as a party to

18

the applicable Assumed Executory Contracts and the Debtors shall be relieved from all liability on such Assumed Executory Contracts arising after the Closing.

20.    Upon the payment of the applicable Cure Amount, if any, and subject to the terms of the stipulation of the parties to any Assumed Executory Contract filed with the Court, if any, (a) each Assumed Executory Contract shall constitute a valid and existing interest in the property subject to such Assumed Executory Contract, (b) none of the Debtors' rights will have been released or waived under any such Assumed Executory Contracts, (c) the Assumed Executory Contracts shall remain in full force and effect, and (d) no default shall exist under the Assumed Executory Contracts, nor shall there exist any event or condition which, with the passage of time or the giving of notice, or both, would constitute such a default.

21.    The Purchaser has provided adequate assurance of its future performance under the relevant Assumed Executory Contracts within the meaning of sections 365(b)(1 )(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

22.    There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to Purchaser as a result of the assumption and assignment of the Assumed Executory Contracts.

23.    Pursuant to sections l05(a), 363 and 365 of the Bankruptcy Code, all parties to the Assumed Executory Contracts are forever barred and enjoined from raising or asserting against Purchaser any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Executory Contracts existing as of the Closing or arising by reason of the Closing, except for any postpetition amounts that are Assumed Liabilities being assumed by the Purchaser under the Purchase Agreement.

19

24.    The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

25.    Pursuant to Rules 7062, 9014, 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, this Order shall be effective immediately upon entry and the Debtors are authorized to close the sale immediately upon entry of the Sale Order.

26.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens and other Encumbrances of record against or in the Saleable Assets shall not have delivered to the Debtors or the Purchaser prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Liens and other Encumbrances that the person has with respect to the Saleable Assets, then (i) each of the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the Purchaser or entity with respect to the Saleable Assets, and (ii) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens and other Encumbrances against or in the Saleable Assets except the Permitted Liens.

27.    The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the terms and conditions of the Purchase Agreement and the provisions of this Order. If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or interests in, the Saleable

20

Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to the Saleable Assets, the Purchaser is hereby authorized, to execute, file and/or record with the appropriate filing offices such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Saleable Assets.

28.    This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

29.    This Order constitutes authorization under all applicable jurisdictions versions of the Uniform Commercial Code for the Purchaser to file UCC termination statements with respect to all security interests in or liens on the Saleable Assets.

30.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the sale.

21

31.      The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

32.      This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all modifications thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

33.      To the extent that any provisions of this Order shall be inconsistent with the provisions in the Purchase Agreement, any prior order, or any pleading with respect to the motions in this case, the terms of this Order shall control.

Dated: _____, 2007

_____
Honorable Christopher S. Sontchi
United States Bankruptcy Judge

22

# EXHIBIT A

# [ASSET PURCHASE AGREEMENT TO BE SUBMITTED]

B-7

 

# General Docket
## US Court of Appeals for the Third Circuit

```
Court of Appeals Docket #: 02-2078                      Filed: 4/24/02
Nsuit: 3422  Bankruptcy Appeal (801)
In Re: Zenith Elec, et al v. , et al
Appeal from: U.S. District Court for the District of Delaware

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Lower court information:

    District: 0311-1 : 99-cv-00747
    Trial Judge: Gregory M. Sleet, District Judge
    Date Filed: 11/4/99
    Date order/judgment: 2/12/02
    Date NOA filed: 4/11/02
    District: 0311-1 : 00-cv-00399         lead: 99-cv-00747
    Date Filed: 4/13/00
    Date order/judgment: 2/12/02
    Date NOA filed: 4/11/02
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Fee status: Not Applicable

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Prior cases:
  None
Current cases:
  None


Docket as of July 15, 2003 6:03 pm                     Page 1




02-2078  In Re: Zenith Elec, et al v. , et al

IN RE: ZENITH ELEC CORP


- - - - - - - - - - - - - - - - - - - - - -


ACTING UNITED STATES TRUSTEE       P. Matthew Sutko
FOR REGION 3                       FAX 307-2397
     Appellant                     202-307-1399
                                   7th Floor
                                   [COR NTC gvt]
                                   Executive Offices of United
                                   States Trustees
                                   20 Massachusetts Avenue, N.W.
                                   Washington, DC 20530

                                   William Kanter
                                   FAX 202-514-9405
                                   202-514-4575
                                   Room 9102
                                   [COR NTC gvt]
                                   Frank A. Rosenfeld
                                   FAX 202-514-9405
                                   202-514-0168
                                   [COR NTC gvt]
```

United States Department of
Justice
Civil Division, Appellate Staff
601 D Street, N.W.
Washington, DC 20530

Joseph J. McMahon, Jr.
FAX 302-573-6497
302-573-6491
[COR NTC gvt]
United States Department of
Justice
Office of the Trustee
844 King Street
Suite 2313, Lockbox 35
Wilmington, DE 19801


v.

UNOFFICIAL COMMITTEE OF EQUITY      Norman L. Pernick
SECURITY HOLDERS                    FAX 302-421-5865
    Appellee                        302-421-6800
                                    [COR NTC ret]
                                    J. Kate Stickles
                                    FAX 302-421-5865
                                    302-421-6873
                                    [COR NTC ret]
                                    Saul Ewing

Docket as of July 15, 2003 6:03 pm           Page 2




02-2078  In Re: Zenith Elec, et al v. , et al

                                    222 Delaware Avenue
                                    P.O. Box 1266, Suite 1200
                                    Wilmington, DE 19899

                                    Harley J. Goldstein
                                    312-902-5599
                                    [COR NTC ret]
                                    Katten, Muchin, Zavis &
                                    Rosenman
                                    525 West Monroe Street
                                    Suite 1600
                                    Chicago, IL 60661

OFFICIAL COMMITTEE OF EQUITY        Norman L. Pernick
SECURITY HOLDERS                    (See above)
    Appellee                        [COR NTC ret]
                                    J. Kate Stickles
                                    (See above)
                                    [COR NTC ret]

                                    Harley J. Goldstein
                                    (See above)
                                    [COR NTC ret]

Docket as of July 15, 2003 6:03 pm           Page 3




02-2078  In Re: Zenith Elec, et al v. , et al

205

IN RE: ZENITH ELEC CORP

--------------------------

ACTING UNITED STATES TRUSTEE FOR REGION 3

       Appellant

   v.

UNOFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS; OFFICIAL
COMMITTEE OF EQUITY SECURITY HOLDERS

       Appellees

Docket as of July 15, 2003 6:03 pm        Page 4


02-2078  In Re: Zenith Elec, et al v. , et al

| | |
|---|---|
| 4/24/02 | CIVIL CASE DOCKETED. Notice filed by Acting US Trustee. (lwc) |
| 4/29/02 | ZZ#ATTORNEY ZZ#NOT ZZ#PARTICIPATING: John D. McLaughlin advises he will not participate in this appeal. ZZ#[SEND ZZ#TO ZZ#MERITS ZZ#PANEL] (lwc) |
| 5/6/02 | TRANSCRIPT PURCHASE ORDER (PART I), no proceedings in District Court. (lwc) |
| 5/6/02 | APPEARANCE from Attorney Joseph J. McMahon on behalf of Appellant Acting US Trustee, filed. (lwc) |
| 5/6/02 | INFORMATION STATEMENT on behalf of Appellant, received. (lwc) |
| 5/6/02 | CONCISE SUMMARY OF CASE on behalf of Appellant, received. (lwc) |
| 5/8/02 | APPEARANCE from Attorney Norman L. Pernick and J. Kate Stickles on behalf of Appellees Unofficial Commm and Official Comm, filed. (lwc) |
| 5/8/02 | DISCLOSURE STATEMENT on behalf of Appellees Unofficial Commm and Official Comm, filed. (lwc) |
| 5/28/02 | FOLLOW UP LETTER to James H.M. Sprayregen, Laura D. Jones requesting the following documents: **Appearance Form **Disclosure Statement  ZZ#SEND ZZ#TO ZZ#MERITS ZZ#PANEL (lwc) |
| 6/18/02 | BRIEFING NOTICE ISSUED. Appellants' brief and appendix due 7/29/02. (lwc) |
| 6/25/02 | CERTIFIED LIST filed. (lwc) |
| 7/18/02 | APPEARANCE from Attorney William Kanter and Frank A. Rosenfeld on behalf of, filed. (lwc) |
| 7/18/02 | MOTION by Appellant for extension of time to file brief and appendix until 8/28/02, filed. Answer due 7/30/02. Certificate of Service dated 7/13/02. (lwc) |
| 7/23/02 | ORDER (Clerk) Motion by Appellant for extension of time to |

file brief and appendix is granted. Appellant's brief and
appendix shall be filed and served on or before August 28,
2002, filed. (lwc)

8/23/02    MOTION by Appellant for extension of time to file brief and
appendix until 9/11/02, filed. Answer due 9/4/02.
Certificate of Service dated 8/22/02. (lwc)

Docket as of July 15, 2003 6:03 pm            Page 5


02-2078  In Re: Zenith Elec, et al v. , et al

8/29/02    ORDER (Clerk) Motion by Appellant for Extension of Time to
file Brief and Appendix is granted. Appellant's brief and
appendix shall be filed and served on or before September
11, 2002, filed. (lwc)

9/10/02    BRIEF/APPENDIX on behalf of Appellant Acting US Trustee.
Pages: 34, Copies: 10, Word Count: 8,516, Delivered by
mail, filed. Certificate of service dated 9/10/02. (gas)

10/8/02    Appellees Unofficial Comm. and Official Comm verbally
granted an extension of time until 10/29/02 to file brief
pursuant to LAR 31.4. (kkg)

10/9/02    Letter from Appellees Unofficial Commm & Official Comm
confirming extension of time pursuant to LAR 31.4 with
service on opposing counsel. Service Date 10/8/02. (nmb)

10/31/02   Notice of telephone request to Harley J. Goldstein, counsel
for Appellees, for appearance and statement of related
cases and proceedings. Response due in 3 days. (gpk)

11/1/02    COMPLIANCE RECEIVED. Appellees' statement of related cases
and proceedings and appearance, received. (gpk)

11/1/02    APPEARANCE from Attorney Harley J. Goldstein on behalf of
Appellees Unofficial Commm and Official Comm, filed. (gpk)

11/1/02    BRIEF with attachments on behalf of Appellees. Pages: 16,
Copies: 10, Delivered by mail, filed. Certificate of
service date 10/28/02. (gpk)

11/1/02    LETTER dated 10/31/02 on behalf of Appellees stating that
Appellees adopt Appellant's statement of related cases and
proceedings, filed. ZZ#SEND ZZ#TO ZZ#MERITS ZZ#PANEL (gpk)

11/5/02    MOTION by Appellant for an Extension of time to file reply
brief until 12/16/02, filed. Answer due 11/18/02.
Certificate of Service dated 11/4/02. (lwc)

11/7/02    ORDER (Clerk) granting motion by Appellant for Extension of
time to file Reply Brief. Appellant's reply brief shall be
filed and served on or before December 16, 2002, filed. (lwc)

11/22/02   APPEARANCE from Attorney P. Matthew Sutko on behalf of
Appellant, filed. (lwc)

12/3/02    REPLY BRIEF on behalf of Appellant Acting US Trustee,
Copies: 10, Delivered by mail, filed. Certificate of
service date 12/3/02. (mcw)

1/14/03    LETTER dated 01/03/03 received pursuant to Rule 28(j) from
counsel for Appellant Acting US Trustee.  ZZ#SEND ZZ#TO

Case 1:06-cv-00521-GMS    Document 13-9    Filed 07/30/2007    Page 6 of 6

ZZ#MERITS ZZ#PANEL (lwc)

Docket as of July 15, 2003 6:03 pm                    Page 6

02-2078  In Re: Zenith Elec, et al v. , et al

| | |
|---|---|
| 2/20/03 | CALENDARED for Monday, April 7, 2003. (eh) |
| 4/7/03 | ARGUED Monday, April 7, 2003 Panel: Becker, Chief Judge, Barry and *Bright, Circuit Judges. (*Sitting by designation for the Eighth Circuit Court of Appeals.) Counsel for Appellant: P. Matthew Sutko and Counsel for Appellee: Harley J. Goldstein. (eh) |
| 4/7/03 | COURT RESPONSE REQUEST AT ORAL ARGUMENT. Court directed counsel for Appellant to file memorandum on jurisdiction by 4/11/03 and Counsel for Appellee has until 4/18/03 to respond. (eh) |
| 4/15/03 | ANSWER dated April 14, 2003, received from Harley J. Goldstein, Esq., counsel for Appellee, in direct response to the Court's request at oral argument requesting supplemental briefing. (Please see letter for further information.) (eh) |
| 4/18/03 | ANSWER dated April 18, 2003, received from P. Matthew Sutko, Esq., counsel for Appellant, in direct response to the Court's request at oral argument requesting supplemental briefing.(Please see letter for further information.) (eh) |
| 5/21/03 | PUBLISHED PRECEDENTIAL REPORTED OPINION (*Chief Judge Becker, Authoring Judge, Barry, **Bright, Circuit Judges), filed. *Judge Becker completed his term as Chief Judge on May 4, 2003. **Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by designation. (lwc) |
| 5/21/03 | JUDGMENT, reversed, and the case remanded for further proceedings in accordance with the opinion of this Court, filed. (lwc) |
| 7/14/03 | MANDATE ISSUED, filed. (lwc) |
| 7/14/03 | RECORD released. (lwc) |

Docket as of July 15, 2003 6:03 pm                    Page 7

## PACER Service Center

### Transaction Receipt

07/30/2007 12:19:17

| | | | |
|---|---|---|---|
| PACER Login: | us5663 | Client Code: | |
| Description: | dkt report | Case Number: | 02-2078 |
| Billable Pages: | 7 | Cost: | 0.56 |

208