## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NELLSON NUTRACEUTICAL, INC., *et al.*,[1] | : | Case No. 06-10072 (CSS) |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |
| UNITED STATES TRUSTEE and OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | : | Civil Action Nos. 06-00520 (GMS) and 06-00521 (GMS) |
| Appellants, | : | |
| v. | : | |
| NELLSON NUTRACEUTICAL, INC., *et al.*, | : | |
| Appellees. | : | |

### APPENDIX OF UNREPORTED CASES TO THE ANSWERING BRIEF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO APPELLEES' MOTION TO DISMISS APPEAL ON MOOTNESS GROUNDS

Dated:  July 30, 2007
        Wilmington, Delaware

Kurt F. Gwynne (No. 3951)
Kimberly E.C. Lawson (No. 3966)
REED SMITH LLP
1201 Market Street, Suite 1500
Wilmington, DE  19801
Telephone:  (302) 778-7500
Facsimile:  (302) 778-7575
E-mail:kgwynne@reedsmith.com
       klawson@reedsmith.com

Attorneys for the Official Committee of Unsecured Creditors

---

[1]  The Debtors are the following entities:  Nellson Nutraceutical, Inc., Nellson Holdings, Inc., Nellson Intermediate Holdings, Inc., Nellson Northern Operating, Inc., Nellson Nutraceutical Eastern Division, Inc., Nellson Nutraceutical Powder Division, Inc., and Vitex Foods, Inc.

## TABLE OF CONTENTS

**Page**

*Capital Factors, Inc. v. Kmart Corp.*,
  2003 WL 22282518 (7th Cir. 2003) ................................................................. A

*Mine Management Inc. v. Wolfe (In re Mountain Laurel Resources Co.)*,
  2000 WL 341913 at *1 (4th Cir. April 3, 2000) ........................................... B

*Stamford Computer Group, Inc. v. Exide Technologies (In re Exide Technologies)*,
  2004 WL 1465760 (D.Del. June 25, 2004) ..................................................... C

*The Huntington National Bank v. Shawnee Hills, Inc. (In re Shawnee Hills, Inc.)*,
  2002 WL 31681538 (S.D.W.Va. November 19, 2002) .................................... D

# EXHIBIT A



Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22282518 (N.D.Ill.), 51 Collier Bankr.Cas.2d 498
**(Cite as: 2003 WL 22282518 (N.D.Ill.))**

**H**

United States District Court,
N.D. Illinois, Eastern Division.
CAPITAL FACTORS, INC., Appellant,
v.
KMART CORPORATION, Appellee.
**No. 02 C 1264, 02 C 2088, 02 C 1265, 02 C 3178,
02 C 2086.**

Sept. 30, 2003.

Steven Bennett Towbin, Shaw, Gussis, Fishman, Glantz, Wolfson & Towbin LLC, Chicago, IL, for appellant.

William John Barrett, Barack, Ferrazzano, Kirschbaum, Perlman & Nagelberg, John Wm. Butler, Jr., Christopher P. Connors, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for appellee.

*MEMORANDUM OPINION*

GRADY, J.

**\*1** Capital Factors, Inc. appeals from four final orders of the bankruptcy court that authorized Kmart to pay certain prepetition obligations. For the reasons explained below, the bankruptcy court's orders are reversed.

*BACKGROUND*

On January 22, 2002, Kmart Corporation and certain of its domestic subsidiaries and affiliates, debtors and debtors-in-possession (collectively, "Kmart") filed a voluntary petition for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code. As part of its "first day motions" filed on that date, Kmart sought authority to pay prepetition obligations to certain "critical vendors" (the "Critical Vendors Motion") and certain foreign vendors (the "Foreign Vendors Motion"). Kmart contended that these payments were necessary to maintain relationships essential to its continued operation and reorganization, and it invoked the "doctrine of necessity" and 11 U.S.C. § 105(a) for the bankruptcy court's authority to permit these payments.

The same day, the bankruptcy court held a hearing and heard evidence on these motions. Appellant Capital Factors, Inc. ("Capital") objected to both motions. (Capital is a factoring agent [FN1] for a number of Kmart's apparel suppliers, and it holds

general unsecured claims against the bankruptcy estate of approximately $20 million.)

> FN1. A factoring agent purchases accounts receivable from its customers and assumes the collection responsibilities. *See Mr. Furniture Warehouse, Inc. v. Barclays Am./Commercial Inc.*, 919 F.2d 1517, 1519 (11th Cir.1990).

Regarding the Critical Vendors Motion, the court stated:

> Motions to pay certain critical trade creditors always present difficult questions for courts. We're seeing more and more of them, and our problem is that we have to stretch to find some authority to do them. However, I, after hearing this testimony and reading the affidavit [of Charles C. Conaway, Kmart's Chief Executive Officer], am convinced that Fleming, Handleman and the egg and dairy vendors--and I would like a list of the specific vendors that you would like included in this motion--as well as the advertising concerns, are necessary to keep this business going as a going concern.

(App. to Appellee's Brief, Ex. 4A, at 162.) Accordingly, the bankruptcy court granted the Critical Vendors Motion. Without reciting specific findings from the bench, the bankruptcy court also granted the Foreign Vendors Motion. (*Id.* at 173.) On January 25, the bankruptcy court entered written orders granting both motions.

On February 1 and 8, 2002, Kmart filed motions seeking authority to pay issuers of prepetition letters of credit (the "Letters of Credit Motion") and prepetition claims of certain liquor vendors (the "Liquor Vendors Motion"). On February 13, the bankruptcy court held a hearing on these motions, heard evidence, and granted both motions over Capital's objections. Regarding the Letters of Credit Motion, the court stated:

> Because the foreign vendors are integral to the reorganization of this Debtor and the Court already ruled on the payment of certain foreign vendors as part of the critical vendors motions and I believe that this is just a component of that particular transaction, and further finding that I may be inconsistent if I do not grant the relief that is requested here, I am going to go ahead and sign your order authorizing the reimbursement of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

obligations to the issuers of Letters of Credit.

*2 (*Id.,* Ex. 4B, at 251.) The bankruptcy court also granted the Liquor Vendors motion, "finding that there [was] a good business justification for it." (*Id.* at 269.) Written orders granting the motions were entered that same day.

Capital filed notices of appeal from each order, and we granted Capital's motion to consolidate the appeals. The parties' briefing is complete, and we heard oral argument on the appeals as well.

### DISCUSSION

This court has jurisdiction over the instant appeals pursuant to 28 U.S.C. § 158(a)(1). On appeal from an order of the bankruptcy court, we review the bankruptcy court's factual findings under a "clearly erroneous" standard and its conclusions of law *de novo. See In re Smith,* 286 F.3d 461, 464-65 (7th Cir.2002); Fed. R. Bankr.P. 8013.

Capital raises the following issues on appeal: (1) whether 11 U.S .C. § 105(a) or the "doctrine of necessity" provides a bankruptcy court with either statutory authority or equitable power to allow the payment of selected prepetition unsecured trade claims prior to confirmation of a Chapter 11 plan; [FN2] (2) whether there was a sufficient evidentiary basis for the bankruptcy court to allow payment of certain prepetition claims; and (3) whether state laws prohibiting liquor wholesalers from selling products to Chapter 11 debtors legally unable to pay their prepetition debt are invalid or unenforceable to the extent that they conflict with the Bankruptcy Code. [FN3] Kmart raises the additional issue of whether Capital's appeals are moot because Kmart has already paid a substantial portion of the prepetition claims.

> FN2. For convenience, we will refer to the time period prior to confirmation of a Chapter 11 plan as "pre-plan."

> FN3. Capital also raises what it deems a separate issue of whether "a bankruptcy court may utilize" § 105(a) or the "doctrine of necessity" "to circumvent explicit provisions of the Bankruptcy Code." (Appellant's Brief at 2.) We view this issue as being part and parcel of the first issue listed *supra.*

### A. The Bankruptcy Court's Power Under § 105

We first examine the question of whether the bankruptcy court had the power to authorize the pre-

plan payment of prepetition claims. The court relied on 11 U.S.C. § 105(a) to authorize the payments. Section 105(a) addresses the equitable powers of bankruptcy courts and provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). Although the bankruptcy court did not refer specifically to the equitable "doctrine of necessity" when ruling on the motions in open court or in its written orders, [FN4] Kmart relies on the doctrine. It is derived from the "necessity of payment rule," which was developed and used in railroad reorganizations "as justification for the payment of pre-petition debts paid under duress to secure continued supplies or services essential to the continued operation of the railroad." *B & W Enters., Inc. v. Goodman Oil Co. (In re B & W Enters., Inc.),* 713 F.2d 534, 537 (9th Cir.1983). The rule has subsequently evolved into the "doctrine of necessity," which has been applied in non-railroad reorganizations to justify the pre-plan payment of prepetition claims of creditors who threaten to withhold goods or services believed critical to the debtor's continued viability and reorganization. [FN5] The doctrine is not codified anywhere in the Bankruptcy Code, so the only way to apply it is through § 105.

> FN4. As noted *supra,* the bankruptcy court did, however, find that the payments were "necessary," "integral," and that there was "good business justification" for them.

> FN5. See 2 William L. Norton, Jr., *Norton Bankr.L. & Prac, 2d* § 42:11 (Supp.2002), for a good discussion of the doctrine's history.

*3 The Seventh Circuit has stated that the grant of equitable power in § 105 is limited in that it "allows [bankruptcy] courts to use their equitable powers only as necessary to enforce the provisions of the Code, not to add on to the Code as they see fit." *In re Fesco Plastics Corp.,* 996 F.2d 152, 156 (7th Cir.1993); *see also Gouveia v. Tazbir,* 37 F.3d 295, 300 (7th Cir.1994) ("The Supreme Court has taught that any grant of authority given to the bankruptcy courts under § 105 must be exercised within the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 22282518 (N.D.Ill.), 51 Collier Bankr.Cas.2d 498
(Cite as: 2003 WL 22282518 (N.D.Ill.))

confines of the bankruptcy code.") (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)).

The Bankruptcy Code sets forth a priority scheme for the payment of claims. *See* 11 U.S.C. § § 503, 507. The Code does not carve out priority or administrative expense status for prepetition general unsecured claims based on the "critical" or "integral" status of a creditor. But the effect of the bankruptcy court's orders was to elevate the claims of the "critical" vendors over those of other unsecured creditors and to subordinate the claims of non-"critical" unsecured creditors. The bankruptcy court altered the priority scheme set forth in the Bankruptcy Code.

There is a split in the courts regarding whether § 105 authorizes bankruptcy courts to permit pre-plan payment of prepetition unsecured claims. As set forth in Kmart's briefs, many bankruptcy courts and a handful of district courts have held that bankruptcy courts do in fact have this power. *See, e.g., In re Just For Feet, Inc.*, 242 B.R. 821 (D.Del.1999); *Michigan Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp. .)*, 80 B.R. 279 (S.D.N.Y.1987); *In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr.N.D.Tex.2002); *In re Wehrenberg, Inc.*, 260 B.R. 468 (Bankr.E.D.Mo.2001).

On the other hand, as Capital points out, a number of courts of appeals and a few lower courts have held just the opposite. *See, e .g., Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299 (4th Cir.1987); *B & W Enters., Inc. v. Goodman Oil Co. (In re B & W Enters., Inc.)*, 713 F.2d 534 (9th Cir.1983); *Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Mgmt. Inc.)*, 4 F.3d 1329 (5th Cir.1993); *In re FCX, Inc.*, 60 B.R. 405 (E.D.N.C.1986); *In re Timberhouse Post & Beam, Ltd.*, 196 B.R. 547 (Bankr.D.Mont.1996). [FN6] We agree with the latter courts' view that we cannot ignore the Bankruptcy Code's statutory scheme of priority in favor of "equity," especially in light of the Seventh Circuit's admonition that "[t]he fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be." *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 528 (7th Cir.1986).

FN6. *Cf. Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.)*, 963 F.2d 1490 (11th Cir.1992) (bankruptcy court had no

authority to allow cross-collaterization, a method of securing prepetition debt with prepetition and postpetition collateral); *Southern Ry, Co. v. Johnson Bronze Co. (In re Johnson Bronze Co.)*, 758 F.2d 138 (3d Cir.1985) (bankruptcy court had no authority to grant lien status to a prepetition contractual indemnification claim); *Crowe & Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 (In re Crowe & Assocs., Inc.)*, 713 F.2d 211, 216 (6th Cir.1983) (dictum).

We acknowledge that the application of the "doctrine of necessity" through § 105 in this situation is well-intended and may even have some beneficial results, in that pre-plan payment of certain prepetition claims allows the debtor to minimize disruptions in doing business, and thus may further reorganization. Nevertheless, it is clear that however useful and practical these payments may appear to bankruptcy courts, they simply are not authorized by the Bankruptcy Code. Congress has not elected to codify the doctrine of necessity or otherwise permit pre-plan payment of prepetition unsecured claims.

*4 Because we hold that the bankruptcy court did not have either the statutory or equitable power to authorize the pre-plan payment of prepetition unsecured claims, we need not address the second and third issues Capital raises on appeal.

B. *"Equitable Mootness"*

Kmart does not persuade us that Capital's appeals are moot due to the fact that the prepetition claims have been substantially paid. Kmart makes much of the fact that Capital did not seek a stay of the bankruptcy court's orders. It is highly unlikely, however, that a motion to stay would have been successful. It would be inconsistent for the bankruptcy court to enter the orders on the theory that prompt payments were necessary to keep Kmart operational, and then turn around and stay those orders. [FN7] In any event, Capital was not required to seek a stay of the orders in order to preserve its appellate rights.

FN7. *See* Charles Jordan Tabb, *Emergency Preferential Orders in Bankruptcy Reorganizations*, 65 Am. Bankr.L.J. 75, 108 (1991).

Kmart also argues that the appeals are "equitably moot" because effective relief on appeal has become imprudent and inequitable. The term "equitable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 4
Not Reported in F.Supp.2d, 2003 WL 22282518 (N.D.Ill.), 51 Collier Bankr.Cas.2d 498
(Cite as: 2003 WL 22282518 (N.D.Ill.))

mootness" was "anathematized by Judge Easterbrook" [FN8] in the case of *In re UNR Industries, Inc.,* 20 F.3d 766, 768 (7th Cir.1994). The Seventh Circuit in *UNR* "banish[ed] the term 'equitable mootness' from the (local) lexicon," 20 F.3d at 769, because it is misleading: "[t]here is a big difference between *inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome ('equitable mootness')." *Id.* Nonetheless, the "now nameless doctrine" lives on and "is perhaps best described as merely an application of the age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties." *Envirodyne*, 29 F.3d at 304. The basic questions under the doctrine, then, are these: is it prudent and fair to undo what the bankruptcy court did? [FN9] *See UNR*, 20 F.3d at 769; *Envirodyne*, 29 F.3d at 304.

FN8. *In re Envirodyne Indus., Inc.,* 29 F.3d 301, 304 (7th Cir.1994).

FN9. As Capital points out, it is worth noting that most of the cases addressing or applying the doctrine involved appeals of orders confirming bankruptcy plans of reorganization. *See, e.g., UNR*, 20 F.3d 766; *Mac Panel Co. v. Virginia Panel Corp.,* 283 F.3d 622 (4th Cir.2002). Those cases are distinguishable from the instant proceeding because there has not yet been a confirmation of Kmart's plan.

Kmart argues that we should not reverse the orders allowing payment of the prepetition claims because the parties receiving the payments have already acted in reliance on them. As noted *supra* note 9, however, this is not a situation where there has been confirmation of a bankruptcy plan. Accordingly, it is not too late to order that the monies paid be returned. Kmart also claims that undoing the bankruptcy court's orders would "paralyze" Kmart by forcing it to "undergo the Herculean task of immediately commencing thousands of lawsuits to collect hundreds of millions of dollars from thousands of vendors." (Appellee's Brief at 45-46.) We are not persuaded by Kmart's doomsday speculations. It is not evident that Kmart will have to sue to recover the payments, and in fact, Kmart cites no cases indicating that the bankruptcy court would not have the power to order the return of the monies paid.

### C. J.P. Morgan Chase's Brief

J.P. Morgan Chase ("JPM"), which is an "administrative agent for the lenders under various pre-petition credit agreements among such lenders and Kmart" (JPM Brief at 1), has filed a supplemental brief regarding the Letters of Credit Motion. JPM contends that, even if the bankruptcy court did not have the authority under § 105 to authorize Kmart to pay the prepetition claims of the issuers of the letters of credit, the court "properly allowed those payments [pursuant to § 361 of the Bankruptcy Code] on the basis that such payments constituted adequate protection for the Issuers' secured reimbursement claims under the Letters of Credit." (JPM Brief at 2.) According to JPM, the issuers had statutory liens in the documents and the proceeds thereof presented by the foreign vendors to obtain payment under the letters of credit, and the issuers were entitled to adequate protection of those liens under § 361 of the Code. [FN10]

FN10. Section 361 provides:
When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by--
1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

**\*5** In authorizing the payments to the issuers of the letters of credit, the bankruptcy court did not rely on § 361. We may affirm the bankruptcy court's decision on an alternative ground, but that ground must have been adequately presented in the bankruptcy court. *See Anderson v. U.S.F. Logistics (IMC), Inc.,* 274 F.3d 470, 478 (7th Cir.2001) (citing *Logan v. Caterpillar, Inc.,* 246 F.3d 912, 924 (7th Cir.2001)). Neither Kmart nor the issuers raised the adequate protection issue at the hearing on the Letters

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22282518 (N.D.Ill.), 51 Collier Bankr.Cas.2d 498
**(Cite as: 2003 WL 22282518 (N.D.Ill.))**

of Credit Motion. The bankruptcy court was not presented with evidence on whether the issuers held valid security interests nor whether they were entitled to adequate protection. There is an insufficient basis in the record to allow a finding that the payments to the issuers constituted adequate protection under § 361 of the Bankruptcy Code.

### CONCLUSION

For the foregoing reasons, the following orders of the bankruptcy court are reversed: (1) Order Under 11 U.S.C. § 105(a) Authorizing the Payment of Prepetition Claims of Certain Critical Trade Vendors; (2) Order Pursuant to 11 U.S.C. § § 105(a) and 363 Authorizing Payment of Prepetition Obligations Necessary to Obtain Imported Merchandise; (3) Order Pursuant to 11 U.S.C. § § 105(a) and 363 Authorizing the Debtors to Honor Reimbursement Obligations to Issuers of Pre-Petition Letters of Credit Issued for the Benefit of the Debtors' Foreign Vendors; and (4) Order Under 11 U.S.C. § 105(a) Authorizing the Payment of Prepetition Claims of Certain Liquor Vendors.

The case is remanded for further proceedings consistent with this opinion.

Not Reported in F.Supp.2d, 2003 WL 22282518 (N.D.Ill.), 51 Collier Bankr.Cas.2d 498

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



210 F.3d 361 (Table)
210 F.3d 361 (Table), 2000 WL 341913 (4th Cir.(W.Va.))
**Unpublished Disposition**
(Cite as: 210 F.3d 361, 2000 WL 341913 (4th Cir.(W.Va.)))

Page 1

**H**
NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.  Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
In re MOUNTAIN LAUREL RESOURCES
COMPANY, A Corporation, Debtor.
MINE MANAGEMENT, INCORPORATED; Lewis
R. Law, P laintiffs-Appellants,
v.
Roy V. WOLFE, III, Trustee-Appellee;
Federal Insurance Company; Fireman's Fund
Insurance Company; American Empire
Surplus Lines Insurance Company; Continental
Insurance Company; Twin City Fire
Insurance Company; First State Insurance Company;
Camden Fire Insurance
Association; Division of Environmental Protection of
the West Virginia
Department of Commerce, Labor and Environmental
Resources; Town of
Fayetteville; CSX Corporation; CSX Minerals,
Incorporated, CSX Transportation,
Incorporated; Transcontinental Insurance Company;
Fidelity and Casualty Company
of New York; Buckeye Union Insurance Company,
Parties In Interest-Appellees.
**No. 99-1876.**

Argued Jan. 27, 2000.
Decided April 3, 2000.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley. Robert C. Chambers, District Judge. (CA-99-180-5, BK-93-50398, AP-96-125).

Charles Edward Hurt, Lewis Law and Mine Management, Inc., Charleston, WV, for appellants.

Stephen L. Thompson, Barth, Thompson & George, Charleston, WV, for appellees.

Before NIEMEYER, Circuit Judge, HAMILTON, Senior Circuit Judge, and SMALKIN, United States

District Judge for the District of Maryland, sitting by designation.

OPINION

PER CURIAM.

**\*\*1** Mine Management, Inc. (MMI) and Lewis Law (Law) appeal from the district court's dismissal of their appeal as equitably moot from a bankruptcy court order. In this appeal, MMI and Law assert that the bankruptcy court lacked jurisdiction and authority to issue its order and that the district court erred in its finding of equitable mootness. For the reasons stated below, we hold that the bankruptcy court had jurisdiction and authority to issue its order and that the district court did not err in dismissing the case as equitably moot.

I

This appeal arises from a complex fifteen-year history of litigation concerning the environmental cleanup of a 241-acre site in Fayette County, West Virginia. Throughout the 1900s, the site, known as "Summerlee," was used for the dumping of refuse (by-products from coal processing). Prior to 1980, the site was owned by the New River Company (New River), whose name was later changed to Mountain Laurel Resources Company (Mountain Laurel). [FN1] New River was owned by Western Pocahontas Company, which was later purchased by the CSX Corporation and its subsidiaries (collectively the CSX entities). The dumping of refuse at Summerlee resulted in a refuse pile that was approximately 100 feet of "gob" spread over a substantial area of the site. (J.A. 179). Because of the nature of the refuse, as water percolated through the pile of gob, the water accumulated contaminants known as acid mine drainage (AMD).

> FN1. Because New River and Mountain Laurel are essentially the same company and represent the same interests, where appropriate this opinion refers to them collectively as Mountain Laurel.

In 1977, Law formed MMI to engage in various coal-related business activities. [FN2] As part of its activities, Mountain Laurel leased some surface

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 361 (Table)                                                                                       Page 2
210 F.3d 361 (Table), 2000 WL 341913 (4th Cir.(W.Va.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 361, 2000 WL 341913 (4th Cir.(W.Va.)))**

rights at Summerlee to MMI and Law who, in turn, assigned those rights to Princess Cindy Mining Company for the purpose of processing the gob, removing pond fines to blend with coal, and selling the coal refuse. In 1978, the State of West Virginia (the State) required Mountain Laurel to install a treatment plant to treat and mitigate the AMD.

FN2. Law is the sole shareholder of MMI.

On April 1, 1980, Mountain Laurel sold a portion of the surface rights of Summerlee to MMI. The sale included the preparation plant, a series of ponds, the gob pile, and a water treatment system . [FN3] At the time MMI purchased the site, the water treatment system was subject to a National Pollution Discharge Elimination System (NPDES) permit obtained by New River. [FN4] Despite repeated notice, however, neither MMI nor Law ever applied for an NPDES permit authorizing discharges into Wolf and Arbuckle Creeks. Due to MMI and Law's failure to operate the water treatment system effectively, AMD was discharged from the collection pond into Wolf Creek, or from the second settling pond into Arbuckle Creek, on at least sixteen occasions between March 1987 and November 15, 1991. MMI and Law were indicted, tried before a jury, and convicted of violating the Clean Water Act, 33 U.S.C.A. § 1319(c)(2). Law was sentenced to two years in prison and MMI and Law were fined $80,000 each; both convictions were upheld on appeal by this court in *United States v. Law,* 979 F.2d 977 (4th Cir.1992).

FN3. In the deed conveyed to MMI, a provision provided that MMI assumed "any and all liability, present and future, ... for all environmental and safety matters, including but not limited to, air pollution [and] water pollution ... arising out of the ownership or use of the property conveyed, which includes all possible future claims that may be asserted by ... [State and Federal agencies]." (J.A. 12-13).

FN4. The water treatment system was designed to reduce the AMD content of drainage from the gob pile. The system was comprised of a collection pond near Wolf Creek, a pump, and piping that channeled the collected water over a ridge and through a hopper, which dispensed soda ash briquettes to raise the pH of the water. Iron and manganese then precipitated out as the

water flowed through two settling ponds before its discharge into Arbuckle Creek.

**2 From 1984 to 1993, the State and the Town of Fayetteville, West Virginia (the Town) filed a series of civil suits in the Circuit Court of Fayette County (the state circuit court) against Mountain Laurel, the CSX entities, MMI, and Law seeking: (1) injunctive relief to compel abatement of water contamination caused by the gob pile and (2) damages arising from remedying the pollution. [FN5] In response to these suits, MMI and Law filed and served third-party complaints seeking indemnification from Mountain Laurel and the CSX entities. In addition to the indemnification claims, MMI and Law asserted claims of fraud against Mountain Laurel and the CSX entities for fraudulently conveying the Summerlee site which resulted in MMI incurring extensive liability and Law being imprisoned. [FN6] In 1995, the state circuit court entered a judgment in favor of the State against MMI and Law as to their liability. The State, however, did not pursue a damages determination because of the settlement discussions in this case.

FN5. The State's claim for damages was premised on its incurring $2,100,000 in costs to remediate the site by lessening the percolation of water through the gob pile and eliminating four ponds contaminated with AMD that discharged into Wolf Creek. In addition, the State and the Town sought prospective relief for the continuing costs of remediation.

FN6. MMI and Law claim that Mountain Laurel made false statements and engaged in other fraudulent conduct in order to prevent MMI and Law from discovering the pollution problems at Summerlee. MMI and Law's claims against the CSX entities are premised on the theory that the CSX entities are the alter ego of Mountain Laurel

In 1993, Mountain Laurel filed a Chapter 11 petition for bankruptcy protection. [FN7] At the time of the bankruptcy filing, Mountain Laurel was still a defendant in the state court litigation between the State, the Town, the CSX entities, MMI, and Law. Based on the state court litigation, the State, the Town, MMI, and Law filed proofs of claim against Mountain Laurel asserting rights to its bankruptcy estate. In response to those claims against the estate, the Trustee, in administering the bankruptcy estate,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 361 (Table)
210 F.3d 361 (Table), 2000 WL 341913 (4th Cir.(W.Va.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 361, 2000 WL 341913 (4th Cir.(W.Va.)))**

Page 3

initiated an adversary proceeding seeking a declaration of rights, under certain insurance policies, as to Mountain Laurel's coverage and its right to recover its defense costs in defending against the state court litigation. In the complaint, the Trustee alleged that: (1) the bankruptcy court had jurisdiction under 28 U.S.C.A. § § 157, 1334; and (2) the matter was a core proceeding under 28 U.S.C.A. § 157(b)(2)(A)-(B), (E), (O).

FN7. The bankruptcy was later converted to a Chapter 7 proceeding.

The State and the Town, together with MMI and Law, jointly moved to intervene in the adversary proceeding as plaintiffs against the insurers; the bankruptcy court granted that motion. As plaintiffs, the Trustee, the State, the Town, MMI, and Law sought to have the bankruptcy court determine the insurers' liability and each party's rights to the proceeds, if any, from the insurance policies. The insurers denied coverage based upon a variety of reasons.

Over the course of several months, the Trustee engaged in lengthy and complex negotiations in an effort to resolve the various disputes among the parties. Because of the inter-relationship between the adversary proceeding, the bankruptcy claims, and the state court litigation, it was necessary to involve numerous parties not parties to the bankruptcy proceeding. Although not involved in the bankruptcy case or in the adversary proceeding but involved as defendants in the state court litigation, the CSX entities voluntarily participated in the settlement discussions. Other parties, such as citizens groups of riparian landowners along Wolf Creek and representatives of the National Park Service and the Federal Office of Surface Mining were not actual parties to any of the court proceedings or to the settlement itself, but nevertheless participated in the settlement negotiations. Despite invitations by the Trustee and admonitions by the bankruptcy court to participate in settlement negotiations, MMI and Law refused to participate. After several months, the Trustee was able to fashion a proposed settlement and compromise that was acceptable to all parties except MMI and Law. MMI and Law refused to sign the settlement agreement.

**\*\*3** Under the terms of the proposed settlement, the insurers and the CSX entities were required to pay to the Environmental Claim Fund of the estate the total sum of $850,000. Of this amount the estate would

retain $100,000 for reimbursement of the fees and costs it expended in the state court litigation. These funds were also to be available for payment of other claims and administrative expenses of the estate. The remaining balance of $750,000 would be paid by the estate to the State and the Town in full satisfaction of their environmental claims against the estate, Law, MMI, and the CSX entities.

In return for receiving distributions from the estate, the State and the Town agreed to release MMI and Law from liability for the State's costs in remediating Summerlee and the Town's claim for damages to its water supply. In return for the insurers' payment of funds to the estate, the State, the Town, Mountain Laurel/the Trustee, MMI, and Law were to release the insurers from liability. Similarly, in return for the CSX entities' contribution to the estate, the CSX entities and Mountain Laurel were to be released "from any and all duties, liabilities, responsibilities, or obligations of every kind and nature, known or unknown, past, present and future related to the Summerlee Site under or arising out of Mountain Laurel's and the CSX Entities' interest or alleged interest in or arising out of the [insurance] Policies." (J.A. 201). Finally, the benefit the settlement agreement was to provide to MMI and Law was relief from the judgment already entered by the state circuit court in favor of the State for the costs of remediating Summerlee. In addition, MMI and Law would be released from similar claims of the Town and the indemnity claims of the estate, as well as indemnity, contribution, and subrogation claims of the insurers and the CSX entities who might be called upon to satisfy the claims of the estate and then look to MMI and Law.

To ensure that no one interfered with the settlement agreement, the bankruptcy court issued a permanent injunction prohibiting "any person from attempting to pursue any of the claims released by the terms of the Settlement Agreement or from interfering, in any respect, with the implementation of the terms of the Settlement Agreement." (J.A. 187). The injunction, therefore, enjoined MMI and Law from pursuing the state court litigation against Mountain Laurel and the CSX entities.

The parties participating in the settlement agreement moved the bankruptcy court to approve the settlement but MMI and Law objected. On January 28, 1999, the bankruptcy court conducted an evidentiary hearing on the motion and, on February 10, 1999, the bankruptcy court issued an order (the settlement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

order) approving the settlement agreement.

In response to MMI and Law's objections, the bankruptcy court concluded that "the settlement provides for a distribution to MMI and Law upon their Claim which exceeds that which they could be expected to receive from the Trustee from the assets of the estate upon a final distribution." (J.A. 185). With respect to MMI and Law's fraud claims against Mountain Laurel, the bankruptcy court determined that those claims were still viable but that MMI and Law would have to assert them against the estate in bankruptcy court if, at a later time, it was determined that there were funds available for distribution to general unsecured creditors. [FN8]

> FN8. The bankruptcy court's order does not make reference to the status of MMI and Law's fraud claim against the CSX entities. However, the court's interpretation of the settlement agreement as not affecting the viability of MMI and Law's fraud claims against Mountain Laurel appears to indicate that MMI and Law's fraud claims against the CSX entities may still be viable in the bankruptcy court.

**\*\*4** On February 12, 1999, MMI and Law filed a notice of appeal from the bankruptcy court's order. In response to MMI and Law's notice of appeal, on March 4, 1999, the State and the Town filed a motion to dismiss the appeal on the grounds of legal and equitable mootness. The State and the Town's motion to dismiss was originally filed with the United States Bankruptcy Court for the Southern District of West Virginia, but was forwarded later to the United States District Court for the Southern District of West Virginia on March 5, 1999.

On May 17, 1999, the district court held a hearing on the State and the Town's motion to dismiss the appeal on the grounds of legal and equitable mootness. On June 7, 1999, the district court issued an order granting the State and the Town's motion to dismiss, finding that MMI and Law's appeal to the district court was equitably moot. The district court concluded that reversing the settlement agreement and order on appeal would "be manifestly unjust to both the parties and the citizens who waited so long for the pollution in Wolfe [sic] Creek to be rectified." (J.A. 289). The district court focused on MMI and Law's failure to apply for a stay of the bankruptcy court's proceedings, which in turn permitted the bankruptcy court to allow distribution of the funds by

the Trustee. In addition, the district court concluded that if it reversed the portion of the settlement agreement releasing the CSX entities from any claims MMI and Law had against them, such a decision "undoubtedly would affect the substantial rights of the CSX entities by subjecting them to additional litigation," and that doing so would likely result in "unraveling the entire settlement agreement." (J.A. 288).

Finally, the district court looked to the public interest in abating the water pollution. The district court noted that, although the State had performed some land remediation of Summerlee, the settlement proceeds were needed to conduct water remediation. It further noted that the riparian landowners along Wolf Creek, and the citizens' drinking water from Wolf Creek, had already endured fifteen years of litigation waiting for a resolution. Based on this public interest, the CSX entities and the insurers' payment of the funds to the Trustee, the Trustee's disbursement of those funds to the State and the Town, and issuance of the various releases, the district court concluded that the appeal was equitably moot.

On June 17, 1999, MMI and Law noticed a timely appeal.

II

This court is presented with two issues: (1) whether the bankruptcy court had jurisdiction and authority to enjoin, by way of enforcement of the settlement agreement, MMI and Law from proceeding with their suit against Mountain Laurel and the CSX entities in state court; and (2) whether review of the merits of the settlement agreement is now equitably moot because the agreement has been consummated. We address these issues in turn.

A

MMI and Law argue that the bankruptcy court lacked jurisdiction and authority to enjoin their state court litigation against the CSX entities because: (1) the Trustee's adversary proceeding against the insurers was a non-core proceeding in which the bankruptcy court could only propose findings of fact and conclusions of law; and (2) the injunction effectively discharges MMI and Law's claims against a nondebtor third-party, *i.e.,* the CSX entities. We disagree.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 361 (Table)                                                                                      Page 5
210 F.3d 361 (Table), 2000 WL 341913 (4th Cir.(W.Va.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 361, 2000 WL 341913 (4th Cir.(W.Va.)))**

**\*5** The United States district courts possess original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C.A. § 1334(b) (West 1994). "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." *Id.* § 157(a); [FN9] *see United States v. Wilson,* 974 F.2d 514, 516 (4th Cir.1992). Once jurisdiction is established under § 1334 and a case has been referred to the bankruptcy court under § 157(a), the bankruptcy courts are granted authority to "*hear and determine* all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C.A. § 157(b)(1) (emphasis added); *see Wilson,* 974 F.2d at 516. With respect to non-core proceedings that are related to a case under Title 11, however, bankruptcy courts are limited to hearing the proceeding and submitting proposed findings of fact and conclusions of law to the district court for entry of a final order or judgment unless the parties consent otherwise. *See* 28 U.S.C.A. § 157(c)(1). In granting relief in cases properly before it, the bankruptcy court is authorized to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of Title 11. 11 U.S.C.A. § 105(a) (West 1993).

> FN9. The United States' bankruptcy laws are codified in Title 11 of the United States Code. *See* 11 U.S.C.A. § § 101-1330 (1994).

The proceeding at issue in this appeal is the Trustee's claim against Mountain Laurel's insurers for the Trustee's fees and costs in defending the estate against the claims resulting from the pollution problems at Summerlee. The State, the Town, MMI, and Law intervened in the Trustee's proceeding against the insurers as plaintiffs asserting, *inter alia:* (1) that their claims were so related to the claim raised by the Trustee that they form part of the same case or controversy; (2) that intervention was necessary to secure their ability to protect their respective interests; and (3) that the Trustee's claim was situated such that, disposition of it absent allowing intervention, would have impaired or impeded the State, the Town, MMI, and Law's ability to protect their interests. The State, the Town, MMI, and Law sought to have the bankruptcy court afford them relief by making the proceeds of the policies available to satisfy their claims against Mountain Laurel, which were the same claims these parties

asserted against Mountain Laurel in the state court litigation. It follows that the issues of what amount the insurers owed, which claimants were entitled to a portion of any proceeds awarded to the estate of Mountain Laurel, and the merits of the state court litigation were squarely before the bankruptcy court. Accordingly, the Trustee's claim against Mountain Laurel's insurers is, at a minimum, related to a Title 11 case, and therefore, jurisdiction was proper. *See* 28 U.S.C.A. § 1334(a); 1 *Collier on Bankruptcy* ¶ ¶ 3.01[4][c][ii]-[iv], at 3-23 to 3-29 (Matthew Bender 1999).

**\*6** With respect to the bankruptcy court's authority to hear and determine the Trustee's claims against Mountain Laurel's insurers, even if we accepted MMI and Law's argument that this proceeding was a non-core proceeding, it is clear that MMI and Law consented to the bankruptcy court's authority to determine the issues raised by the various claimants. *See Canal Corp. v. Finnman (In re Johnson),* 960 F.2d 396, 403 (4th Cir.1992) ("Under § 157(c)(2) a bankruptcy court may enter appropriate orders and judgments in non-core related matters where such matters are referred by the district court and it has the consent of all the parties." (footnote omitted)). By intervening in the Trustee's adversary proceeding against the insurers, MMI and Law, in effect, requested the bankruptcy court to determine the validity of their claims and their rights to indemnification from Mountain Laurel on the State's and the Town's claims against MMI and Law for remedying the pollution. *See In re Johnson,* 960 F.2d at 403 (holding that a party impliedly consents to entry of judgment by the bankruptcy court in a non-core proceeding where the party fails to object to the bankruptcy court's treatment of the proceeding as core); *see also M.A. Baheth & Co. v. Schott (In re M.A. Baheth Constr. Co.),* 118 F.3d 1082, 1084 (5th Cir.1997) ("Furthermore, by failing to object to the bankruptcy court's assumption of core jurisdiction, Baheth impliedly consented to the court's entry of final judgment."). A determination of the validity of MMI and Law's indemnification claims necessarily requires the bankruptcy court to evaluate the merits of all the parties' claims. Thus, the bankruptcy court had little choice but to exercise its authority over the entire state court litigation, including MMI and Law's alter ego claim against the CSX entities.

MMI and Law also argue that the bankruptcy court lacked the authority under 11 U.S.C.A. § 105(a) to enjoin their suit against the CSX entities because the CSX entities are nondebtor third-parties. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 361 (Table)                                                                    Page 6
210 F.3d 361 (Table), 2000 WL 341913 (4th Cir.(W.Va.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 361, 2000 WL 341913 (4th Cir.(W.Va.)))**

bankruptcy court, however, has authority to" ''enjoin parties other than the bankrupt' from commencing or continuing litigation." *A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.), 788 F.2d 994, 1002 (4th Cir.1986)*. *A.H. Robins* makes clear that a bankruptcy court has the authority under § 105(a) to enjoin suits against a third-party where the third-party could seek indemnification from the estate or where a judgment against the third-party may raise issues of collateral estoppel with respect to suits against the estate. *See id.* at 1005, 1008. In this case, both of these circumstances are present, and the bankruptcy court had authority to enjoin MMI and Law's claims against the parties to the settlement agreement.

B

Having determined that the bankruptcy court (1) had jurisdiction under 28 U.S.C.A. § 1334 over the Trustee's adversary proceeding against the insurers, (2) had the authority under 28 U.S.C.A. § 157 to determine the issues raised in the proceeding, and (3) had the authority under 11 U.S.C.A. § 105(a) to issue an injunction against alleged third-party nondebtors, we turn to the issue of whether MMI and Law's challenge to the merits of the bankruptcy court's settlement order is equitably moot. Upon review of the briefs and the record, and after consideration of oral arguments, we conclude that the district court correctly held that MMI and Law's appeal from the bankruptcy court's settlement order was equitably moot for the reasons stated in its opinion. *See Law v. Wolfe (In re Mountain Laurel Resources Co.),* Civ. A. No. 5:99-0180 (D.W.Va. June 9, 1999).

III

**7** For the reasons stated above, the judgment of the district court is affirmed.

*AFFIRMED.*

•MINE MANAGEMENT, INC. and Lewis R. Law, Appellants, v. Roy G. WOLFE, III, Trustee, Appellee, Federal Insurance Company; Fireman's Fund Insurance Company; American Surplus Lines Insurance Company; Continental Insurance Company; Twin City Fire Insurance Company; First State Insurance Company; Camden Fire Insurance Association; Division of Environmental Protection of the West Virginia Department of Commerce, Labor and Environmental Resources; Town of Fayetteville; CSX, 1999 WL 33615302 (Appellate Brief) (C.A.4

August 19, 1999), Brief of Appellants

•MINE MANAGEMENT, INCORPORATED; Lewis R. Law, Plaintiffs-Appellants, v. Roy v. WOLFE, III, Trustee-Appellee, Federal Insurance Company; Fireman's Fund Insurance Company; American Empire Surplus Lines Insurance Company; Continental Insurance Company; Twin City Fire Insurance Company; First State Insurance Company; Camden Fire Insurance Association; Division of Environmental Protection of the West Virginia Department of Commerce, Labor and Environmental, 1999 WL 33615304 (Appellate Brief) (C.A.4 September 20, 1999), Brief of Appellees

•MINE MANAGEMENT, INC. and Lewis R. Law, Appellants, v. Roy G. WOLFE, III, Trustee, Appellee, Federal Insurance Company; Fireman's Fund Insurance Company; American Surplus Lines Insurance Company; Continental Insurance Company; Twin City Fire Insurance Company; First State Insurance Company; Camden Fire Insurance Association; Division of Environmental Protection of the West Virginia Department of Commerce, Labor and Environmental Resources; Town of Fayetteville; CSX, 1999 WL 33615303 (Appellate Brief) (C.A.4 October 1, 1999), Reply Brief of Appellants

210 F.3d 361 (Table), 2000 WL 341913 (4th Cir.(W.Va.)) Unpublished Disposition

END OF DOCUMENT

# EXHIBIT C



Not Reported in F.Supp.2d                                                                     Page 1
Not Reported in F.Supp.2d, 2004 WL 1465760 (D.Del.)
**(Cite as: 2004 WL 1465760 (D.Del.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
In re: EXIDE TECHNOLOGIES, et al.
STAMFORD COMPUTER GROUP, INC.,
Appellant,
v.
EXIDE TECHNOLOGIES, Appellee.
**No. 02-11125 KJC, Civ.04-0056-SLR.**

June 25, 2004.

Laura Davis Jones, Pachulski, Stang, Ziehl, Young
& Jones, P.C., Wilmington, DE, for Debtor and
Appellee.

Theodore J. Tacconelli, Ferry, Joseph & Pearce,
P.A., Wilmington, DE, for Appellant.

Mark S. Kenney, U.S. Trustee, Wilmington, DE, pro
se.

MEMORANDUM ORDER

ROBINSON, J.

I. INTRODUCTION

**\*1** On January 23, 2004, appellant Stamford
Computer Group filed this appeal from a December
1, 2003 bankruptcy court order rejecting an
unexpired lease for computer equipment between
appellant and appellee Exide Technologies. (D.I.1)
This court has jurisdiction pursuant to 28 U.S.C. §
158(a).

Appellee has filed a motion to dismiss on the
grounds of equitable mootness. (D.I.8) Appellant
disputes the facts supporting appellee's motion to
dismiss and filed a cross motion to remand to the
bankruptcy court for further fact finding on appellee's
motion to dismiss. (D.I.13) Because the court finds
that equitable mootness is not applicable under the
facts alleged by appellee, the court will deny
appellee's motion to dismiss and deny appellant's
motion to remand as moot. The court also concludes
that the bankruptcy court's order should be affirmed
and the appeal denied.

II. BACKGROUND

On April 15, 2002, appellee, the debtor-in-
possession, filed a voluntary petition for relief under
Chapter 11 of the Bankruptcy Code. On October 23,
2003, appellee submitted a fourth amended joint plan
of reorganization for confirmation. The plan provided
for, among other things, the rejection of all executory
contracts and unexpired leases not otherwise
assumed. (D.I. 6 at 3)

On October 27, 2003, appellee filed a motion for an
order to reject an unexpired lease for computer
equipment, of which appellant was the lessor.
Appellant challenged the rejection of the lease on the
grounds that it was not in the estate's best interest.
(*Id.*)

An evidentiary hearing was held on November 24,
2003, at which time the bankruptcy court granted
appellee's motion to reject. Testimony was heard
from two witnesses, the chief restructuring officer for
appellee and a representative of appellant. The court
found that rejection of the unexpired lease was an
exercise of sound business judgment and in the best
interest of the estate. (D.I. 7 at 79-80) The order was
subsequently entered on December 1, 2003.

III. STANDARD OF REVIEW

In undertaking a review of the issues on appeal, the
court applies a clearly erroneous standard to the
bankruptcy court's findings of fact and a plenary
standard to that court's legal conclusions. *See Am.
Flint Glass Workers Union v. Anchor Resolution
Corp.,* 197 F.3d 76, 80 (3d Cir.1999). A finding of
fact is clearly erroneous "when although there is
evidence to support it, the reviewing court on the
entire evidence is left with the definite and firm
conviction that a mistake has been committed." *U.S.
v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525,
92 L.Ed. 746 (1948).

With mixed questions of law and fact, the court must
accept the bankruptcy court's "finding of historical or
narrative facts unless clearly erroneous, but exercises
'plenary review of the [bankruptcy] court's choice and
interpretation of legal precepts and its application of
those precepts to the historical facts." ' *Mellon Bank,
N.A. v. Metro Communications, Inc.,* 945 F.2d 635,
642 (3d Cir.1991) (citing *Universal Minerals, Inc. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1465760 (D.Del.)
**(Cite as: 2004 WL 1465760 (D.Del.))**

*C.A. Hughes & Co.,* 98 669 F.2d 98, 101-02 (3d Cir.1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. *In re Hechinger,* 298 F.3d 219, 224 (3d Cir.2002).

## IV. DISCUSSION

### A. Equitable Mootness

**\*2** The doctrine of equitable mootness directs that an appeal from a bankruptcy court order may be dismissed as moot, even where the court has jurisdiction and relief can be granted, if the implementation of that relief would be inequitable under the circumstances. *See In re PWS Holding Corp.,* 228 F.3d 224, 236 (3d Cir.2000). The Third Circuit has enumerated five nonexclusive factors to be considered in determining whether the merits of a bankruptcy appeal should be reached:

(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan and (5) the public policy of affording finality to bankruptcy judgments.

*In re Continental Airlines,* 91 F.3d 553, 560 (3d Cir.1996). Of these considerations the most crucial for the court is whether the reorganization plan has been substantially consummated. *In re Zenith Elec. Corp.,* 329 F.3d 338, 343-44 (3d Cir.2003). For a plan to be substantially consummated, it requires more than that the elements of the plan have been implemented; rather "granting of the appeal [must] unravel the plan, upon which numerous parties were at that point in reliance." *Id.* at 344.

Appellee has failed to allege facts to support this first factor. Appellee contends that the rejection order has been substantially consummated. (D.I. 9 at 7) This is not, however, the central consideration with respect to equitable mootness under Third Circuit precedence. It must be shown that the plan has been substantially consummated, which appellee has not demonstrated. Although appellant did not seek a stay of the rejection order it has appealed, that alone is not dispositive of equitable mootness. Further, appellant filed notice of its intent to appeal on December 9, 2003; therefore, appellee was well aware that appellant would challenge the bankruptcy court's order and was on notice (as were other creditors) that the bankruptcy court's rejection order may not be final.

Consequently, having found that appellee has failed to demonstrate that the plan has been substantially consummated such that reversal of the bankruptcy court order would be inequitable, the court finds that the doctrine of equitable mootness does not bar the present appeal.

### B. The Rejection Order

Appellant contends that the bankruptcy court's factual finding that appellee exercised sounds business judgment in rejecting the lease is clearly erroneous. Appellant contends that the record before the bankruptcy court was insufficient to show appellee exercised sound business judgment and that the record suggests that appellee's judgment was motivated by whim. (D.I.6)

The bankruptcy court heard evidence that the chief restructuring officer had sought advice from appellee's information technology department as to whether retaining the leased equipment was consistent with the appellee's needs. (D.I. 7, app. 1 at 53-62) The IT department reported to her that it was not. (*Id.* at 54) The chief restructuring officer also sought advice from appellee's accounting department to determine what the cost of assuming the lease would in fact be. (*Id.* at 61) Further, the chief restructuring officer testified that discussions occurred between appellee and appellant in an effort to reach a settlement. (*Id.* at 54, 61) Appellee determined, however, that the cost of assuming the lease outweighed the benefits to the estate of rejecting the lease and obtaining new equipment and software licenses from other sources. (*Id.* at 54) The chief restructuring officer testified that she did not have personal knowledge of all the facts upon which this conclusion was formed, but that she did rely upon summaries and recommendations of appellee's employees. (*Id.* at 54, 56, 59, 61, 62) While appellant contends that it would have been more cost effective for appellee to have assumed the unexpired lease, appellee's judgment to the contrary was not unreasonable. Further, the fact that the chief restructuring officer relied on summaries and recommendations is not evidence of whim, but instead evidence of sound business practices. Consequently, the court finds that the bankruptcy court's finding that appellee exercised sound business judgment was not clearly erroneous.

### V. CONCLUSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1465760 (D.Del.)
**(Cite as: 2004 WL 1465760 (D.Del.))**

Page 3

**\*3** At Wilmington this 25th day of June, 2004, having reviewed the appeal in the above captioned case, and the motions related thereto;

IT IS ORDERED that:

1. Appellee's motion to dismiss on the grounds of equitable mootness is denied. (D.I.8)

2. Appellant's motion to remand is denied as moot. (D.I.13)

3. The appeal is denied and the December 1, 2003 bankruptcy court order rejecting the unexpired lease is affirmed.

Not Reported in F.Supp.2d, 2004 WL 1465760 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



Not Reported in F.Supp.2d, 2002 WL 31681538 (S.D.W.Va.)
**(Cite as: 2002 WL 31681538 (S.D.W.Va.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. West Virginia.
In re: SHAWNEE HILLS, INC. Debtor.
THE HUNTINGTON NATIONAL BANK,
Appellant,
v.
SHAWNEE HILLS, INC., Appellee.
**No. Civ.A. 2:02-0872.**

Nov. 19, 2002.

MEMORANDUM OPINION AND ORDER

GOODWIN, J.

*1 Pending before the court is a motion by Appellee H. Lynden Graham Jr., trustee of the bankruptcy estate of Shawnee Hills, Inc., to dismiss the appeal filed by Appellant Huntington National Bank. Graham argues that the appeal should be dismissed because it is both legally and equitably moot. After a hearing and full briefing from the parties, the court GRANTS Graham's motion to dismiss [Docket 5] and DISMISSES the appeal as equitably moot.

I. Background

Shawnee Hills, Inc., was a non-profit corporation that operated mental health, mental retardation, and alcohol counseling and rehabilitation facilities throughout West Virginia. Shawnee Hills employed approximately eight hundred employees to serve between ten to twelve thousand patients on a regular basis. On May 1, 2002, Shawnee Hills filed for Chapter 7 bankruptcy. H. Lynden Graham was appointed as trustee.

On May 2, 2002, counsel for the debtor, Shawnee Hills, and counsel for the trustee, Graham, filed a motion to compel Huntington National Bank (Huntington) and City National Bank (City) to honor payroll checks drawn before the filing of Shawnee Hill's bankruptcy. [FN1] After an emergency telephone hearing held that afternoon on the motion, the Bankruptcy Court granted the debtor's and trustee's motion over Huntington's objections. The next day, on May 3, 2002, Huntington filed a motion

for reconsideration of that order. The Bankruptcy Court held a hearing on May 15, 2002 and denied the motion for reconsideration. The Bankruptcy Court found that Huntington appeared to be fully secured by other assets, including real estate, and that it appeared that Huntington did not have priority in the cash accounts over the Shawnee Hills payroll check holders.

> FN1. Specifically, the emergency motion sought to: (1) disgorge monies deposited with Huntington by the debtor that had been set off by Huntington and applied to the debtor's obligations to Huntington; (2) compel Huntington to require City to unfreeze an account in which Huntington claimed a pre-petition security interest; and (3) require both Huntington and City to honor the paychecks delivered to Shawnee Hills employees in the weeks before the filing date, notwithstanding Huntington's claim of a perfected pre-petition security interest.

Huntington now appeals. On appeal, Huntington argues that the Bankruptcy Court deprived it of its property without due process of law and erred in its application of the Uniform Commercial Code and the Bankruptcy Code. Graham, the trustee, filed a motion to dismiss the appeal, arguing that the case is moot both as a matter of constitutional law and as a matter of equity. This court held a hearing on the motion to dismiss on August 19, 2002.

II. Analysis

Graham argues that the case is moot both as a matter of constitutional law and as a matter of equity. First, Graham argues that events during the pendency of the appeal have rendered it impossible for the court to provide relief to the Appellant, and that as such, no Article III case or controversy now exists. *See Cent. States, Southeast and Southwest Areas Pension Fund v. Cent. Transp., Inc.,* 841 F.2d 92, 95-96 (4th Cir.1988) *(citing Mills v. Green,* 159 U.S. 651, 653 (1895)). Second, Graham invokes the doctrine of equitable mootness, arguing that the rights of the parties as well as parties not before the court have been so modified that effective judicial relief is no longer practically available. *See Mac Panel Co. v. Virginia Panel Corp.,* 283 F.3d 622, 625 (4th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2002 WL 31681538 (S.D.W.Va.)
(Cite as: 2002 WL 31681538 (S.D.W.Va.))

Cir.2002). "Unlike the constitutional doctrine of mootness, which bars consideration of appeals because no Article III case or controversy remains, the doctrine of equitable mootness is a pragmatic principle, grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *Id.* Because the court concludes that the appeal is moot as a matter of equity, the court will not address Graham's constitutional argument.

*2 The doctrine of equitable mootness is particularly suited to bankruptcy proceedings, both because of "the equitable nature of bankruptcy judgments," *id.,* and because bankruptcy judgments frequently result in complex business reorganizations or distributions of assets that would be difficult for an appellate court to unravel. The doctrine of equitable mootness is a flexible concept that cannot be captured in a set of rigid rules. Rather, "a court must determine whether judicial relief on appeal can, as a pragmatic matter, be granted." *Id.* In determining whether to apply the doctrine of equitable mootness, the court considers factors such as: "(1) whether the appellant sought and obtained a stay; (2) whether the reorganization plan or other equitable relief ordered has been substantially consummated; (3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and (4) the extent to which the relief requested on appeal would affect the interests of third parties." *Id.* This court now turns to these factors as well as any others that might affect the balance of equities given the particular facts and circumstances of this case.

The first enumerated factor under *Mac Panel* is "(1) whether the appellant sought and obtained a stay." *Id.* Huntington concedes that it failed to seek a stay either in the bankruptcy court or in the district court. *See* Fed. R. Bank. P. 8005 (West 2002). It argues, however, that an order regarding the use of cash collateral may be reversed or modified on appeal without the need for a stay. Huntington reaches this conclusion by drawing a negative inference from 11 U.S.C. § 363(m), a provision of the Bankruptcy Code providing that appellate reversal of a sale or lease of property does not affect the validity of that sale or lease absent a stay. Huntington argues that because § 363 contains no similar provision with regard to the disposition of cash collateral, a stay is neither needed nor relevant in a case involving cash collateral. Huntington's negative inference is a weak one. Even if the Bankruptcy Code supports the

proposition that a district court *could* reverse a prior distribution of cash collateral, the question remains whether such a reversal is practicable or desirable as a matter of equity. Huntington failed to seek a stay of the Bankruptcy Court's order to distribute the cash collateral, and this factor weighs against this court's appellate reconsideration of that order.

The second enumerated factor is "whether the reorganization plan or other equitable relief ordered has been substantially consummated ." *Mac Panel,* 283 F.3d at 625. In this case, Huntington makes much of the fact that the Shawnee Hills bankruptcy proceeding is still underway and that the order on appeal is not a comprehensive reorganization plan, but rather an order issued very early in the bankruptcy proceedings simply requiring Huntington to honor employee paychecks. This fact, Huntington argues, renders factor two irrelevant to this appeal. Many cases discussing the doctrine of equitable mootness do involve reorganization plans; nonetheless, this factor also applies to an order of "other equitable relief" that "has been substantially consummated." *Id.* If there is any distinction between simple orders early in the bankruptcy proceedings and final comprehensive reorganization plans, it is that a simpler, preliminary order may be easier to unravel than a comprehensive reorganization plan. *See* In re Continental Airlines, 91 F.3d 553, 560-61 (3d Cir.1996) (en banc). Whether that is true in this case remains to be seen and will be discussed below under factors three and four. But regardless of whether this court can unravel the order, factor two simply asks the court to determine whether the order has been substantially consummated. In that regard, Huntington argues that while the employee paychecks have been presented for payment, over $300,000 remains in the City account on which Shawnee Hills payroll checks are drawn. Huntington argues that given the remaining funds, the Bankruptcy Court's order has not been "substantially consummated." But the parties agree that it is very unlikely that any employee paychecks remain outstanding on that account. The trustee's affidavit filed in support of this motion to dismiss states that as of July 8, 2002, approximately $498,136.78 in payroll checks had been honored by City and that approximately $15,000 in payroll checks had been honored by Huntington. Accordingly, the evidence presented indicates that the Bankruptcy Court's order for City and Huntington to honor employee payroll checks has been substantially consummated.

*3 The third enumerated factor is "the extent to which the relief requested on appeal would affect the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31681538 (S.D.W.Va.)
**(Cite as: 2002 WL 31681538 (S.D.W.Va.))**

success of the reorganization plan or other equitable relief granted." *Mac Panel, 283* F.3d at 625. In this case, there is no comprehensive reorganization plan the success of which would be imperilled by the reversal of the Bankruptcy Court's order. Instead, given the facts of this case, the court must determine whether the relief requested on appeal--reversal of the Bankruptcy Court's order--could successfully undo the distribution of the cash collateral, which has already been substantially consummated. Huntington acknowledges that putting into effect a reversal of the Bankrupcty Court's order would involve disgorging funds from the employees who have cashed their payroll checks. Huntington argues that such disgorgement could be accomplished through various statutory mechanisms. The question of whether disgorgement *could* be accomplished would be relevant to the issue of constitutional mootness. But as to the issue of equitable mootness, the question is instead whether disgorgement is practicable. *See id.* In this case, the cash collateral at issue has been distributed to many, probably hundreds, of Shawnee Hills employees. Tracking down these many employees, determining whether they are entitled to keep the funds as innocent transferees, and, if not, determining whether they are able to repay the funds, would be an impracticable, if not literally impossible, venture.

The difficulty of recovering monies already paid out to hundreds of employees also brings the court to the final enumerated factor, "the extent to which the relief requested on appeal would affect the interests of third parties." *Id.* While the Shawnee Hills employees are creditors of Shawnee Hills (or at least were when they held uncashed payroll checks), they did not file the motion in question and werenot represented before the Bankruptcy Court or on appeal. Disgorgement of paychecks long since cashed would clearly impose a significant hardship on them. *See Manges v. Seattle-First Nat'l Bank (In re Manges), 29* F.3d 1034, 1043 (5th Cir.1994). Most people promptly spend much or all of their regular paychecks on living expenses. Because the Bankruptcy Court's order involved distributing funds to cover regular employee paychecks, a prompt stay was all the more critical in this case, and Huntington's failure to seek such a stay is all the more damaging to its case on appeal.

Finally, Huntington argues that the Bankruptcy Court's emergency order, issued with only a few hours of notice, deprived it of its property without due process of law. While this argument goes in part to the merits of the order on appeal, it is also potentially relevant to the issue of equitable mootness. In the context of preliminary injunctions, for example, courts consider the likelihood of success on the merits as part of the equitable determination of whether an injunction is warranted. *See aaiPharma Inc. v. Thompson,* 296 F.3d 227, 234 (4th Cir.2002). While likelihood of success on the merits is not typically mentioned as a factor in evaluating equitable mootness, a court in equity must always consider the possibility of serious injustice. *See Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.,* 363 U.S. 528, 532 (1960) (courts should exercise equitable powers in a manner that "ensure[s] that ... equitable remedies will not become the engines of injustice."). If it were true that the Bankruptcy Court had acted with such haste as to deprive Huntington of its property without a meaningful opportunity to present evidence and arguments, then the difficulty of fashioning relief from the Bankruptcy Court's order would not stand in the way of this court's ability to correct the resulting injustice. However, Huntington presents an incomplete picture of the procedural history of this case when it focuses entirely on the admittedly hasty emergency hearing and order. After that order, Huntington filed a motion for reconsideration. In response, the Bankruptcy Court held a hearing twelve days later, at which Huntington was able, with adequate time to fully prepare its case, to present evidence and arguments in support of its position. To the extent that adequate process was lacking from the emergency hearing and order, Huntington received the process it was due in the hearing on its motion to reconsider. *See Houston v. Holder (In re Omni Video, Inc.),* 60 F.3d 230, 233 (5th Cir.1995). Finally, Huntington had the procedural opportunity to seek a stay, an option it declined to pursue. Huntington disputes the correctness of the Bankruptcy Court's decision after this hearing, but the Due Process Clause is concerned with adequate process, not the merits of the eventual decision. Accordingly, Huntington has failed to show that it was deprived of property without due process of law.

*4 In sum, the equities favor a finding of mootness in this case. Huntington was given an adequate opportunity to present its case to the Bankruptcy Court. The resulting order, which Huntington did not attempt to stay, has been substantially consummated. Attempting to grant Huntington relief at this time would be impractical and would impose significant hardship on hundreds of employees who cashed their regular paychecks months ago and who are not parties to this appeal. Therefore, this court concludes that Huntington's appeal of the Bankruptcy Court's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31681538 (S.D.W.Va.)
**(Cite as: 2002 WL 31681538 (S.D.W.Va.))**

Page 4

order is equitably moot.

 III. Conclusion.

 For the foregoing reasons, the court GRANTS Appellee Graham's motion to dismiss and ORDERS that Huntington's appeal be DISMISSED as moot.

 The court DIRECTS the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

 Not Reported in F.Supp.2d, 2002 WL 31681538 (S.D.W.Va.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NELLSON NUTRACEUTICAL, INC., *et al.*,    Debtors. | : | Case No. 06-10072 (CSS) |
| | : | Jointly Administered |
| | : | |
| _____ | : | |
| | : | |
| UNITED STATES TRUSTEE and OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | : | Civil Action Nos. 06-00520 (GMS) and 06-00521 (GMS) |
| | : | |
| Appellants, | : | |
| | : | |
| v. | : | |
| | : | |
| NELLSON NUTRACEUTICAL, INC., *et al.*, | : | |
| | : | |
| Appellees. | : | |
| _____ | : | |

## CERTIFICATE OF SERVICE

I, Kimberly E. C. Lawson, Esquire, do hereby certify that, on the 30th day of June 2007, I caused a true and correct copy of the foregoing *Appendix of Unreported Decisions To The Answering Brief Of The Official Committee Of Unsecured Creditors To Appellees' Motion To Dismiss Appeal On Mootness Grounds* be served upon the addressees on the attached service list in the manner indicated.

/s/ Kimberly E. C. Lawson
Kimberly E. C. Lawson, Esq. (No. 3966)

**NELLSON NUTRACEUTICAL, INC.**
MIP Appeal Service List

**VIA FIRST CLASS MAIL**
Suzzanne Uhland, Esquire
O'Melveny & Myers LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA  94111-3305

**VIA HAND DELIVERY**
William K Harrington, Esquire
Joseph J. McMahon, Jr., Esquire
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Suite 2207
Lockbox 35
Wilmington, DE  19801

**VIA HAND DELIVERY**
Richard W. Riley, Esquire
Duane Morris LLP
1100 North Market St., Suite 1200
Wilmington, DE  19801

**VIA HAND DELIVERY**
Robert S. Brady, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

**VIA HAND DELIVERY**
J. Richard Tucker, Esquire
Maron Marvel Bradley & Anderson, P.A.
1201 N. Market Street, Suite 900
Wilmington, DE 19801

**VIA HAND DELIVERY**
Laura Davis Jones, Esquire
Richard M. Pachulski, Esquire
Brad R. Godshall, Esquire
Maxim B. Litvak, Esquire
Rachel Lowy Werkheiser, Esquire
Pachulski, Stang, Ziehl, Young, Jones
   & Weintraub LLP
919 North Market Street, 17th Floor
Wilmington, DE  19801

**VIA HAND DELIVERY**
Mark D. Collins, Esquire
Richards Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE  19801

**VIA FIRST CLASS MAIL**
Gregory A. Bray, Esquire
Thomas R. Kreller, Esquire
Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, CA  90017

**VIA FIRST CLASS MAIL**
Fred Hodara, Esquire
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, NY 10022

**VIA FIRST CLASS MAIL**
John P. Sheahan, Esquire
United States Department of Justice
Executive Office for United States Trustees
20 Massachusetts Avenue, N.W.
Washington, DC 20530